Monica J. Tranel
TRANEL LAW FIRM, P.C.
401 Washington Street
Missoula, MT  59802
(406) 926-2662
*mtranel@tranelfirm.com*

*Attorneys for Plaintiffs Susan Webber and Jonathan St. Goddard*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| Susan Webber and Jonathan St. Goddard, | Cause No. 4:25-cv-00026-JTJ |
| Plaintiffs, | |
| vs. | **BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION** |
| U.S. DEPARTMENT OF HOMELAND SECURITY, THE UNITED STATES OF AMERICA, and, in her official capacity, KRISTI NOEM, | |
| | **HEARING RESPECTFULLY REQUESTED** |
| Defendants. | |

## BRIEF IN SUPPORT OF MOTION FOR
## PRELIMINARY AND PERMANENT INJUNCTION

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ...........................................................................................................1

BACKGROUND AND FACTS .......................................................................................1

    A.  The Plaintiffs history on the borderlands.................................................................1

    B.  The Executive Orders and Proclamations ...............................................................3

    C.  The Orders are already causing harm ......................................................................6

    D.  The Executive Orders and Proclamations are pretext for a trade war ....................9

LEGAL STANDARD AND REVIEWABILITY .............................................................9

ARGUMENT ..................................................................................................................11

    A.  The plaintiffs are likely to prevail on the merits...................................................11

        1.  The Executive Orders exceed Constitutional authority ...................................11

        2.  The Orders exceed statutory authority .............................................................13

        3.  The Orders violate the Jay Treaty ....................................................................15

        4.  The Orders violate due process and are impermissibly vague..........................17

    B.  Irreparable harm from the tariffs...........................................................................18

    C.  Equities and public interest favor an injunction ....................................................18

CONCLUSION...............................................................................................................19

CERTIFICATE OF SERVICE .......................................................................................21

CERTIFICATE OF COMPLIANCE...............................................................................22

# **TABLE OF AUTHORITIES**

## **CASES**

*Aamer v. Obama*,
    742 F.3d 1023, 1038 (D.C. Cir. 2014) ............................................................10

*Akins v. Unites States*
    CCP 76-12, 1977...............................................................................................17

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127, 1135 (9th Cir. 2011) ...............................................................10

*Am. Foreign Serv. Ass'n v. Trump*,
    2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025) ...............................................18

*Assurance Wireless USA, L.P. v. Reynolds*,
    100 F.4th 1024, 1031 (9th Cir. 2024) ..............................................................10

*Banco San Juan Int'l, Inc. v. Federal Reserve Bank of New York*,
    700 F. Supp. 3d 86, 92 (S.D.N.Y. 2023). ........................................................10

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ..........................................................................19

*CASA, Inc. v. Trump*,
    2025 WL 408636, at *1, *4 (D. Md. Feb. 5, 2025) ...........................................9

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174, 218 (D.D.C. 2020)........................................................18

*Doctors for Am. v. Off. Of Pers. Mgmt.*,
    2025 WL 452707, at *10 (D.D.C. Feb. 11, 2025) ..............................................9

*Doe v. McHenry*
    1:25- cv-00286, Dkt. 44 (D.D.C. Feb. 18, 2025)...............................................9

*Haaland v. Brackeen*,
    143 S.Ct. 1609, 1627 (2023 ......................................................................12, 15

*Harris v. Bessent*,
    2025 WL 521027, at *2 (D.D.C. Feb. 18, 2025) ..............................................10

*Herrera v. Wyoming*,
    139 S.Ct. 1686 (2019)......................................................................................16

*Industrial Union Department v. American Petroleum Institute Marshall v. American Petroleum Institute*,
    448 U.S. 607, 674 (1980) ................................................................................13

*Jones v. Trump*,
    1:25-cv-00401, Dkt. 28 (D.D.C. Feb. 24, 2025 ...................................................9

*Lone Wolf v. Hitchcock*,
    187 U.S. 553, 566–568, 23 S.Ct. 216, 47 L.Ed. 299 (1903)................................12

*McGirt v. Oklahoma*,
    140 S.Ct. 2452, 207 L.Ed.2d 985 (2020), .........................................................12

*Menominee Tribe v. United States*,
    391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968 ..................................16

*Minnesota v Chippewa Indians*,
    526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999)..............................15, 16

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999)....................................16

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803, 807-08 (2003) .............................................................................9

*N. Rockies Reg Ctr. v. Jaddou*,
    CV 24-99-M-DWM (D. Mont.  2024) ................................................................10

*Open Cmties. Alliance v. Carson*,
    286 F. Supp. 3d 148, 179 (D.D.C. 2017) ..........................................................18

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
    152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016). ......................................................10

*Rodriguez v. Robbins*,
    715 F.3d 1127, 1145 (9th Cir. 2013). ...............................................................19

*Saline Parents v. Garland*,
    88 F.4th 298, 306 (D.C. Cir. 2023).....................................................................9

*Seila Law LLC v. CFPB*,
    591 U.S. 197, 223 (2020)..................................................................................11

*Textile Unlimited, Inc. v. A..BMH & Co.*,
    240 F.3d 781, 786 (9th Cir. 2001) .....................................................................10

*Trump v. New York*,
592 U.S. 125, 131 (2020)...................................................................................9

*U.S. v. Michigan*,
    471 F. Supp. 192 (1979) ................................................................................16

*United States v. Williams*,
    553 U.S. 285, 304 (2008)...............................................................................17

*Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L.Ed. 253 (1825) ................................11

*West Virginia v. EPA*, 597 U.S. 697, 737 (2022)....................................................11, 14

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7, 24 (2008).......................................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579, 610-11, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)..........................1, 12

## **OTHER AUTHORITIES**

Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350)  ......................................11

Jay Treaty...............................................................................................................15

R. Jackson, The Struggle for Judicial Supremacy 48-123 .......................................13

March 2, 1799 Tariff Act, Ch. 22, Sections 104, 105, 5th Congress, p. 702............................17

Treaty of Ghent.......................................................................................................16

## I.    INTRODUCTION

Plaintiffs Susan Webber and Jonathan St. Goddard ask the Court to enjoin: Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended; Section 14 of Proclamations 10896 and 10895; and, Sections 2, 3(a), (b), (c), (d), (e) and (f), Section 4 (a), (b), (c), and (d) of Executive Order on Reciprocal Tariffs issued April 2, 2025. The Orders are collectively referred to as the Canada Orders.

The Canada Orders are invalid in their entirety, and this Court should enjoin them for two reasons:

*First*, the Orders exceed the President's constitutional and statutory authority and violate the separation of powers. Use of the International Emergency Economic Powers Act of 1977 (IEEPA) to have a full on trade war with universal tariffs is an unconstitutional attempt by the executive branch to regulate commerce.

*Second*, the Orders violate Native American trade rights recognized by the Jay Treaty of 1794 and exercised continuously from prior to the creation of the border at the 49th parallel through the present day.

Plaintiffs have suffered an injury in fact from the tariffs, and their injury will be redressed by the Court's favorable decision on the Plaintiffs' request for an injunction. *Youngstown v. Ohio*[1] sets out the bedrock constitutional principle that commerce lies exclusively with Congress.[2]

Plaintiffs seek immediate injunction of the Canada Orders. Plaintiffs ask that the Court set a hearing on this motion at its earliest possible time, and enjoin the Canada Orders.

---

[1] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)
[2] *Youngstown, id.,* Also, *Indigenous Envtl. Network v. Trump*, 428 F.Supp.3d 296 (D. Mont. 2019) (cross-border transportation of crude oil through a pipeline constitutes a form of foreign commerce).

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**                    **1**

## II.    BACKGROUND AND FACTS

### A.  The Plaintiffs history on the borderlands

Plaintiffs are members of the Blackfeet Tribe, which has historic homelands from the Yellowstone River in Montana north to the North Saskatchewan River in Canada.[3] The Confederated Salish and Kootenai Tribes, made up of three tribes, the Bitterroot Salish, Upper Pend d'Oreille, and the Kootenai, are part of the Ktunaxa Nation and have traditional homelands across the border with Canada. They have traditionally crossed the border at Roosville crossing, a practice that continues. Native Americans from at least a dozen tribal groups have historical homelands that cross what is now the Montana -  Canada border.[4]

The Kainai, Piikani and Siksika people lived on the northwestern plains for more than a millennium before the Canada – U.S. border was established. "[T]he Blackfoot used the northwest plains' unique geography to create one of the most vibrant and lasting Indigenous homelands in North America."[5]

Through the 19th century the Blackfeet had significant leverage in negotiations with Canadian traders on the North Saskatchewan River and with the Americans in commerce.[6] The Blackfoot people have used their unique location on the borderlands to their strategic and economic advantage through the 18th and 19th centuries, and continue to move through their historic homelands today as if there were no border on the 49th parallel.

Although divided by an international border, tribal members consider themselves one community. The Blackfeet Confederacy crosses the border and encompasses Tribes recognized

---

[3] Hall Declaration, see also <u>Beneath the Backbone of the World: Blackfoot People and the North American Borderlands</u> (2020).
[4] Richard White, <u>It's Your Misfortune and None of My Own</u>, See Ch. 2, *Empires and Indians*, p. 26, and Ch. 4, *The Federal Government and the Indians*, p. 110, map of tribes in Montana circa. 1880.
[5] Ryan Hall, <u>Beneath the Backbone of the World, Blackfoot People and the North American Borderlands</u> (1720-1877), p. 3.
[6] Hall, *id*., <u>Beneath the Backbone of the World</u> pp. 102-105.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**         **2**

by both Canada and America. Plaintiff Jonathan St. Goddard has relatives who are part of the Siksika Nation.[7]

Through the remainder of the 19th century the reserved lands of the Tribes continued to be diminished. None of the orders or agreements changed the northern border or the transnational interaction of the Tribes, nor did the exemption from tariffs change through these land reduction orders. The treaties did not address commerce or limit the Tribe's rights to cross the border and interact and trade with tribes to the north; the tariff laws explicitly retained passage and commerce rights. No Treaty has abrogated the rights conferred by the Jay Treaty, reaffirmed by the Treaty of Ghent.

In 2014, Tribes from Montana joined other First Nations in signing the Iinii Treaty or Buffalo Treaty. The Treaty recognizes and revitalizes the Tribes relationship with the buffalo.[8] In February of 2025, Mosquito, Grizzly Bear's Head, Lean Man First Nations in Saskatchewan received 11 bison from the Fort Peck Assiniboine and Sioux Tribes in Montana.

Today, Montana tribes and tribal members trade and do business across the border. They operate Indigenous-owned businesses in construction, energy, tourism, ag and management. Plaintiffs utilize cross-border relationships and trade and have done so for years. They are directly harmed by the unpredictability and increased costs imposed by the tariffs.

### B.    The Executive Orders and Proclamations

The Canada Orders declare authority to act under: the Constitution; the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*) (IEEPA); the National Emergencies Act (50 U.S.C. 1601 *et seq*) (NEA); section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483); and section 301 of title 3.

---

[7] Declaration of St. Goddard.
[8] https://www.buffalotreaty.com/treaty, Purpose and Objective of the Treaty

Proclamations 10896 and 10895 declare authority to act under United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

The IEEPA does not include the power to "tariff" or to "tax." The powers enumerated in the statute are extensive and specific. Omission of tariffs is significant given how clearly Congress referenced tariff authorities in other trade statutes. The IEEPA has been the basis for over 60 Executive Orders. It has never been used to impose tariffs.

Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862), sets out a process that begins with an investigation that is initiated by request from agency heads or the Secretary of Commerce's own motion.[9] There are strict timelines that apply to the process, after which recommendations are presented to the President. If the findings are affirmative then the President may accept them and implement the recommended action, and then inform Congress.

Executive Order 14193 states that the U.S. Customs and Border protection (CBP) has seized, comparatively, much less fentanyl from Canada than from Mexico last year. But the Order imposes universal tariffs in the same way on both countries.

Executive Order 14193 declares that the failure of Canada "to do more to arrest, seize, detain, or otherwise intercept DTOs [Designated Global Terrorist], other drug and human traffickers, criminals at large, and drugs" constitutes an unusual and extraordinary threat.[10]

The "Fact Sheet" accompanying Executive Order 14193 includes Canada only in the first two bullets under "Addressing an Emergency Situation" that encompasses Canada, Mexico and China without differentiating among the countries.[11]

---

[9] 19 U.S.C. 162(b)(1)(A).
[10] See https://international.canada.ca/en/global-affairs/services/trade/tariffs-regulations/harmonized-system-codes (last visited April 3, 2025).
[11] https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-imposes-tariffs-on-imports-from-canada-mexico-and-china/ (last visited April 3, 2025).

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**          **4**

The second section of the "Fact Sheet" states that "tariffs are a powerful, proven source of leverage for protecting the national interest." Under the third section, the "Fact Sheet asserts that the "problem of illegal aliens and drug" is not confined to the southern border – "encounters at the northern border with Canada are rising as well." The Fact Sheet does not identify apprehensions at the northern border.

The fourth and final section of the "Fact Sheet" asserts that the tariffs are in line with a promise made in November of 2024 to charge a 25% tariff on ALL products coming into the U.S. This section discusses "threats of tariffs" and "unreasonable behavior" as a basis to ensure that "U.S. trade policy serves the national interest."

The tariffs have been paused, reinstated, partially paused, then put back on. No public comment or process has been involved. No mention is made as to consultation with Secretaries, or congress, in making this determination, or what information will constitute "sufficient steps." There was discussion of tariffs and the "goal of fair trade" in advance of the April 2, 2025 deadline for further tariffs to be imposed.[12] On March 30, 2025 the Economist reported that "The real goal, like with Mexico and Canada, is to negotiate trade deals."

On April 2, 2025, new tariffs were imposed that are universal, sweeping, and random, applying to every country in the world other than Russia and North Korea. Under the Order the new round of tariffs are to go into effect April 5, 2025.

The accompanying Fact Sheet for the April 2, 2025 tariffs identify the national emergency as trade deficits. But America has carried trade deficits for decades, and there is no link to how this can be an emergency under the IEEPA that justifies no process for immediate implementation of sweeping tariffs on every country but Russia and North Korea.

---

[12] https://www.commerce.gov/news/press-releases/2025/03/readout-secretary-lutnicks-meeting-minister-leblanc-ontario-premier (last visited April 3, 2025).

### C.       The Orders are already causing harm

Montana shares 14 Canadian border crossings with British Columbia, Alberta, and Saskatchewan provinces along its 545 mile, 877 kilometer northern border. The most heavily travelled ports are Sweetgrass, Roosville, and Piegan. These three are also major trucking portals between Canada and the U.S. Two of those border crossings lie within existing tribal lands of the Blackfeet Nation. Piegan Port of Entry on Highway 89 north of Babb, and the Del Bonita Border Crossing on Highway 213. The Piegan/Carway crossing is the third highest border crossing in Montana. All Montana border crossings lie within the traditional homelands of the tribes.

Plaintiffs are enrolled members of the Blackfeet Tribe. Plaintiff Susan Webber is an enrolled member of the Blackfeet Nation and an elected representative of the Blackfeet and Confederated Salish and Kootenai Nations of Montana. Webber represents families, businesses, and communities that are immediately and irreparably harmed by the increased costs of goods and tariffs that are universally imposed by the Canada Orders. Webber represents businesses that regularly do business across the border of Canada, import goods for the tribal community, and for personal use, and who are injured by the tariffs in their personal and business lives and in the business that is conducted on the Blackfeet and CSKT Nations. Senator Webber's Senate District 8 encompasses the Blackfeet Nation, abuts the border of Montana and Canada, and includes portions of the Confederated Salish and Kootenai Nation.

Jonathan St. Goddard is a rancher on the Blackfeet Nation who operates the family ranch south of Browning.[13] St. Goddard has relatives who are part of the Siksika Nation, in Alberta, Canada, which is part of the Blackfeet Confederacy. He does not have a passport but goes back and forth across the border using his tribal identification card.

---

[13] Declaration of Jonathan St. Goddard, attached and incorporated.

On March 25, 2025, St. Goddard had a rim break on his tractor wheel. He needed a replacement right away because they are in the middle of calving and the tractor was essential to continue feeding and doing daily chores during calving season.

St. Goddard called a person from Frontline Ag in Cut Bank to see if they had the part that he needed. They would have had to order one of the two parts from the John Deere warehouse overseas. That would have taken a couple of weeks, and he needed it right away.

St. Goddard called the Medicine Hat Tractor Salvage place, and they found a hub and wheel that would work. Medicine Hat is in Alberta, across the border in Canada. The replacement wheel cost $1,790.00 Canadian dollars.[14] St. Goddard drove up to pick it up, and when he was coming back, at the border, border patrol agent Nelson asked him what he was doing in Canada. The border patrol guy asked for a receipt, but the copy St. Goddard had his phone didn't work because the service was spotty. At first Border Patrol Agent Nelson told St. Goddard that he would have to go through Sweet Grass, which is over 100 miles away. He then asked if St. Goddard could send him the invoice. St. Goddard walked around outside trying to get a signal, but wasn't able to, so he finally went into the office where they had a booster and he could get a signal and sent the invoice to the Border Patrol Agent from the Tractor Salvage store.

Border Patrol Nelson converted the invoice to U.S. Dollars, and then calculated the tariff for the replacement tractor wheel. What came out of St. Goddard's bank account for the wheel was $1,252.89 U.S. Dollars. St. Goddard was not sure what amount was being used as a basis for the tariff or what conversion rate was being used or how it was being calculated.

---

[14] Exhibit 1 attached to Declaration of Jonathan St. Goddard, invoice for the wheel replacement part.

Border Patrol Nelson told St. Goddard the tariff charge would be $308.77. He said 25% tariff but didn't clarify what the 25% was for or why it was being charged. St. Goddard paid the $308.77 for the tariff. Then he got a receipt for the payment of $308.77 for the tariff.[15]

The tariff was totally out of the blue both in the amount and the way it was implemented. St. Goddard does his budget for the family ranch year by year, and has not accounted for increased costs of up to 25% over budget. A tariff of $308.77 on a part that cost $1,252 is a substantial increase in costs. If tariffs continue, the cost from the tariffs will cause irreparable harm to St. Goddard's family's ranch and agricultural business.

The unpredictable costs make it harder to plan and prepare. Ranching requires managing costs where you can and planning for things that you know are unpredictable, like weather. Getting hit out of the blue with costs for a replacement part that couldn't be located in the U.S. makes it hard for the agriculture community to plan.[16]

Tariffs will have a major impact on Montana, the state most vulnerable to the universal tariffs.[17] Goddard and Webber have already experienced the impacts of the tariffs.[18] Montana's beef producers, oil refineries, and wheat, barley and canola growers will be hard hit by the tariffs. Housing prices, already a big pain point for Montanans, will increase.

A 10 percent tariff would result in $300 billion in new annual taxes. Economic estimates have indicated that a universal tariff of 20 percent could cost a typical U.S. family nearly $4,000 annually. These impacts are dramatic and irreversibly harmful.

---

[15] Exhibit 2 attached to Dec. of Jonathan St. Goddard copy of the tariff charged at the border for the tractor wheel.
[16] Schweitzer Declaration.
[17] Schweitzer Declaration.
[18] Goddard and Webber Declarations.

### D.    The Executive Orders and Proclamations are pretext for a trade war

The press and public have recognized the tariff orders for what they are – pretext for a trade war. There is a Constitutional process for that. It's called Congress. If the government wants to engage in a trade war and raise tariffs on every country and U.S. citizen, it is free to do so, through the Article I branch of government. The Article II branch of government has no authority to undertake the sweeping engagement in commerce that it has done. This is unconstitutional from top to bottom, and must be stopped in its entirety.

## III.    LEGAL STANDARD AND REVIEWABILITY

A district court "may review the constitutionality of [an] Executive Order and grant injunctive relief."[19] Courts recently enjoined implementation of Executive Orders that exceed the President's statutory or constitutional authority.[20]

The Executive Order is immediately reviewable. As shown by Plaintiffs, the Orders are being implemented, albeit with much confusion and the Plaintiffs are feeling its "effects" in a "concrete way."[21] The issues raised in this motion are "fit[] … for judicial decision" now.[22] The hardship of "withholding court consideration" until some later date would be immense.[23] Projects are being cancelled. Employees are being furloughed to unpaid leave. The short farming, construction, and tourist season will be irreversibly lost. This case is not "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all"[24] —

---

[19] *CASA, Inc. v. Trump*, 2025 WL 408636, at *1, *4 (D. Md. Feb. 5, 2025).
[20] See, e.g., *Doctors for Am. v. Off. Of Pers. Mgmt.*, 2025 WL 452707, at *10 (D.D.C. Feb. 11, 2025) (granting TRO to prevent agencies from removing or modifying health-related websites pursuant to executive order); *Jones v. Trump*, 1:25-cv-00401, Dkt. 28 (D.D.C. Feb. 24, 2025) (granting TRO to prevent implementation of executive order regarding transgender inmates "as to the plaintiff"); *Doe v. McHenry*, 1:25- cv-00286, Dkt. 44 (D.D.C. Feb. 18, 2025) (granting preliminary injunction of same order).
[21] *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003).
[22] *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023); see *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (permitting review where plaintiff's conduct was "arguably proscribed" by law).
[23] *Saline Parents*, 88 F.4th at 306.
[24] *Trump v. New York*, 592 U.S. 125, 131 (2020) (cleaned up)

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**                    **9**

the harm is unfolding in real time and increasing by the day.

"In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."[25] Accordingly, the following facts are drawn from the entire record in this case, including the complaint, documents cited in the complaint, and the declarations submitted.[26] To obtain a preliminary and permanent injunction, Plaintiffs must show (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.[27] A preliminary injunction preserves the status quo until a final determination on the action.[28]

The Ninth Circuit applies a sliding scale test to these factors: if Plaintiffs can at least raise "serious questions going to the merits" and demonstrate a "balance of hardships that tips sharply towards [it]," the Tribes are entitled to preliminary injunctive relief "so long as ... [it] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."[29] "Serious questions are issues that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation."[30] Thus, parties do not show serious questions when they raise a "merely plausible claim," nor can a district court "forgo legal analysis just because it has not identified precedent that places the question beyond debate."[31]

---

[25] *Park Irmat Drug Corp. v. Optumrx, Inc.,* 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016).
[26] See *Banco San Juan Int'l, Inc. v. Federal Reserve Bank of New York,* 700 F. Supp. 3d 86, 92 (S.D.N.Y. 2023).
[27] *Harris v. Bessent*, 2025 WL 521027, at *2 (D.D.C. Feb. 18, 2025); *Id.* at 20; *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (cleaned up); also *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).
[28] *Textile Unlimited, Inc. v. A..BMH & Co.,* 240 F.3d 781, 786 (9th Cir. 2001)
[29] *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).
[30] *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (quotation marks omitted).
[31] *Id*. (internal quotation marks omitted); *N. Rockies Reg Ctr. v. Jaddou*, CV 24-99-M-DWM (D. Mont.  2024)

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION        10**

IV.     **ARGUMENT**

A.     **The plaintiffs are likely to prevail on the merits**

1.     <u>**The Executive Orders exceed Constitutional authority**</u>

The U.S. Constitution establishes that Congress has exclusive power to regulate

commerce. Article I Section 8 Clause 1 of the Constitution provides:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

Clause 3 provides:

> To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

Article I Section 10 prohibits states from entering into treaties, imposing tariffs, or imposing

duties. This power belongs solely to Congress.

The executive is limited to implementing laws enacted by Congress. The Framers viewed

the legislative power as a special threat to individual liberty, so they divided that power to ensure

that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and

circumspection' and 'check excesses in the majority.'"[32]

"As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely

regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such

general provisions to fill up the details.'"[33] Tariffs, and their impact on the Indian Tribes, are just

such a subject. In case after case, the Supreme Court has held that the Constitution gives

---

[32] *Seila Law LLC v. CFPB,* 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350).

[33] *West Virginia v. EPA,* 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L.Ed. 253 (1825)).

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION          11**

Congress plenary and exclusive power to legislate with respect to the Tribes.[34]

Conflict in case law addresses the scope of legislative power with respect to Tribes, a state, or Congress in a given area. But nowhere – not in the Constitution, not in case law, not in Treaty – is there any support for the proposition that the Executive branch can regulate commerce with the Indian Tribes through tariffs like those in the Canada Orders.[35] Congress alone holds this power. Justice Gorsuch summarized:

> This Court long ago held that the Legislature wields significant constitutional authority when it comes to tribal relations, possessing even the authority to breach its own promises and treaties. [..] But that power, this Court has cautioned, belongs to Congress alone.[36]

There is no grant to the executive to impose tariffs, and no authority to take the power of the purse from Congress. The executive branch cannot usurp the constitutional power congress has. Justice Kennedy addressed this separation of powers concept and the role of Congress in international affairs in *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015):

> In a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected. For it is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. . . It is not for the President alone to determine the whole content of the Nation's foreign policy.

This analysis applies to the federal government's relationship to the Tribes, as well. The executive branch does not have constitutional power to regulate commerce on tribal lands, and cannot by fiat claim such power. The executive orders regulate commerce among foreign nations and on tribal lands, and they are unconstitutional.

---

[34] *Haaland v. Brackeen*, 143 S.Ct. 1609, 1627 (2023) (In a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as 'plenary and exclusive.') citing cases, quotations in original.
[35] *Haaland* , 143 S.Ct. at 1657-1658, Gorsuch, J. concurring opinion.
[36] *McGirt v. Oklahoma*, 140 S.Ct. 2452, 207 L.Ed.2d 985 (2020), citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566–568, 23 S.Ct. 216, 47 L.Ed. 299 (1903).

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**          **12**

Only Congress can impose tariffs. If Congress wants to impose tariffs it can do so. The Court must enter an order setting the constitutional order aright – the executive branch has no authority to impose tariffs as has been done here, and the executive orders must be enjoined.

### 2.    The Orders exceed statutory authority

The Canada Orders rely on the IEEPA and Section 232 as authority to impose universal tariffs through an executive order. Congress enacted IEEPA nearly 50 years ago to give the president the power to act promptly to protect the nation's security. Section 232, passed in 1962, allows an investigation to be requested to ascertain the effect of specific imports on national security. Section 232 contains explicit processes, timelines, and checks.

The delegation granted in the IEEPA and Section 232 have been used in very narrow circumstances to target a specific outcome. Neither of these statutes provide a blank check on trade policy, and certainly do not delegate power to impose unilateral, universal, tariffs. The president's powers to act can come only from expressly delegated authority.[37] The question of whether the Congress *may* delegate its commerce power to the extent claimed by the Executive in the Canada Orders is not before the Court. In the IEEPA and Section 232 statutes, Congress has *not* delegated power to impose universal tariffs through executive order.[38]

The words "tariff" or "duty" appear nowhere in the statute, in contrast to other laws in which Congress has clearly delegated tariff authority.[39] Antidumping and countervailing duties are the tariffs most commonly used; they are imposed only after a formal process to calculate the appropriate level of duties, paired with a public process that includes a formal record of the

---

[37] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952), Jackson, J., concurring.
[38] See e.g., *Industrial Union Department v. American Petroleum Institute Marshall v. American Petroleum Institute*, 448 U.S. 607, 674 (1980), (the principle that Congress could not simply transfer its legislative authority to the Executive fell under a cloud after Commerce Clause decisions of 1930s and 1940s), Rehnquist, J., concurring, citing R. Jackson, The Struggle for Judicial Supremacy 48-123 (1949).
[39] Section 301, authorizing "duties" to respond to unjustifiable acts that burden U.S. commerce; Section 201, permitting "duties" or "tariff-rate quotas" to respond to a surge in imports that seriously injures a U.S. industry.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**          **13**

factual predicate for duties. The IEEPA and Section 232 do not allow the unilateral, universal imposition of tariffs, without any process at all. The executive orders are a pretext to start a trade war, not an effort to implement meaningful, strategic responses to keep citizens of the U.S. safe. Even if IEEPA and Section 232 allow tariffs in targeted and narrow instances, these statutes cannot justify imposition of tariffs on Indian land.

In *West Virginia v. EPA* the Court held that Congress may not delegate sweeping and consequential authority in a "cryptic" fashion.[40] Tariffs that impose billions in taxes and apply country wide to every country in the world other than Russia and North Korea are nothing if not sweeping and consequential. These tariffs will have severe consequences on our relationships with our strongest allies.[41] These are major questions of great economic and political significance. The Court "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance."[42] Using the IEEPA and Section 232 to authorize the executive to impose universal tariffs on every country but two, with no process, directly challenges the separation of powers, and turns tariff policy into "the will of the President."

The Canada Orders impose tariffs that are random, arbitrary, unpredictable, and the worst thing that could happen to Montana's agriculture and commodity markets.[43] They are walloping our agricultural community out of the blue and are incredibly harmful. No one can plan or prepare. Ranchers typically budget on an annual operating line of credit, and cannot just absorb

---

[40] *West Virginia v. EPA*, 597 U.S. 697, 719, 142 S.Ct. 2587, (2022).
[41] Declaration of Walter Schweitzer, attached and incorporated.
[42] *West Virginia*, 142 S.Ct. 2587, 2605, citing *Utility Air Reg. Group v. EPA ,*573 U.S. 302, 324, (2014)
[43] Schweitzer Declaration, para. 5.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**          **14**

increased costs of up to or more than 25%. The result will be fewer crops harvested, or a massive reduction in the price of Montana beef.[44]

50 U.S.C. § 1701(b) of IEEPA requires that actions be taken only "*to deal with* an unusual and extraordinary threat with respect to which a national emergency has been declared" There is no connection between universal tariffs, and the identified actions that are being targeted. There is no rational link between the goods targeted and the named countries' actions to address threats of illegal immigration and fentanyl. Tariffs imposed on every country, other than Russia and North Korea, makes the Canada Orders suspect.

The Court should enjoin the executive orders pending the final resolution of this case. If Congress wishes to advance an agenda of tariffs, it can do so. The executive branch may not.

### 3.    The Orders violate the Jay Treaty

The limited power given to the executive to make treaties ensures that they are overseen and consented to by two-thirds of the Senate. Article II Section 2 provides:

> He shall have Power, **by and with the Advice and Consent of the Senate**, to make Treaties, provided two thirds of the Senators present concur;

The Jay Treaty recognized – it did not grant – the rights of Native American people to use their historic homelands in the way they had prior to the border. The Jay Treaty acknowledged that an artificial border was being superimposed on existing Tribes; the Tribes did not come to the border, the border happened to the Tribes. The Jay Treaty was self-executing, it cannot be abrogated or terminated by an executive order.[45]

Treaties are interpreted to give effect to the terms as the Indians themselves would have understood them.[46] The Court looks beyond the written words to the historical context that

---

[44] Schweitzer Declaration, para. 6.
[45] *Haaland v. Brackeen*, 143 S.Ct. 1609, 216 L.Ed.2d 254 (2023)
[46] *Minnesota v Chippewa Indians*, 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999).

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**          **15**

frames the Treaty, including "the history of the treaty, the negotiations, and the practical construction adopted by the parties."[47] Through the 1700s and 1800s the Blackfoot people traded freely across the 49th parallel, without limitation, as nations interacting with other nations.[48] This history, together with the recognition of commerce rights in the Jay Treaty, exempt the Tribes from the tariffs imposed in the Canada Orders.

Article III of the Jay Treaty provided:

It is agreed that it shall at all Times be free ... to the Indians dwelling on either side of the said Boundary Line, freely to pass and repass by Land or Inland Navigation, into the respective Territories and Countries of the Two Parties on the Continent of America . .. and freely to carry on trade and commerce with each other.

. .. [N]or shall the Indians passing or repassing with their own proper Goods and Effects of whatever nature, pay for the same any Impost or Duty whatever. But Goods in Bales, or other large Packages unusual among Indians shall not be considered as Goods belonging bona fide to Indians.

The Treaty of Ghent signed on December 24, 1814 (8 Stat. 218) restored the rights of Britain's Indian allies after the War of 1812.[49] The Canada Orders do not –  and cannot – negate the historic trade rights of Native Americans, as recognized by the Constitution, treaties, and upheld through 250 years.

The rights of Native American people cannot be abrogated absent a crystal clear intent to do so.[50] No such discussion or intent is contained in the IEEPA or Section 232. There must be "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty."[51]

---

[47] *Minnesota*, 526 U.S. 172, citing *Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943).
[48] Declaration of Ryan Hall, attached.
[49] See *U.S. v. Michigan*, 471 F. Supp. 192 (1979), citing Treaty of Ghent, Article IX.
[50] *Herrera v. Wyoming*, 139 S.Ct. 1686 (2019), citing *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999); also *Menominee Tribe v. United States*, 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968).
[51] *Id* ., at 202–203, 119 S.Ct. 1187

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**                    **16**

Subsequent to the signing of the Jay Treaty and prior to the War of 1812, a provision closely patterned after the duty exemption of Article III was included in the Tariff Act of 1799, ch. XXII, 1 Stat. 627.[52] A provision, substantially the same, continued in tariff acts for 100 years.[53] Since 1897, no such exemption has been provided. But there was no explicit abrogation of Article III duty rights by Congress. Native Americans were not acknowledged as citizens until 1925. Absence of tariff language post-1897 reiterating the Article III language of the Jay Treaty is not an abrogation of express rights of Native Americans to engage in cross-border commerce.

### 4.    The Orders violate due process and are impermissibly vague

A federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."[54]

The Customs and Border Protection, under the Department of Homeland Security, cannot comply with the terms of the Orders without violating due process. Indeed, St. Goddard's haphazard interaction on the border illustrates the due process concerns. He was never actually quoted a tariff rate or price until he saw the invoice that he had to pay to get back to work on his tractor.[55]

The Canada Orders impose tariffs with no temporal nor other specific limitations. There is no time frame for removing the duties, the duties exceed the rates Congress approved in the USMCA, and tariffs on all products do not bear "an eminently reasonable relationship" to the identified emergencies and national security issues. The orders are nothing more than pretext for

---

[52] March 2, 1799 Tariff Act, Ch. 22, Sections 104, 105, 5th Congress, p. 702, https://tile.loc.gov/storage-services/service/ll/llsl/llsl-c5/llsl-c5.pdf#page=92
[53] But see, *Akins v. Unites States* (CCP 76-12, 1977).
[54] *United States v. Williams*, 553 U.S. 285, 304 (2008)
[55] Declaration of St. Goddard.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**                    **17**

a trade war: they are tariffs imposed at rates the president deems desirable, entirely negating all

other process and the role of congress in trade, foreign relations, and commerce.

Legislative history indicates that "emergencies are by their nature rare and brief, and are

not to be equated with normal, ongoing problems." The United States has been running trade

deficits for decades, and engaged in a drug war for at least as long. These are not "rare" or

"brief" emergencies. Allowing these tariffs means there are no limits to the president's power on

tariffs. This has never been the law. It cannot be now. The Canada Orders subvert the

Constitution and separation of powers.

### B. Irreparable harm from the tariffs

The tariffs cause irreparable harm to our communities by destroying jobs, ruining

businesses, and harm to Montana's farmers and ranchers.[56] Montanans have significant cross

border relationships. Webber and St. Goddard have relatives in Canada, and historically conduct

business as if there is no border. All that is changed with one signature on an executive order.

Many farms and ranches are physically located closer to suppliers in Canada than other places in

the United States, and in an emergency, it is essential for them to be able to get parts quickly.

The tariffs make that process haphazard and unpredictable, creating another layer of uncertainty

and chaos for farmers and ranchers and businesses across Montana.

### C. Equities and public interest favor an injunction

Where a movant "seeks to enjoin the government, the final two factors — balancing the

equities and the public interest — merge."[57] Plaintiffs are presently experiencing harm as a result

of Defendants' unlawful actions.[58] The harm from the tariff orders and unlawful seizure of power

---

[56] Schweitzer Declaration para. 8-10.
[57] *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025) (citation omitted).
[58] *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)).

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION**    **18**

by the executive to conduct commerce has already had far-reaching consequences, which will continue and grow if the Orders are allowed to stand. Tourism reservations are cancelled, contracting jobs are off, farm and ranch operations have been thrown into high unpredictability, and businesses cannot plan. The growing, tourism, and construction season is short in Montana. It cannot withstand see-saw tariffs that are on one day and higher the next.

In contrast, Defendants would suffer no cognizable harm if enjoined from collecting tariffs that are arbitrary and unrelated to the claimed emergency. The Government cannot suffer harm from an injunction that merely ends an unlawful practice, especially when constitutional concerns are at stake.[59] In contrast to personal and irreparable harms to Plaintiffs, a preliminary injunction would not harm the federal government at all, but merely maintain the status quo.

The tariffs have spooked the financial markets and generated concern worldwide. They are harming real people in concrete ways as shown by the Plaintiffs' declarations.

An injunction is necessary to preserve the status quo. Defendants have upended the commercial and cultural world for the Blackfeet and other tribes; without notice, without an opportunity to be heard, and without addressing the claimed emergency. The status quo is no tariffs from the executive branch. That should not change absent a fair process.

## V.   CONCLUSION

Plaintiff respectfully request the Court hold a hearing as soon as possible and declare that the Canada Orders are unconstitutional.

---

[59] *Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023), citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

DATED this 4th day of April, 2025.

TRANEL LAW FIRM P.C.

*Monica Tranel*
_____
Monica J. Tranel
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of April, 2025, I served true and accurate copies of the

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR INJUNCTION AND**

**IMMEDIATE HEARING** by the method(s) indicated below, addressed as follows:

<u>  1 - 2  </u>  U.S. Mail, Postage Prepaid
_____  Federal Express, Billed to Sender
_____Hand Delivery
_____  E-Mail

Kurt Alme
District of Montana
Billings Main Office
2601 2nd Ave N.
Suite 3200
Billings, MT 59101

Regulatory Affairs Law Division
Office of the General Counsel
U.S. Department of Homeland Security
245 Murray Lane, SWMail Stop 0485
Washington, DC 20528-0485

Pursuant to F.R.C.P. 5 and L.R. 7.1, the United States Attorney for Montana was contacted regarding this motion and brief through email and telephone at the U.S. Attorney's office in Billings, Montana, at 406-576-1013, and via email at lindsey.crowder@usdoj.gov. The motion and brief are being served by U.S. Mail overnight delivery requested, and via email. Counsel left a telephone message at 3:30 p.m. on April 4, 2025 with the main office at the U.S. Attorney's office in Billings, MT, with notice of the filing.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to MT Rule USDCT L.R. 7.1(d)(2)(E), I certify that the foregoing brief has a word count including footnotes as calculated by Microsoft Word for Mac of less than 6,500 words, excluding the certificate of service and certificate of compliance.

*Monica Tranel*
MONICA J. TRANEL