Monica J. Tranel
TRANEL LAW FIRM, P.C.
401 Washington Street
Missoula, MT 59802
(406) 926-2662
*mtranel@tranelfirm.com*

*Attorneys for Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| SUSAN WEBBER, JONATHAN ST. GODDARD, RHONDA MOUNTAIN CHIEF, DAVID MOUNTAIN CHIEF and Does 1 – 100,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM in her official capacity; and THE UNITED STATES OF AMERICA,<br><br>Defendants. | Cause No. DV 25-26-GF-DLC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs bring this Complaint against the U.S. Department of Homeland Security and the United States of America, and, in her official capacity, Kristi Noem, and state as follows:

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF     **1**

## I.    SUMMARY OF THE CASE

1.    The border on the 49th parallel came to the Indigenous people of Montana. The Indigenous people did not come to the border. They did not participate in its creation. By history and law, the Indigenous people are exempt from the border's artifice. Prior to the construct of nations on the 49th parallel, Indigenous people travelled and engaged in commerce across the northwest plains. Post creation of a border at the 49th parallel, Indigenous people travelled and conducted commerce exempt from duties under the Jay Treaty of 1794.

2.    Plaintiffs challenge Orders and Proclamations and seek relief as follows:

*First:* Plaintiffs challenge the constitutionality of Executive Order 14193 (February 1, 2025 (Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border)[1], as amended by Section 3 of Executive Order 14197 (Progress on our Northern Border)[2] and further amended by Executive Order 14231[3] of March 6, 2025 (Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border). The Orders declare a national emergency, and

---

[1] https://en.wikisource.org/wiki/Executive_Order_14193 (last visited April 11, 2025, federal register site unavailable.)

[2] https://en.wikisource.org/wiki/Executive_Order_14197 (last visited April 11, 2025, federal register site unavailable.)

[3] https://www.federalregister.gov/documents/2025/03/11/2025-03990/amendment-to-duties-to-address-the-flow-of-illicit-drugs-across-our-northern-border (last visited April 11, 2025).

invoke authority International Emergency Economic Powers Act of 1977 (IEEPA) to impose tariffs that are universal in nature. Plaintiffs ask the Court to enjoin Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended;

*Second:* Plaintiffs challenge Proclamation 10896 (steel) and Proclamation 10895 (aluminum).[4] These two Proclamations were issued February 10, 2025 and invoke authority under Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862). The steel and aluminum Proclamations impose 25% tariffs on those products. Plaintiffs ask the Court to enjoin Section 14 of Proclamations 10896 and 10895;

*Third:* Plaintiffs challenge the constitutionality of Executive Order 14257 issued April 2, 2025 (Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits), as amended and modified.[5] The Order declares a national

---

[4]Implementation of Duties on Steel Pursuant to Proclamation 10896 Adjusting Imports of Steel Into the United States; and Implementation of Duties on Aluminum Pursuant to Proclamation 1089 Adjusting Imports of Aluminum Into the United States, effective March 12, 2025, available at https://www.govinfo.gov/content/pkg/FR-2025-03-05/pdf/2025-03598.pdf (last visited April 11, 2025).

[5] Doc. 9-12, Exhibit 14 https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/ (last visited April 11, 2025). Amendments and modifications to Executive Order 14257 were issued on April 8, 2025, Executive Order titled "Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF      **3**

emergency, and invokes authority International Emergency Economic Powers Act of 1977 (IEEPA) to impose tariffs that are universal, sweeping, and random in application. Plaintiffs ask the Court to enjoin Sections 2, 3(a), (b), (c), (d), (e) and (f), Section 4 (a), (b), (c), and (d) of Executive Order 14257 issued April 2, 2025, as amended.

3.      Executive Order 14193 as amended and modified, Proclamations 10896 and 10895, and Executive Order 14257 as amended and modified, are collectively referred to as the Canada Orders. While the Orders and Proclamations impact nations other than Canada, Plaintiffs seek an Order granting relief for their specific trade and commerce across the Blackfeet Nation on the Canada border.

4.      The Canada Orders exceed the President's constitutional and statutory authority and violate the separation of powers. The imposition of universal tariffs in the Canada Orders is an unconstitutional attempt by the Executive to regulate commerce and violates Plaintiffs' constitutional and treaty rights.

5.      Plaintiffs are enrolled members of the approximately 17,500 member Blackfeet Nation, one of the 10 largest tribes in the United States. Webber represents Montana Senate District 8, which includes about 20,000 residents, the Blackfeet Nation in Montana, borders Canada, and includes portions of the

---

the People's Republic of China," and April 9 Executive Order titled "Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment."

Confederated Salish and Kootenai Tribes. Plaintiffs conduct business and travel across the U.S. – Canada border.

6.      Plaintiffs ask the Court to enjoin the Canada Orders. Alternatively, Plaintiffs ask the Court to either: stay tariffs on all commerce and goods at the Roosville, Del Bonita, and Piegan/Carway ports of entry that are the historical ports of entry for the Kootenai and Blackfeet Tribes; or stay all tariffs imposed under the Canada Orders for tribal members.

## II.     JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction because the claims arise under the Constitution and laws of the United States, 28 U.S.C. § 1331 (federal question), 1337 (regulation of commerce), 1346 (U.S. as defendant), and under 28 U.S.C. § 1362. This action is brought by enrolled members of the Blackfeet Tribe and representative of the Confederate Salish, Kootenai, and Blackfeet Tribes with governing bodies duly recognized by the Secretary of the Interior alleging violations of their rights under the Constitution, laws and treaties of the United States and because the individual Defendant is an official of the United States. 28 U.S.C. § 1346(a)(2).

8.      The Court has authority to enter a declaratory judgment and to provide temporary, preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the

All Writs Act, and the Court's inherent equitable powers to grant injunctive and declaratory relief when the President has no authority to act.[6]

9.    Pursuant to D. Mont. L.R. 1.2, and 3.2(b)(1)(B), venue lies in this District because Plaintiffs reside here and each Defendant is an agency or officer of the United States sued in her official capacity. 28 U.S.C. § 1391(b), (e)(1).

10.    A real case or controversy exists between the parties as to the legality of universal tariffs imposed on Plaintiffs, and on tribal members, under the Canada Orders, without regard to the Constitution and the Treaty rights of the Plaintiffs. This Court has authority to issue the declaratory judgment requested pursuant to 28 U.S.C. § 2201(a).

## III.  PARTIES

11.    Plaintiff Susan Webber is an enrolled member of the Blackfeet Nation and an elected representative of the Blackfeet and Confederated Salish and Kootenai Nations of Montana. Webber represents families, businesses, and communities that are immediately and irreparably harmed by the increased costs of goods and tariffs that are universally imposed by the Canada Orders. Webber represents businesses that regularly do business across the border of Canada,

---

[6] *Indigenous Envtl. Network  v. Trump*, 428 F.Supp.3d 296, 307 (D. Mont. 2019), citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

import goods for the tribal community, and for personal use, and who are injured by the tariffs in their personal and business lives and in the business that is conducted on the Blackfeet and CSKT Nations. Senator Webber, in her representative role, has standing to bring these claims on behalf of members who are harmed by the tariffs and who have no plain, speedy, or adequate remedy at law. Her Senate District 8 encompasses the Blackfeet Nation, abuts the border of Canada, and includes portions of the Confederated Salish and Kootenai Nation.

12.     Plaintiff Jonathan St. Goddard is a rancher on the Blackfeet Nation who operates a family place south of Browning. St. Goddard is an enrolled member of the Blackfeet Tribe, with relatives in Canada who are enrolled tribal members. Plaintiff has had to pay tariffs on replacement tractor parts that have increased the cost of ranching and doing business and caused direct harm. If tariffs continue and increase, the cost from the tariffs will cause irreparable harm to Plaintiff's ranch and agricultural business. See Declaration of St. Goddard (Doc. 1-2).

13.     Plaintiff Rhonda Mountain Chief is an enrolled member of the Blackfeet Tribe and lives on the Blackfeet Nation, and owns and operates the Mountain Chief Company, registered with the Blackfeet Nation, that delivers shuttle services across the Chief Mountain border crossing on Montana Highway 17/AB Highway 6 at Waterton- Glacier International Park. Rhonda Mountain

Chief has extended family on the Canada and Montana side of the border and travels and works on both sides of the border. The Canada Orders have inflicted harm on Plaintiffs and compromised their viability and unique ability to operate and provide services to an international tourist population. The tariffs are already causing irreparable harm as customer reservations are significantly down through the summer months, which is the short tourist season that Plaintiffs' company depends on for business. In addition, Plaintiffs' business has grown and been successful by word of mouth reputation, and the tariffs significantly harm and irreversibly compromise Plaintiffs' ability to plan and prepare as international tourism has been depressed in response to the unpredictable tariffs. See Declaration of Rhonda Mountain Chief, attached as Exhibit 17.

14.    David Mountain Chief is an enrolled member of the Blackfeet Tribe and lives on the Blackfeet Nation, and works with Rhonda Mountain Chief at Mountain Chief Cab Company. David is a descendant of Mountain Chief. David received the Mountain Chief original pipe during the pandemic. The tariffs will harm the business he operates with his wife using Chief Mountain pass, and harm the family relationships he conducts with extended Blackfeet members across the border. Unless the tariffs are stopped from being implemented, Plaintiffs' personal and business relationships will be irreparably harmed. See Declaration of David Mountain Chief, attached as Exhibit 18.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF      **8**

15.    Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 20 U.S.C. § 3412.

16.    Defendant the United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government that has been created by Congress. 6 U.S.C. § 111 *et seq*.

17.    Defendant the United States of America is responsible for the exercise of executive action by the named Defendants and all other agencies that are directed by the Order to take action respecting the imposition of universal tariffs. Because the Canada Orders impose universal tariffs, the United States of America is included as a defendant to ensure that the relief ordered by the Court will apply on a government-wide basis, including to federal agencies that are not specifically listed as defendants, and enjoin all tariffs imposed at Montana Ports of Entry.

18.    For all these reasons, Plaintiffs seek an Order: declaring Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended; Section 14 of Proclamations 10896 and 10895; and Sections 2, 3(a), (b), (c), (d), (e) (f), Section 4 (a), (b), (c), and (d) of Executive Order April 2, 2025 violate the of separation of powers and are unconstitutional and staying those Orders from going into effect until this case is finally determined; or, alternatively, declaring

that the Executive branch does not have authority to impose universal tariffs on the border Tribes and that such tariffs are illegal at cross border ports of entry on historically owned tribal lands, specifically at the border crossings at Roosville, Piegan/Carway, and Del Bonita; or, that the Orders do not apply to tribally enrolled members.

## IV.    FACTS COMMON TO ALL COUNTS

### A.    <u>History of the Tribes</u>

19.    Native Americans, whose historic and current homelands cross the Montana – Canada border, are among the oldest inhabitants of the northwestern plains. Archaeological discoveries by the University of Alberta in Edmonton, reveal campsites in the St. Mary River drainage dating back over 13,000 years.[7]

20.    Through the 1700s, the relationship between nomadic and horticulture tribes was symbiotic, trading horses and buffalo hides for agricultural products.[8] Nomadic culture was based on the bison hunt, and was intrinsically portable, taking tribes such as the Blackfeet from the Yellowstone River in Montana north to

---

[7] Dempsey, Hugh A. "Blackfoot Confederacy" The Canadian Encyclopedia (2010), available at https://www.thecanadianencyclopedia.ca/en/article/blackfoot-nation (last visited April 11, 2025).
//en.wikipedia.org/wiki/Blackfoot_Confederacy#cite_note-Dempsey-1
[8] Richard White, <u>It's Your Misfortune and None of My Own: A New History of the American West</u> (1991) p. 24-25.

the North Saskatchewan River in Canada.[9] While the bison was the most important element of their economy, they hunted and traded other large game.[10] Native Americans from at least a dozen tribal groups have historical homelands that cross what is now the Montana - Canada border.[11]

21.    The Confederated Salish and Kootenai Tribes are made up of three tribes, the Bitterroot Salish, Upper Pend d'Oreille, and the Kootenai. The Confederated Salish and Kootenai Tribes (Ksanka Band) are part of the Ktunaxa Nation and have traditional homelands across the border with Canada.

22.    The people who constitute the Blackfoot Confederacy – the Kainai, Piikani and Siksika – lived on the northwestern plains for more than a millennium before the Canada – U.S. border was established. Through the 18th and 19th centuries, "the Blackfoot used the northwest plains' unique geography to create one of the most vibrant and lasting Indigenous homelands in North America."[12] The Peigan or Piikani include the Northern Piikani (Aapátohsipikáni); and the

___

[9] https://www.montana.edu/iefa/introductiontomttribalnations/tribalterritories.html (last visited April 11, 2025).

[10] 29 American Indian Law Review 1, *Glacier Park and the Blackfoot Natin's Reserved Rights: Does a Valid Tribal Co-Management Authority Exist?* Curt Sholar (2004), pp. 152-153.

[11] Richard White, It's Your Misfortune and None of My Own, See Ch. 2, *Empires and Indians*, p. 26, and Ch. 4, *The Federal Government and the Indians*, p. 110, map of tribes in Montana circa. 1880.

[12] Ryan Hall, Beneath the Backbone of the World, Blackfoot People and the North American Borderlands (1720-1877), p. 3.

Southern Piikani (Amskapi Piikani or Pikuni). The Blackfoot Confederacy is called Niitsitapi, or Siksikaitsitapi, meaning "the people" or "Blackfoot-speaking real people."[13]

23.    The Blackfoot people had physical and cultural boundaries, and "clearly marked their boundaries" to identify "Blackfoot territory to travelers as a distinct and sovereign space."[14]

24.    Chief Mountain (Ninnahstako ), a sacred place for the Blackfeet people, is on the eastern border of Glacier National Park and the Blackfeet Indian Reservation and is subject to Blackfeet restrictions.[15]

25.    Through the 19th century, the Blackfeet had significant leverage in negotiations with Canadian traders on the North Saskatchewan River and with the Americans in commerce.[16]

26.    In January of 1870, American troops massacred over 200 Piikani people near the Marias River in present-day Montana. Piikani witnesses claimed the dead numbered about 220 people.[17] Called the Marias or Baker massacre but

---

[13] Broader definitions include groups such as the Tsúùtínà (Sarcee) and A'aninin (Gros Ventre) who spoke quite different languages but allied with or joined the Blackfoot Confederacy.

[14] Hall, *id*., <u>Beneath the Backbone of the World</u> p. 23.

[15] Blackfeet Business Council Resolution Number 140-82, available at https://www.blackfeet-thpo.com (last visited April 10, 2025).

[16] Hall, *id*., <u>Beneath the Backbone of the World</u> pp. 102-105.

[17] Dempsey, *id*., Blackfoot Confederacy; see also *The Piikuni and the U.S. Army's Piegan Expedition*, Rodger Henderson

known as the "Piegan Expedition" in U.S. military records, the massacre was part of an effort to end the government's policy of making treaties in favor of unconditional surrender for total submission of Native Americans.[18] At the time, the Blackfeet lands stretched across the northern tier of the Montana territory to the confluence of the Yellowstone and Missouri rivers.

27.     In the late 1800s, the decline of the buffalo was used to exploit Native American vulnerabilities, but the First Nations people in what is now Canada followed the buffalo into Montana where the few remaining herds could be located.[19]

### B.     The Border

28.     The border between the United States and Canada is the longest international boundary in the world. The border bisects historic homelands of more than thirty tribes, including members of the "Wabanaki and Iroquois Confederacies, the Ojibwe, Ottawa, Lakota, Salish, Colville, several tribes of western Washington, and the Haida, Tlingit, and Tsimshian of Alaska and

---

https://mhs.mt.gov/education/IEFA/HendersonMMWHSpr2018.pdf (last visited April 11, 2025).

[18] Henderson, *id*., pp. 50-52.

[19] Benjamin Hoy, A Wall of Many Heights: the uneven enforcement of the Canadian-United States border, p. 244, available at https://purl.stanford.edu/bk961hr7970 (last visited April 11, 2025).

Canada."[20] The Blackfeet Confederacy and the Akwesasne Mohawks are examples of sovereign tribal nations whose homelands straddle the 3,987 mile U.S. Canada border.

29.     Although divided by an international border, tribal members consider themselves one community. Akwesasne has a total of 12,000 residents, with the largest population and land area of any Kanien'kehá:ka community. From its development in the mid-eighteenth century, Akwesasne was considered one of the Seven Nations of Canada.

30.     The Blackfeet Confederacy crosses the border and encompasses Tribes recognized by both Canada and America. Plaintiff Jonathan St. Goddard has relatives who are part of the Siksiki Nation, which is part of the Blackfeet Confederacy. Plaintiff Rhonda Mountain Chief's grandmothers were Pikuuni and her grandfathers were fur trappers. Rhonda's grandmother was taken from Canada and placed in the Fort Shaw Indian school. David Mountain Chief is a descendant of Mountain Chief and was honored with the Mountain Chief original pipe being returned to us as its rightful keepers from a museum back east.

31.     Montana shares 14 Canadian border crossings with British Columbia, Alberta, and Saskatchewan provinces along its 545 mile, 877 kilometer northern

---

[20] Sharon O'Brien, *The Medicine Line: A Border Dividing Tribal Sovereignty, Economies and Families*, 53 Fordham L. Rev. 315, 315-16 (1984).

border. Montana border crossings lie within the traditional homelands of the tribes. The most heavily travelled ports are Sweetgrass, Roosville, and Piegan. Chief Mountain is the border crossing on the Chief Mountain Highway through Waterton and Glacier National parks.

32.    In 1932, Waterton-Glacier was designated the first International Peace Park.

33.    The Continental Divide Trail (CDT) was established in 1978 and runs from Canada to Mexico along the continental divide, with an official starting and ending point at Waterton park village four miles inside Canada in Waterton Lakes National Park. The CDT is part of the Triple Crown of Hiking trails that refers to the three major U.S. National Scenic Trails. The CDT draws significant international tourism that supports businesses like Rhonda Mountain Chief's on the Blackfeet Nation.

34.    Plaintiff Susan Webber represents businesses and has personal relationships across the U.S. Canada border. Goods imported to the tribal communities come across at ports of entry in Montana, some of which lie exclusively within tribal lands. Plaintiff St. Goddard has had to pay tariffs at the border on tractor parts used for his ranching operations. Rhonda Mountain Chief has lost business and reservations for the summer tourist season are down by over half as a result of the tariffs.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF    **15**

C.     **Tariffs and Treaties at the Border**

35.     On June 21, 1788, the U.S. Constitution was ratified; it took effect on

March 4, 1789. Article I Section 8 Clause 1 of the Constitution gave Congress

exclusive power to collect taxes and duties, and to regulate Commerce with

foreign Nations, and among the several States, and with the Indian Tribes.

36.     Four months after the U.S. Constitution took effect, in July of 1789,

the U.S. Congress passed the first national tariff act to raise revenue and pay the

national debt.[21]

37.     On November 19, 1794, Jay's Treaty[22] was signed by trade

representatives between U.S. and Britain, resolving trade and border disputes.

Article III of the Treaty excludes Indigenous people from paying duty on goods

carried across the border:

> It is agreed that it shall at all times be free ... to the Indians dwelling on
> either side of the said Boundary Line, freely to pass and repass by Land or
> Inland Navigation, into the respective Territories and Countries of the Two
> Parties on the Continent of America ... and freely to carry on trade and
> commerce with each other.
>
> . .. [N]or shall the Indians passing or repassing with their own proper Goods
> and Effects of whatever nature, pay for the same any Impost or Duty

---

[21] An Act for laying a Duty on Goods, Wares, and Merchandises imported into the
United States, (July 4, 1789) https://tile.loc.gov/storage-services/service/ll/llsl//llsl-
c1/llsl-c1.pdf#page=143 (last visited April 11, 2025).
[22] The Jay Treaty, formally termed the Treaty of Amity, Commerce, and
Navigation, established rules to settle the boundaries, trade, and evacuations
disputed after the Revolutionary War.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF     **16**

whatever. But Goods in Bales, or other large Packages unusual among Indians shall not be considered as Goods belonging bona fide to Indians.

38.    On June 24, 1795, the Senate passed Jay's Treaty by a vote of 20-10, the two-thirds required to make it self-executing.[23] On August 18, 1795, President George Washington signed Jay's Treaty. Jay's Treaty held that the border was to have no impact on the Indians and their internal relationships. The Jay's Treaty established a border between the continental United States and Great Britain that artificially separated Native American peoples, whose time on the land predates the treaty by centuries, if not by millennia. Jay's Treaty recognized the rights of Native Americans that already existed – it did not create rights.

39.    On May 5, 1796, the explanatory article to Article III of the Jay's Treaty signed at Philadelphia provided:

> That no stipulations in any treaty subsequently concluded by either of the contracting parties with any other State or Nation, or with any Indian tribe, can be understood to derogate in any manner from the rights of free intercourse and commerce secured by the aforesaid third Article of the treaty of Amity, commerce and navigation, to the subjects of his Majesty and to the Citizens of the United States and to the Indians dwelling on either side of the boundary-line aforesaid; but that all the said persons shall remain at full liberty freely to pass and repass by land or inland navigation, into the respective territories and countries of the contracting parties, on either side of the said boundary-line, and freely to carry on trade and commerce with

---

[23] The Constitution grants the President the power to make treaties with foreign nations, which become part of "the supreme Law of the Land" when at least two-thirds of the Senate consents. U.S. Const. art. II, § 2, cl. 2; *id.* art. VI, cl. 2. *United States v. Clay*, Docket No. 23-2335 (3rd Cir. Feb. 3, 2025)

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF    **17**

each other, according to the stipulations of the said third Article of the treaty of Amity, Commerce and Navigation.[24]

40.    On March 2, 1799, Congress passed the Tariff Act of 1799, exempting Indians from tariffs.[25] Section 104 declared that Indians could freely carry on trade and commerce with the citizens of the U.S., and Section 105 exempted Indians from duties and tariffs in doing so:

> SEC. 104. *And be it further enacted*, That for the purpose of conforming this act to certain stipulations contained in treaties made and ratified under the authority of the United States, it is hereby declared, that it shall at all times be free to British subjects, and also to the Indians dwelling on either side of the boundary line of the United States, as settled by the treaty of peace, freely to pass and repass, by land or inland navigation, into and from the territories of the United States, and to navigate all the lakes, rivers and waters thereof, and freely to carry on trade and commerce with the citizens of the United States:[26]

> SEC. 105. *And be it further enacted,* That no duty shall be levied or collected on the importation of peltries brought into the territories of the United States, nor on the proper goods and effects of whatever nature, of Indians passing, or repassing the boundary line aforesaid, unless the same be goods in bales or other large packages unusual among Indians, which shall not be considered as goods belonging bona fide to Indians, nor be entitled to the exemption from duty aforesaid.[27]

41.    The War of 1812 created additional U.S. and Britain dispute borders.

---

[24] See https://avalon.law.yale.edu/18th_century/jayex1.asp (last visited April 11, 2025).

[25] https://tile.loc.gov/storage-services/service/ll/llsl/llsl-c5/llsl-c5.pdf#page=92 (last visited April 11, 2025).

[26] March 2, 1799 Tariff Act, Ch. 22, Section 104.

[27] March 2, 1799 Tariff Act, Ch. 22, Section 105, 5th Congress, p. 702, https://tile.loc.gov/storage-services/service/ll/llsl//llsl-c5/llsl-c5.pdf#page=92 (last visited April 11, 2025.)

42.    On December 24, 1814, the Treaty of Ghent was signed, restoring pre-war boundaries and marking the end of British support for Native American Indians. On February 17, 1815, the U.S. Senate unanimously approved the Treaty of Ghent. The 1814 Treaty of Ghent affirmed the Jay's Treaty recognition of rights, including the right to pass through the United States-Canada border and the right to take goods across the border duty-free, providing in Article IX that both nations agreed to "restore to such Tribes or Nations respectively all the possessions, rights, and privileges which they may have enjoyed or been entitled to in one thousand eight hundred and eleven previous to such hostilities."

43.    The rights of Native American people were recognized in, not granted by, the Jay Treaty and the Treaty of Ghent. Since the ratification of those treaties, no other treaty or legislative action has changed the rights granted to the Indigenous people on the northern border.

44.    In 1818, the U.S. and Britain executed a treaty setting the northern border of the U.S. at the 49th parallel. The treaty allowed for joint occupation and settlement of the Oregon Country (known in Canada as the Columbia District of the Hudson's Bay Company) but did not address rights of Native Americans and did not limit or address rights under the Jay Treaty.[28]

---

[28] The Treaty of Ghent is referenced in Article V of the 1818 Treaty, with respect to slaves.

45.     The merger of the Hudson's Bay Company and Montreal-based North West Company in 1821 impacted trade with the Indians through the Midwest, but did not diminish the north-south commerce among and between the Tribes.

46.     On May 18, 1823, Mi'ksskimmisoka'simi, or Iron Shirt, made a peace overture to establish a trading post at the mouth of the Marias River (Bear River) to trade with the Missouri Fur Company. The Blackfeet created economic competition between what is now Canada and America to their economic advantage; the geopolitics and economy of the Blackfeet people was as an integrated economy across the border, negotiating and trading with the Canadians and Americans coming in. The Blackfeet operated as one nation with no border.[29]

47.     In 1827, Piikáni and Kainai leaders met with American trappers in Flathead territory to "establish a branch post in their country." The tribes of the northwest continued to trade and do business with each other without recognition of a border.

48.     In 1830-1831, a delegation consisting of representatives for all three Nitsitapii tribes negotiated an agreement, for the first time, to establish an American trading post in Piikáni territory. In the fall of 1831, construction of Fort

---

[29] Hall, *id*., Beneath the Backbone of the World.

Piegan near the confluence of the Missouri and Marias rivers signified the end of the Blackfoot blockade to the upper Missouri fur trade.[30]

49.     Through the 1830s and 1840s the tribes traded with each other and collectively played the American and Canadian economies of the area against each other, even as the trapping industry moved from beaver to bison.[31]

50.     The Oregon Treaty of 1846 resolved disputes between the U.S. and Britain and confirmed the 49th parallel as the boundary but did not address or limit the trade and passage rights of Native Americans as set out in the Jay Treaty.[32]

51.     In July of 1855, the U.S. Government signed the Treaty of Hell Gate with the Confederated Tribes of the Flathead, Kootenay, and Upper Pend d'Oreilles.[33]

52.     In October of 1855, the U.S. Government signed the Blackfeet Treaty with the Blackfoot Nation (Piegan, Blood, Blackfoot, and Gros Ventre), the

---

[30] Henderson, *id.*, p. 56.
[31] Hall, *id.*, <u>Beneath the Backbone of the World.</u>
[32] Oregon Treaty, Taylor Noakes (2006), available at https://www.thecanadianencyclopedia.ca/en/article/oregon-treaty (last visited April 11, 2025).
[33] The July 1855 Treaty is also known as the Treaty of Hell Gate; available at https://www.washingtonhistory.org/wp-content/uploads/2020/04/hellgateTreaty.pdf (last visited April 11, 2025).

Flathead Nation (Flathead – Salish, Upper Pend d'Oreille, Kootenai), and Nez Perce Indians.[34]

53.     The two 1855 Treaties set out territory of the tribes in present-day Montana abutting the entire Canada border.

54.     Montana became a Territory in 1864 and was admitted as the 41st state in the Union in 1889.

55.     On July 1, 1867, Canada became a federated country in its own right.

56.     In the 1873-1874 Session, Congress enacted the Revised Statutes of the United States. Section 2515 of the revision incorporated the language of Section 105 of the Tariff Act of 1799, recognizing the duty exemption for Native Americans.

57.     In 1877, the First Nations signed Treaty 7 with the Canadian government.[35] The First Nations negotiating the treaty understood the treaty to be primarily a peace treaty, allowing settlement and promoting peaceful cohabitation; it is agreed that none of the Indigenous nations involved in the treaty understood the treaty as a surrender of land.

---

[34] The October 1855 Treaty is also known as the Blackfeet Treaty, https://www.washingtonhistory.org/wp-content/uploads/2020/04/blackfeetTreaty-1.pdf (last visited April 11, 2025).
[35] Sheila McManus, The Line Which Separates, Race, Gender, and the Making of the Alberta – Montana Borderlands (2005), pp. 72-73.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF     22

58.     In 1878, section 2515 was repeated with a marginal note referring to the Tariff Act of 1799.

59.     The 1883 Tariff Act included substantially the same language of Section 105 of the 1799 Tariff Act:

> SEC. 2512.-That no duty shall be levied or collected on the importation of peltries brought into the Territories of the United States by Indians, nor on the proper goods and effects, of whatever nature, of Indians passing or repassing the boundary-line aforesaid, unless the same be goods in bales or other large packages unusual among Indians, which shall not be considered as goods belonging to Indians, nor be entitled to the exemption from duty aforesaid.[36]

For nearly 100 years, language substantially identical to Article III of the Jay Treaty was continuously reenacted by Congress in tariff acts.

60.     The exemption from tariffs through the 19th century is significant because during that time tariffs provided between 50% and 90% of the federal government's income. This changed with the 16th Amendment to the Constitution (1913), which established a federal income tax. The ability to raise revenue through income tax decreased the need for tariffs.[37]

---

[36] Act of March 3, 1883, ch. 121, § 2512, 22 Stat. 488, 523, available at https://fraser.stlouisfed.org/title/tariff-1883-5892?page=36 (last visited April 11, 2025).

[37] The History and Framework of U.S. Tariffs, citing ITC, Two Centuries of Tariffs: The Background and Emergence of the United States International Trade Commission, pp. 1-2, 6-7, available at https://www.reuters.com/practical-law-the-journal/government/history-framework-us-tariffs-2025-04-01/ (last visited April 11, 2025).

61.     Through the remainder of the 19th century, the reserved lands of the
Tribes continued to be diminished. None of the orders or agreements changed the
northern border or the transnational interaction of the Tribes, nor did the exemption
from tariffs change through these land reduction orders.[38] The treaties did not
address commerce or limit the Tribe's rights to cross the border and interact and
trade with tribes to the north; the tariff laws explicitly retained passage and
commerce rights.

62.     Throughout the twentieth century, and into the 21st century,
Indigenous people continued to do business across the border, without duties or
national identification cards. No Treaty has abrogated the rights conferred by the
Jay Treaty, reaffirmed by the Treaty of Ghent.

63.     In 2014, Tribes from Montana joined other First Nations in signing
the Iinii Treaty or Buffalo Treaty, including: the Blackfeet Nation (American
band), Assiniboine and Gros Ventre Tribes of Fort Belknap, Assiniboine and
Dakota Tribes of Fort Peck, Confederated Salish and Kootenai Tribes (Coast and
Interior Salish), and the Tsuut'ina Nation. The Treaty recognizes and revitalizes
the Tribes relationship with the buffalo:

> It is our collective intention to recognize BUFFALO as a wild free-ranging
> animal and as an important part of the ecological system; to provide a safe
> space and environment **across our historic homelands, on both sides of the
> United States and the Canadian border**, (emphasis added) so together WE

---

[38] *Supra* fn. 10, Sholar, 29 Am. Ind. Law Review, p. 154.

can have our brother, the BUFFALO, lead us in nurturing our land, plants and other animals to once again realize THE BUFFALO WAYS for our future generations.[39]

64.    In 2024, Senator Steve Daines cosponsored the "Tribal Border Crossing Parity Act," to acknowledge protections under the Jay Treaty of 1794 and to eliminate the 50 percent blood quantum requirement for members of federally recognized tribes when exercising their treaty-protected right to cross between the U.S. and Canada freely.

65.    In February of 2025, Mosquito, Grizzly Bear's Head, Lean Man First Nations in Saskatchewan received eleven bison from the Fort Peck Assiniboine and Sioux Tribes in Montana.

66.    Today, Montana tribes and tribal members trade and do business across the border. They operate Indigenous-owned businesses in construction, energy, tourism, resource extraction and management. Plaintiffs utilize cross-border relationships and trade and have done so for years. They are directly harmed by the unpredictability and uncertainty and increased costs imposed by the tariffs.

**D.    <u>The Executive Orders and Proclamations</u>**

67.    On February 1, 2025, three Executive Orders declared a national emergency due to increased immigration and fentanyl flows into the United States.

---

[39] https://www.buffalotreaty.com/treaty (last visited April 11, 2025).

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        **25**

Under the stated emergency, the Executive Orders imposed tariffs on goods from Canada, Mexico, and China.

68.    Plaintiffs challenge Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended (Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border).

69.    On February 10, 2025, Proclamations 10896 and 10895 were issued based on the claim that imported aluminum and steel produced threaten national security. Under the stated threat and invoking Section 232 of the Trade Act of 1962, the Proclamations imposed 25% tariffs on steel and aluminum goods effective March 12, 2025.

70.    Plaintiffs challenge Sections 14 of Proclamations 10896 (steel) and 10895 (aluminum), subjecting steel and aluminum imports from Canada to a 25% tariff.

71.    Before these new tariffs, tariffs on goods from Canada had an effective rate of 0.1%.[40]

---

[40] *Effects of U.S. Tariff Policy Changes Will Vary Sharply Across Sectors, Countries*, Fitch Ratings (Jan. 9, 2025), available at https://www.fitchratings.com/research/structured-finance/effects-of-us-tariff-policy-changes-will-vary-sharply-across-sectors-countries-09-01-2025#:~:text=The%20effective%20tariff%20rate%20on,to%2012.4%25%20for%20textile%20products (last visited April 10, 2025).

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        **26**

72.    On April 2, 2025, Executive Order 14257 titled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits" was issued, adding to the prior tariffs. The Order declares a national emergency and invokes authority International Emergency Economic Powers Act of 1977 (IEEPA) to impose tariffs that are universal, sweeping, and random in application. On April 8 and again on April 9, 2025, Executive Order 14257 was amended and modified. Plaintiffs ask the Court to enjoin Sections 2, 3(a), (b), (c), (d), (e) and (f), Section 4 (a), (b), (c), and (d) of the April 2, 2025 Order as amended and modified.

### 1.    *Authority invoked by Executive Orders and Proclamations*

73.    The Canada Orders declare authority to act under: the Constitution; the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*) (IEEPA); the National Emergencies Act (50 U.S.C. 1601 *et seq*) (NEA); section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483); and Section 301 of title 3.

74.    Proclamations 10896 and 10895 declare authority to act under United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

### a.    *The Constitution*

75.    The Constitution gives exclusive control over collecting money, as well as commerce with foreign Nations and the Indian Tribes. Article I Section 8 Clause 1 provides:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States.

Clause 3 provides:

> To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

76.    Article I Section 10 *prohibits* states from entering into treaties, imposing tariffs, or imposing duties. Read together these provisions are crystal clear that this power belongs solely to Congress.

77.    Article II Section 2 provides:

> He shall have Power, **by and with the Advice and Consent of the Senate**, (emphasis added) to make Treaties, provided two thirds of the Senators present concur.

The limited power given to the executive to make treaties ensures that they are overseen and consented to by two-thirds of the Senate.

78.    Jay's Treaty is self-executing, having passed the Senate on a 20 to 10 vote on June 24, 1795.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        **28**

Case 4:25-cv-00026-DLC    Document 15    Filed 04/11/25    Page 29 of 57


79.    Article VI of the Constitution provides:

…all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

80.    Absent explicit rescission by Congress, Treaties remain in force. No Treaty has abrogated the express grant in the Jay Treaty to tribes to cross the border without paying tariffs.

### b.    *The IEEPA*

81.    The International Emergency Economic Powers Act of 1977 (IEEPA), enacted in 1977, gives the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency.

82.    The President may avail himself of the broad authorities granted to him through the IEEPA if he declares a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."[41]

83.    The President's declaration of a national emergency to address an unusual and extraordinary threat is not all-encompassing and without limitation.

---

[41] 50 U.S.C. § 1701(a).

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF       **29**

The IEEPA directs "[a]ny exercise of [ ] authorities to deal with any new

threat [to] be based on a new declaration of national emergency."[42] A declaration

of a national emergency must be confined "to a specific set of circumstances which

constitutes a real emergency, and for no other purpose."[43]

84.     The plain language of the statute does not include the power to "tariff"

or to "tax." The powers enumerated in the statute are extensive and specific.

Omission of tariffs is significant given how clearly Congress referenced tariff

authorities in other trade statutes. The IEEPA has been the basis for over 60

Executive Orders. It has never been used to impose tariffs. In the 48 years and 8

administrations since Congress enacted the IEEPA no president had cited it to

impose tariffs until February 1, 2025.

85.     Section 204(a) of the IEEPA, 50 U.S.C. § 1703(a), provides that the

President "in every possible instance, shall consult with the Congress **before**

exercising any of the authorities granted by this chapter, and shall consult regularly

with the Congress so long as such authorities are exercised." (Emphasis added.)

86.     Section 204(b), 50 U.S.C. § 1703(b), requires that "[w]henever the

President exercises any of the authorities granted by this chapter, he shall

immediately transmit to the Congress a report specifying" the circumstances

---

[42] *Id*. § 1701(b).
[43] H.R. Rep. 95–459 at 10 (1977).

necessitating the exercise of his authority; the reasons that the circumstances constitute an unusual and extraordinary threat; the authorities to be exercised and the actions to be taken; the reasons that such actions are necessary; a list of foreign countries with respect to which such actions are to be taken; and the reasons for such decisions.

87.    The Trade Sanctions Reform and Export Enhancement Act of 2000 (TSRA), generally prohibits the President from using his IEEPA authority to unilaterally restrict commercial sales of agricultural commodities, food, medicine, and medical devices.[44]

88.    There is no legal basis in the IEEPA to impose universal tariffs. The scale and scope of the tariffs is arbitrary, does not identify how it relates to or abates the declared emergency, and has been erratically deployed. The tariffs have been discussed as bargaining chips, bringing jobs to the U.S., and a way to raise revenue to offset tax cuts. Rarely, if at all, have the tariffs been linked to the stated emergencies. Tariffs are different from the actions the IEEPA does authorize. None of the authorized emergency actions involves imposing a tax on American citizens and residents.[45]

---

[44] 22 U.S.C. § 7202.
[45] See § 1702(a)(1)(A), (B).

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        **31**

89.     Executive Order 14193 refers to the January 20, 2025 America First Trade Policy Memorandum and Executive Order 14157 (Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists) for further justification. The Trade Memorandum discusses the importance of tariffs as a trade policy. It mentions Canada in reference only to the USMCA Agreement and in Section 4(g) directing an assessment of fentanyl flows from Canada, Mexico, and China. The Trade Memo does not address the fact that tariffs in 2017–2019 resulted in billions of dollars of taxpayer bailout funds for industries that were hurt from the tariffs. The Cartel Designation Order discusses Mexico and the southern border but does not mention Canada at all.

### c.    *The NEA*

90.     The National Emergency Act 50 USC Section 1601 terminates actions taken as a result of the existence of any declaration of national emergency.[46] Nothing in the NEA delegates congressional power to impose tariffs and conduct commerce with foreign Nations and Indian Tribes to the Executive branch. Nothing in NEA authorizes the executive branch to impose universal tariffs.

---

[46] 50 U.S.C. § 1601.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF     **32**

### d. *Section 604 of the Trade Act of 1974 as amended*[47]

91.     The Trade Act of 1974 as amended grants the Executive branch authority to "embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter."[48] This Act assigns the President the responsibility of publishing consequential changes in Tariff Schedules. It does not grant the executive the power to unilaterally make such changes.

92.     Section 2486 of the Trade Act provides that the President "may initiate negotiations for a trade agreement with Canada to establish a free trade area covering the United States and Canada. Nothing in this section shall be construed as prior approval of any legislation which may be necessary to implement such a trade agreement." The Trade Act does not give the executive branch power to impose universal tariffs. It specifically retains authority to approve legislation necessary to implement a trade agreement in Congress.[49]

93.     The Trade Act of 1974 granted the president new authority to *negotiate* trade agreements and adjust tariffs, while also creating mechanisms to protect U.S. industries and workers. For example, Section 201 provides a mechanism for the U.S. to protect domestic industries from serious injury caused

---

[47] 19 USC § 2483.
[48] 19 U.S.C. § 2483.
[49] 19 U.S.C. §2486.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF      **33**

by import surges, and Section 301 grants authority to the U.S. Trade

Representative to take action against foreign countries that violate trade

agreements or engage in practices that are deemed unfair and negatively affect

U.S. commerce. All of this contemplates a process that has not been followed

under the Canada Orders.

### e.     *3 U.S.C. Section 301*

94.     Finally, the Executive Orders rely on 3 U.S.C. Section 301 as

authority to impose universal tariffs. This statute authorizes the President to

delegate functions to a head of an agency, provided that the official has been

approved by the Senate and that the delegation is in writing, among other

limitations.

95.     Nothing in Section 301 authorizes the executive branch to engage in

constitutional functions reserved to Congress. The universal tariffs are not

authorized by this statute. The President does not have the authority to impose

them and has no authority to delegate imposition of tariffs to any head of agency.

### f.     *Section 232 of the Trade Expansion Act of 1962*

96.     Section 232 of the Trade Expansion Act of 1962, as amended (19

U.S.C. 1862), sets out a process that begins with an investigation that is initiated

by request from agency heads or the Secretary of Commerce's own motion.[50]

---

[50] 19 U.S.C. 162(b)(1)(A).

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF     **34**

There are strict timelines that apply to the process, which is subject to consultation with others, findings and recommendations are presented to the President. If the findings are affirmative, then the President may accept them and implement the recommended action, and then inform Congress.

97.     Proclamations 10896 and 10895 do not address the required Section 232 process. They simply provide conclusory statements that "the Secretary has informed me" without setting out the process required by Section 232, public input and consultation with others. There has been no final report published in the Federal Register regarding the investigation that Section 232 requires prior to implementing tariffs. Section 232 does not allow the Executive to pick up prior tariffs and adjust them without some kind of process. Proclamations 10896 and 10895 have not been subjected to the process and timelines set out in Section 232, and as a result, violate Plaintiffs due process rights and exert authority under a statute that has not been granted.

### 3.    <u>Justification for Tariffs and "Fact Sheet"</u>

98.     Executive Order 14193 states that the U.S. Customs and Border protection (CBP) has seized, comparatively, much less fentanyl from Canada than from Mexico last year. But the Order imposes universal tariffs in the same way on both countries.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF       **35**

99.    Section 1 of Executive Order 14193 declares that the failure of Canada "to do more to arrest, seize, detain, or otherwise intercept DTOs [Designated Global Terrorist], other drug and human traffickers, criminals at large, and drugs" constitutes an unusual and extraordinary threat. Section 1 declares that the "national emergency requires decisive and immediate action." Section 1 states that the unusual and extraordinary threat justifies the use of section 1702(a)(1)(B) of the IEEPA to impose universal tariffs on articles that are products of Canada. Of the more than 60 times the IEEPA has been invoked, not once prior to the 2025 Executive Orders was the IEEPA ever invoked as the basis to impose tariffs.

100.    Section 2(a) and 2(e) of Executive Order 14193 imposed an additional 25 percent ad valorem rate of duty on all non-energy related goods imported from Canada for which the Secretary of Homeland Security determines modifications are necessary. This includes a 25% duty on all lumber imports from Canada.[51]

101.    Section 2(b) of Executive Order 14193 imposed an additional 10 percent ad valorem rate of duty on energy related goods imported from Canada, defined in Section 8 of Executive Order 14156 of January 20, 2025 as "crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products,

---

[51] See https://international.canada.ca/en/global-affairs/services/trade/tariffs-regulations/harmonized-system-codes (last visited April 11, 2025).

uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water,

and critical minerals, as defined by 30 U.S.C. 1606 (a)(3)."

102.    Section 3(a) of Executive Order 14193 declared that the executive

branch could remove the tariffs if in the opinion of the Secretary of Homeland

Security Canada had "taken adequate steps" or upon a determination that

"sufficient action had been taken" to alleviate the crisis.

103.    Section 3(b) of Executive Order 14193 declared that the Secretary of

Homeland Security shall "recommend additional action" if Canada fails "to take

adequate steps to alleviate the illegal migration and illicit drug crises through

cooperative enforcement actions."

104.    The "Fact Sheet" accompanying Executive Order 14193 includes

Canada only in the first two bullets under "Addressing an Emergency Situation"

that encompasses Canada, Mexico and China without differentiating among the

countries.[52]

105.    The second section of the "Fact Sheet" states that "tariffs are a

powerful, proven source of leverage for protecting the national interest." Under the

third section, the "Fact Sheet asserts that the "problem of illegal aliens and drug" is

not confined to the southern border – "encounters at the northern border with

---

[52] https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-imposes-tariffs-on-imports-from-canada-mexico-and-china/ (last visited April 11, 2025).

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF     **37**

Canada are rising as well." The Fact Sheet does not identify apprehensions at the northern border.

106.    The fourth and final section of the "Fact Sheet" asserts that the tariffs are in line with a promise made in November of 2024 to charge a 25% tariff on ALL products coming into the U.S. This section discusses "threats of tariffs" and "unreasonable behavior" as a basis to ensure that "U.S. trade policy serves the national interest."

107.    In response to the February 1, 2025 Executive Orders imposing universal tariffs under the IEEPA, Canada announced retaliatory tariffs of 25 percent on over $100 billion worth of U.S. goods.

108.    Two days later, on February 3, 2025, Executive Order 14197 (Progress on our Northern Border)[53] was issued pausing implementation of the tariffs in Executive Order 14193 until March 4, 2025. Less than 48 hours after the emergency was declared, Section 2 of Executive Order 14197 declared "I have determined that the Government of Canada has taken immediate steps designated to alleviate the illegal migration and illicit drug crisis through cooperative actions."

---

[53] Executive Order 14197 of February 3, 2025 (Progress on the Situation at Our Northern Border), https://www.federalregister.gov/documents/2025/02/10/2025-02478/progress-on-the-situation-at-our-northern-border (link not available on April 11, 2025)

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        **38**

No indication is given as to whether there was consultation with any Secretary appointees or Congress, or what information supported the determination.

109.   Section 3 of Executive Order 14197 paused the implementation of tariffs until March 4, 2025. Section 3(c) declares that if the crisis worsens, and if Canada fails to take sufficient steps to alleviate the situation, the "President shall take necessary steps to address the situation, including by immediate implementation of the tariffs." No mention is made as to consultation with Secretaries, or congress, in making this determination, or what information will constitute "sufficient steps." Section 3 of Executive Order 14197 purports to give the President alone authority to impose further tariffs without any clear assessment of the bases for doing so.

110.   On February 10 and 11, 2025, Proclamations 10896 and 10895 and an accompanying Fact Sheet were issued addressing the claimed national security threat of imports of aluminum and steel, and imposing tariffs of 25% on all steel and aluminum imports from Canada and other countries to address the claimed national security threat. Section 232 of the Trade Act of 1962 was the authority relied upon to justify imposing these tariffs.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        **39**

111.  On March 3, 2025, announcements were issued that tariffs would proceed under IEEPA with modifications. The CBP issued a "Cargo Systems Messaging Service" with guidance for additional duties on imports from Canada.[54]

112.  On March 4, 2025, a 10% tariff on Canadian energy and a 25% tariff on goods from Canada and Mexico took effect.

113.  On March 6, 2025, Executive Order 14193 was amended to allow a de minimis exemption from the tariffs until such time as systems are in place to "collect tariff revenue applicable" to articles eligible for de minimis treatment.[55]

114.  On March 6, 2025, tariffs were postponed on many imports from Mexico and some imports from Canada, with "reciprocal" tariffs to start on April 2.[56]

115.  On March 8, 2025, the U.S. Customs and Border Protection (CBP) collected the following additional tariffs on imports from Mexico and Canada under the Executive Orders:

---

[54] https://content.govdelivery.com/bulletins/gd/USDHSCBP-3d519e9?wgt_ref=USDHSCBP_WIDGET_2 (last visited April 11, 2025).
[55] Executive Order 14231 of March 6, 2025 Amendment to Duties to Address the Situation at our Southern Border and Amendment to Duties to Address the Flow of Illicit Drugs across our Northern Border. https://www.federalregister.gov/documents/2025/03/11/2025-03990/amendment-to-duties-to-address-the-flow-of-illicit-drugs-across-our-northern-border (last visited April 11, 2025).
[56] https://www.tariffinder.ca/en/getStarted; https://international.canada.ca/en/global-affairs/services/trade/tariffs-regulations/harmonized-system-codes (last visited April 11, 2025).

- Additional 25% tariffs on goods that do not satisfy U.S.-Mexico-Canada Agreement (USMCA) rules of origin. Approximately 50% of the products of Mexico and 38% of Canadian products qualify under USMCA. Potash used in fertilizer qualifies under the USMCA.
- A lower, additional 10% tariff on energy products imported from Canada that fall outside the USMCA preference.
- A lower, additional 10% tariff on potash imported from Canada and Mexico that falls outside the USMCA preference.

116.   On March 13, 2025, there was discussion of tariffs and the "goal of fair trade" in advance of the April 2, 2025 deadline for further tariffs to be imposed.[57]

117.   On March 14, 2025, the U.S. Senate approved the House continuing resolution that prohibits any vote terminating the national emergency used to justify imposition of universal tariffs. In other words, regardless of whether all fentanyl was removed from Canada, Congress cannot vote on terminating the national emergency and removing the tariffs.

118.   On March 30, 2025, the Economist reported that "The real goal, like with Mexico and Canada, is to negotiate trade deals."

119.   On April 2, 2025, Executive Order 14257 was issued declaring a national emergency related to trade deficits.[58] (Regulating Imports with a

---

[57] https://www.commerce.gov/news/press-releases/2025/03/readout-secretary-lutnicks-meeting-minister-leblanc-ontario-premier (last visited April 11, 2025).
[58] https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/ (last visited April 11, 2025).

Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent

Annual United States Goods Trade Deficits). The Order declares a national

emergency based on trade deficits that have been present for decades and invokes

authority International Emergency Economic Powers Act of 1977 (IEEPA) to

impose tariffs that are universal, sweeping, and random, applying to every country

in the world other than Russia and North Korea. Under the Order, the new round of

tariffs were to go into effect April 5, 2025.

120.   On April 8 and again on April 9, 2025, Executive Order 14257 was

amended and modified.

### E.   Cross Border Trade

121.   Plaintiffs are or represent tribal members with ranches and businesses

that do business and have relatives across the border with Canada.

122.   On March 25, 2025, Plaintiff Jonathan St. Goddard had a wheel break

on his tractor, and found the only available replacement part in Saskatchewan,

across the border in Canada. St. Goddard paid $308 tariff on the part that was

$1,252.89 (U.S. Dollars), increasing his costs for ranching substantially.[59] The

Border Patrol Agent converted the cost of the replacement part to Canadian dollars,

then verbally stated a tariff charge, which St. Goddard paid. After paying the tariff,

St. Goddard was given a receipt (Exhibit 2 attached to Complaint, Doc. 1.)

---

[59] Declaration of Jonathan St. Goddard, filed as Doc. 5-3.

123.   Plaintiffs Rhonda Mountain Chief and David Mountain Chief operate their cab business and drive hikers and tourists to the park, trailheads, and across the border for recreation and tourism. Their business depends on reliable, predictable economies and has thrived under word of mouth and reputation. As of April, their reservations for the coming summer season are off by over half of what they would normally expect, as a result of the tariffs.

124.   The tariffs imposed by the Executive Orders increase costs and expenses for the Blackfeet people substantially, creating a material and negative effect on Plaintiffs and their businesses and community.

125.   Tariffs will be passed on to customers and citizens in Montana and the Tribal Nations. Contracts will be and have been cancelled as a result of the increased prices. Small, Native American owned and operated businesses, hiring and employing Native Americans to work for them, are critical to the economies of the Tribes. Customers cannot afford to absorb the tariffs; the unpredictability, volatility, and imposition has already had severe negative impacts, and those will continue.

126.   The tariffs have a disproportionate and immediate impact on the Plaintiffs. The costs are passed along immediately to customers, who cannot afford to move forward with planned projects, resulting in a direct loss to the Plaintiffs and their businesses, and an indirect loss to the tribal community through lost

wages, lost projects, and lost income from work that will not go forward, tourists that will not come, and construction that will not happen.

127.   The Canada Orders have a direct, immediate, and irreparable negative impact on the Plaintiffs and their communities. Projects that are not getting killed off outright are being delayed and slow walked as a result of the tremendous uncertainty caused by the on-again off-again tariffs. As a result of not knowing when projects will be funded and if tariffs will continue, employers have laid people off. This combined with the uncertainty imposed as a result of widescale job losses is wreaking havoc on the community and creating immediate, irreparable harm.

128.   The direct harm includes increased costs of ranching and doing business, the inability to plan for and bid on contracts, compete for and complete work and projects, and to retain and pay employees, causing direct harm to the Plaintiffs, and larger societal harm caused by unpredictable tariffs and funding. The entire community is harmed by the instability.

### F.   **Irreparable harm**

129.   In 2024, U.S. Customs and Border Protection agents intercepted about 19 kilograms of fentanyl at the northern border [entire U.S.], compared with almost 9,600 kilograms at the border with Mexico. The quantities of fentanyl leaving Canada for the United States are a fraction of what is seized at the U.S. southern

border. The Executive Orders do not address the differential or attempt to target the harm, they simply impose blanket tariffs on all borders without reference to the factual situation or any attempt to explain how universal tariffs, which are functioning like sanctions, will actually address the stated emergency. Since the Canada Orders were issued, there is little if any discussion of the way the tariffs are supposed to address the stated emergency; rather, they are considered part of a "deal" or a "bargaining chip".

130.    Out of all the illegal drugs crossing US borders into the United States, less than one per cent (1%) comes through Canada. The executive orders impose blanket, universal tariffs without regard to the differentiated facts on the ground. There is no link between the emergency that is declared and the impact that universal tariffs will have on that.

131.    There is no link between the stated national security threat of imports from steel and aluminum and a 25% tariff on all goods, including a replacement tractor wheel necessary to continue farming and ranching.

132.    There is no link between universal tariffs and the purported harm identified by the administration; nor is there any justification for the whiplash series of on-again off-again tariffs that have resulted in a trade war with Canada. Plaintiffs and other Tribal members have been caught in the net of a trade war that causes direct, immediate, and irreparable harm.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        **45**

133.   The Canada Orders unilaterally impose universal tariffs without justification; they have harmed Plaintiffs by creating unpredictability in the market, uncertainty in being able to plan for a short ranching, construction, and tourist season in northern Montana, and inability to develop a business plan to obtain business especially in much-needed areas such as housing.

134.   The Canada Orders have had, and will continue to have, a chilling effect on whether and how Plaintiffs and members of the Blackfeet Nation will be able to conduct business using traditional cross border imports. These consequences will continue to mount if The Canada Orders are allowed to stand.

135.   For relief, Plaintiffs ask the Court to enjoin Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended, to enjoin Section 14 of Proclamations 10896 and 10895, and to enjoin to enjoin Sections 2, 3(a), (b), (c), (d), (e) and (f), Section 4 (a), (b), (c), and (d) of Executive Order issued April 2, 2025.

136.   Alternatively, Plaintiffs ask the Court to stay all tariffs under the Canada Orders on all commerce and goods crossing at the Roosville, Del Bonita, and Piegan/Carway ports of entry that are the historical ports of entry for the Kootenai and Blackfeet Tribes; or, to stay all tariffs on tribal members.

## CLAIMS FOR RELIEF

## COUNT I

## (Against All Defendants)

### *Ultra Vires Presidential Action – Unconstitutional Exercise of Congressional Authority*

137.    Plaintiffs repeat and reallege the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

138.    Fundamental to the Constitution is that the separation of powers prevents Congress from concentrating power in the Executive Branch. The separation of powers "protects the liberty of the individual from arbitrary power."[60] Courts must take adequate account of separation of powers principles, including both the significant legislative interests of Congress and the unique position of the President.[61]

139.    The Constitution vests the legislative power in Congress. U.S. Const., Art. I. Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law.[62]

140.    The Constitution vests executive power in the President. U.S. Const., Art. II, and imposes on the President a duty to "take Care that the Laws be

---

[60] *Bond v. United State*s, 564 U.S. 211, 222 (2011).
[61] *Trump v. Mazars USA, LLP* (2020)
[62] U.S. Const., Art. I.; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).

faithfully executed."[63] The President's authority to act must "stem either from an act of Congress or from the Constitution itself."[64]

141.   The Executive Branch has no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes.[65] The declared purpose of separating and dividing the powers of government was to "diffus[e] power the better to secure liberty."[66] "There can be no liberty where the legislative and executive powers are united in the same person..."[67]

142.   There is no enumerated or inherent executive authority from the Constitution to impose tariffs. To the contrary, tariffs lie exclusively with congress. They are expressly *not* part of the executive branch's core constitutional power.

143.   A fundamental principle for analyzing the history between the Tribes and the U.S. is that Treaties are ratified by the Senate, and all commerce is negotiated with Congress.

---

[63] U.S. Const. art. II, § 3.
[64] *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585 (1952).
[65] *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).
[66] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); see also *Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986).
[67] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); citing James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961).

144.    The Jay Treaty is the Supreme law of the land. It provides that Native Americans shall not be subject to duties or tariffs when crossing the border. No Treaty has abrogated that.

145.    The Canada Orders rely on the IEEPA as the source of authority to impose universal tariffs in response to a stated emergency. The Orders are *ultra vires* because there is "no express constitutional or statutory authorization" empowering the President to impose universal tariffs under the limited authority of the IEEPA. The Orders fail to distinguish the differences between borders and the harm that universal tariffs might mitigate. Although Executive Order 14193 specifically states that drug seizures at the northern border are a fraction of what is seized at the Mexican border, it does not place that in the context of the fact that the Canada-U.S. border is almost three times longer than the 3,145-kilometer-long border between Mexico and the United States. The Canada-U.S. border is considerably less fortified than the Mexico-U.S. border. Canada's border to the U.S. has around 75+ border crossing locations compared to Mexico's 22 (Montana alone has 14). There is no effort to tailor the sanctions in Executive Order 14193 to address these significant differences.

146.    The IEEPA was specifically passed to limit the President's authority to invoke sweeping invocation of national emergency powers. The Congress is to be consulted *prior* to the implementation of universal tariffs, which did not happen.

147.   The IEEPA was specifically limited by the Trade Sanctions Reform and Export Enhancement Act of 2000; the Orders do not distinguish or account for this Act.[68]

148.   The Native American rights under the Jay Treaty are recognized in Article VI of the Constitution as the Supreme law of the land. The Canada Orders violate the separation of powers because Congress, not the President, has the explicit authority to regulate commerce with foreign nations and the Indian Tribes. Article I of the Constitution expressly gives Congress alone the power to impose tariffs and to regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes. This authority is a uniquely legislative function that may not be delegated. The Canada Orders are *ultra vires* because not only has Congress failed to delegate the authority that the Executive branch is exercising, it may not constitutionally do so.

149.   The Canada Orders create uncertainty and have unilaterally created and escalated a trade war that imposes irreparable harm on Plaintiffs, and their communities.

150.   The Canada Orders are *ultra vires* because they violate the separation of powers by exercising power granted exclusively to Congress and because Congress cannot delegate the power exercised in these Orders. In addition, the

---

[68] 22 USC Ch. 79 Section 7201 *et seq*.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        **50**

Canada Orders violate the Jay Treaty's rights to Native Americans to cross the border without paying tariffs.

151.    The *ultra vires* nature of the Canada Orders has already harmed, and continues to harm, Plaintiffs and their communities.

## COUNT II

### (Against All Defendants)

*Unconstitutional Deprivation of Procedural Due Process*

152.    Plaintiffs repeat and reallege the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

153.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."

154.    The United States owes an obligation of trust to the Indian tribes. This trust obligation is substantive as well as procedural.[69]

155.    The substantive trust obligation, obligates the United States to ensure that tribal resources are protected. The procedural trust obligation includes the obligation to enter into "meaningful tribal participation" with Tribal Nations and their members. The United States must involve Tribes and their members in the

---

[69] *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942); Ed Goodman, *Protecting Habitat for Off-Reservation Tribal Hunting and Fishing Rights: Tribal Co-Management as a Reserved Right*, 30 Ent. L. 279, 299 (2000).

procedural process, "not merely as commentators, but as sovereign governments with power sharing capacity."[70]

156.   The Canada Orders interfere with and impair multiple liberty and property interests protected by the Due Process Clause. Plaintiffs have an ongoing business and community interest in continued cross border trade without universal tariffs unilaterally imposed in violation of the constitutional framework that limits such action to Congress, and provides an opportunity to be heard and for due process. The erratic nature of the on-again off-again tariffs and escalating trade war has harmed Plaintiffs and denied their communities and businesses the ability to plan, prepare and engage in commerce, and impairs their private contracts. The Canada Orders harm Plaintiffs' constitutionally protected property interests by imposing tariffs without notice and an opportunity to be heard.

157.   Plaintiffs did not receive notice prior to being subjected to The Canada Orders. As illustrated by Plaintiff St. Goddard's experience, it was not even clear what the basis of the calculation of the tariff was, or why it was being imposed. Plaintiffs were not aware, prior to the issuance of the Canada Orders, of the severity of the tariffs. Mountain Chief's business is being severely impacted

---

[70] 29 American Indian Law Review 1, *Glacier Park and the Blackfoot Natin's Reserved Rights: Does a Valid Tribal Co-Management Authority Exist?* Curt Sholar (2004), p. 169, citing Goodman, *id*.

and the ongoing volatility of the tariffs and the unpredictability of what is coming next makes it impossible to plan.

158.    No compelling government interest justifies Defendants' violation of Plaintiffs' due process rights. If tariffs are a reasonable approach, Congress is the sole branch of government that can impose them, especially to the scope and extent set out in the Canada Orders. The decision to impose the tariffs was based on improper purposes. Among other improper purposes, the Canada Orders were adopted to raise revenue to justify tax cuts, not to address a stated emergency. Rarely if at all has the pretextual "emergency" been discussed publicly. The last round of tariffs, and pause, evidences the pretext.

159.    The Canada Orders are based on false premises, but even assuming they were not, the tariffs are unrelated to the stated emergency. The improper purpose of the order and absence of any legitimate justification demonstrates that the Canada Orders are an abusive, irrational abuse of power that violates nearly 250 years of constitutional order, and shocks the conscience in its abrupt unilateral imposition of commercial tariffs on every country across the board (other than Russia and North Korea), such that they could not be justified by any level of process.

160.   As a result of Defendants' actions, Plaintiffs' Fifth Amendment right to due process has been violated. Defendants' violation of due process has caused Plaintiffs to suffer ongoing and irreparable harm.

## COUNT III

## (Against All Defendants)

### *Unconstitutional Deprivation of Due Process (Void for Vagueness)*

161.   Plaintiffs repeat and reallege the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

162.   A federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."[71]

163.   The Canada Orders are unconstitutionally vague and violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution. They do not provide Plaintiffs with any basis to understand when the tariffs will be imposed, how they might be lifted, or what the basis for future tariffs may be. When Plaintiff St. Goddard made an emergency trip to Canada to buy the only replacement tractor wheel he could find, he was surprised with a random tariff invoice that had been

---

[71] *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); see also *Johnson v. United States*, 576 U.S. 591, 595 (2015).

calculated on the fly by a Border Patrol Agent using calculations that were not provided.

164.   The Canada Orders do not provide any guidance on which goods are subject to which tariffs, and created enormous confusion and unpredictability related to trade relations. The Orders are vague and imposition has been erratic and unpredictable. Escalation in response to external stimuli unrelated to trade have nothing to do with the Plaintiffs' business and their communities but cause tremendous harm as a result of the arbitrary and discriminatory enforcement at random periods. The process used to charge a tariff on St. Goddard's tractor wheel was arbitrary and uncertain, and violates the Due Process Clause of the Fifth Amendment.

165.   The chaos that has continued since the last round of tariffs has only made things worse. Plaintiffs cannot plan or prepare for a short summer season for agriculture, construction, and tourism.

166.   Plaintiffs' communities and businesses in Montana depend on being able to plan and prepare for a short construction, farming, and tourist, season, potentially high energy costs in fire season, and other needs. The Canada Orders fail to provide adequate notice as to what tariffs may be imposed and why. The Canada Orders are unconstitutionally vague because Plaintiffs cannot plan, hire, prepare, order, and address the upcoming summer season based on the language in

the Orders. There is no way to know how long the tariffs will last, why they remain, and whether they will change. Because the Orders are vague about when tariffs will be imposed, changed, or lifted, they are a violation of Plaintiffs constitutional due process rights.

167. The Canada Orders mean the Plaintiffs will have to face tariffs imposed on a whim and vaguely defined emergency and when it exists, or not. This vague and unpredictable imposition of harm violates Plaintiffs' constitutional due process rights.

168. There is no compelling government interest to usurp congressional authority to regulate commerce among foreign nations and the Tribes, and the decision to adopt the Canada Orders was based on improper purposes. The Orders are based on false premises, but even assuming that they were not, the tariffs are disproportionate and not intended to address the declared emergency. This improper purpose and absence of any legitimate justification demonstrates that the Orders are an irrational abuse of power that shocks the conscience, such that they could not be justified by any level of process.

169. As a result of Defendants' actions, Plaintiffs' Fifth Amendment right to due process has been violated. Defendants' violation of due process has caused Plaintiffs to suffer ongoing and irreparable harm.

AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF        56

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court:

170.   Declare the Canada Orders as unconstitutional as violative of: the Separation of Powers; Article I and Article VI and the Fifth Amendment to the Constitution; and the Jay Treaty.

171.   Immediately enjoin implementation of the Canada Orders pending hearing and consideration on a motion for preliminary injunction and permanent injunction.

172.   Preliminarily, then permanently, enjoin implementation of the Canada Orders.

173.   Declare that tariffs cannot be imposed on cross-border transactions at Montana ports of entry.

174.   Declare that tariffs cannot be imposed on tribal members.

175.   An award to Plaintiffs of the costs of this action and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

176.   Grant such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 11th day of April, 2025.

TRANEL LAW FIRM, P.C.


By:   */s/ Monica Tranel*
　　　Monica Tranel


AMENDED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF     **57**