LUKE MATHERS
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, NY 10278
(212) 264-9236
luke.mathers@usdoj.gov

*Attorney for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| SUSAN WEBBER, JONATHAN ST. GODDARD, RHONDA MOUNTAIN CHIEF, DAVID MOUNTAIN CHIEF and Does 1 – 100, | CV 25-26-GF-DLC |
| Plaintiffs, | |
| vs. | **DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO TRANSFER** |
| U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM in her official capacity; and THE UNITED STATES OF AMERICA, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ....................................................................................2

   I.   Legal Background.............................................................................................2

      A.   The International Emergency Economic Powers Act..............................2

      B.   The National Emergencies Act ................................................................3

      C.   Section 232 ..............................................................................................5

   II.   Executive Orders Under IEEPA ..................................................................8

   III.   Proclamations Under Section 232 .............................................................12

   IV.   Plaintiffs' Suit............................................................................................14

STANDARD OF REVIEW ..................................................................................16

ARGUMENT ........................................................................................................18

   I.   Transfer is Required Because The Court of International Trade Has
Exclusive Subject-Matter Jurisdiction Over Plaintiffs' Complaint......................18

CONCLUSION ....................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Akins v. Saxbe*,
  380 F. Supp. 1210 (D. Me. 1974) ..........................................................................23

*Akins v. United States*,
  551 F.2d 1222 (C.C.P.A. 1977) ............................................................................23

*Alcan Sales, Div. of Alcan Aluminum Corp. v. United States*,
  693 F.2d 1089 (Fed. Cir. 1982) ............................................................................22

*Arjay Associates, Inc. v. Bush*,
  891 F.2d 894 (Fed. Cir. 1989) ..............................................................................20

*Commodities Export Co. v. U.S. Customs Serv.*,
  957 F.2d 223 (6th Cir. 1992) ................................................................................20

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*,
  18 F.3d 1581 (Fed. Cir. 1994) ..............................................................................19

*Cornet Stores v. Morton*,
  632 F.2d 96 (9th Cir. 1980) ..................................................................................22

*Corus Group PLC v. Int'l Trade Comm'n*,
  352 F.3d 1351 (Fed. Cir. 2003) ............................................................................21

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ................................................................................................2

Earth Island Institute v. Christopher,
  6 F.3d 648 (9th Cir. 1990) ....................................................................................22

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ..............................................................................................16

*Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites*,
  456 U.S. 694 (1982) ..............................................................................................16

*Int'l Custom Prods., Inc. v. United States*,
  791 F.3d 1329 (Fed. Cir. 2015) ............................................................................23

*K-Mart Corp. v. Cartier, Inc.*,
  485 U.S. 176 (1988) ...................................................................................19

*Kokkonen v. Guardian Life Ins. Co.*,
  511 U.S. 375 (1994) ...................................................................................16

*Labat-Anderson, Inc. v. United States*,
  346 F. Supp. 2d 145 (D.D.C. 2004) ...........................................................16

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985) .....................................................................21

*Miami Free Zone Corp. v. Foreign Trade Zones Bd.*,
  22 F.3d 1110 (D.C. Cir. 1994) ...................................................................19

*Motion Systems Corp. v. Bush*,
  437 F.3d 1356 (Fed. Cir. 2006) .................................................................21

*Orleans Int'l, Inc. v. United States*,
  334 F.3d 1375 (Fed. Cir. 2003) .................................................................19

*Pentax Corp. v. Myhra*,
  72 F.3d 708 (9th Cir. 1995) ................................................................ 17, 19

*PrimeSource Bldg. Prods., Inc. v. United States*,
  59 F.4th 1255 (Fed. Cir. 2023) ................................................................ 5, 13

*Regan v. Wald*,
  468 U.S. 222 (1984) .....................................................................................2

*Shell Offshore Inc. v. Greenpeace, Inc.*,
  864 F. Supp. 2d 839 (D. Alaska 2012) .......................................................16

*Simon Design Inc. v. United States*,
  609 F.3d 1335 (Fed. Cir. 2010) .................................................................21

*Sires v. State of Wash.*,
  314 F.2d 883 (9th Cir. 1963) .....................................................................16

*Solar Energy Indus. Assn. v. United States*,
  111 F.4th 1349 (Fed. Cir. 2024) ...............................................................20

*Totes-Isotoner Corp. v. United States*,
   594 F.3d 1346 (Fed. Cir. 2010) ............................................................20

*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021) ...................................................... *passim*

*U.S. Shoe Corp. v. United States*,
   523 U.S. 360 (1998) .............................................................................20

*United States v. Garrow*,
   88 F.2d 318 (C.C.P.A. 1937) ..............................................................23

*United States v. Universal Fruits & Vegetables Corp.*,
   370 F.3d 829 (9th Cir. 2004) ..............................................................17

*United States v. Yoshida Int'l*,
   526 F.2d 560 (C.C.P.A. 1975) ............................................................22

*USP Holdings, Inc. v. United States*,
   36 F.4th 1359 (Fed. Cir. 2022) .........................................................5, 6

## Constitutional Provisions

U.S. Const. amend. V ...............................................................................23

U.S. Const. art. 1, § 8, cl. 1 ....................................................................19

## Statutes

19 U.S.C. § 1862 .......................................................................................5

19 U.S.C. § 1862(b) (1955) ......................................................................6

28 U.S.C. § 1331 .....................................................................................19

28 U.S.C. § 1337(c) ................................................................................18

28 U.S.C. § 1581(i) ................................................................. 1, 21, 22, 24

28 U.S.C. § 1581(i)(1)(A) .......................................................................18

28 U.S.C. § 1581(i)(1)(B) ................................................................. 18, 21

28 U.S.C. § 1581(i)(1)(D) .................................................................... 18, 21

28 U.S.C. § 1631 ............................................................................... 1, 17, 24

50 U.S.C. § 1621(a) ..............................................................................4

50 U.S.C. § 1622 ..................................................................................5

50 U.S.C. § 1641 ..................................................................................4

50 U.S.C. § 1662(d) ..............................................................................5

50 U.S.C. § 1701(a) ..............................................................................2

50 U.S.C. § 1702(a)(1)(B) ....................................................................3

50 U.S.C. §1702(b) ...............................................................................3

Act of May 28, 1926, ch. 411, 44 Stat. 669 ......................................20

Customs Administration Act of 1890, ch. 407, 26 Stat. 131 ..................20

National Emergencies Act,
   Pub. L. No. 94-412, 90 Stat. 1255 (1976) ..............................................3

Omnibus Trade and Competitiveness Act of 1988,
   Pub. L. No. 100-418, 102 Stat. 1107 (1988) .......................................7

**Treaties**

Treaty of Amity, Commerce, and Navigation,
   U.S.–Great Britain,Nov. 19, 1794, 8 Stat. 116, T.S. No. 105 ......................... 1, 23

**Rules**

Federal Rule of Civil Procedure 65 .......................................................17

**Executive Orders and Implementing Notices**

Executive Order 14193 of February 1, 2025,
   *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025) ...........................................8

Executive Order 14197 of February 3, 2025,
    *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 10,
    2025)..........................................................................................................9

Executive Order 14231 of March 6, 2025,
    *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern
    Border*, 90 Fed. Reg. 11,785 (Mar. 11, 2025).........................................................9

Executive Order 14257 of April 2, 2025,
    *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That
    Contribute to Large and Persistent Annual United States Goods Trade Deficits*,
    90 Fed. Reg. 15,041 (Apr. 7, 2025)...........................................................10, 11, 12

Executive Order 14259 of April 8, 2025,
    *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value
    Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14,
    2025)........................................................................................................11

Executive Order 14266 of April 9, 2025,
    *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and
    Alignment*..................................................................................................11

*Implementation of Duties on Aluminum Pursuant to Proclamation 10895 Adjusting
    Imports of Aluminum Into the United States*, 90 Fed. Reg. 11,251 (Mar. 5, 2025)
    ................................................................................................................14

*Implementation of Duties on Steel Pursuant to Proclamation 10896 Adjusting
    Imports of Steel Into the United States*, 90 Fed. Reg. 11,249 (Mar. 5, 2025)......14

*Notice of Implementation of Additional Duties on Products of Canada Pursuant to
    the President's Executive Order 14193, Imposing Duties To Address the Flow of
    Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,423 (Mar. 6, 2025)..9

Proclamation 10886 of January 20, 2025,
    *Declaring a National Emergency at the Southern Border of the United States*, 90
    Fed. Reg. 8,327 (Jan. 29, 2025)..............................................................................8

Proclamation 10895 of February 10, 2025,
    *Adjusting Imports of Aluminum Into the United States*, 90 Fed. Reg. 9,807 (Feb.
    18, 2025)..................................................................................................14

Proclamation 10896 of February 10, 2025,
*Adjusting Imports of Steel Into the United States*, 90 Fed. Reg. 10,896 (Feb. 18, 2025).................................................................................................14

Proclamation 9705 of March 8, 2018,
*Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018).................................................................................................12

Proclamation 9980 of January 24, 2020,
*Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States*, 85 Fed. Reg. 5,281 (Jan. 29, 2020)..................................13

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 2941 (3d ed.)....................................................16

H.R. Rep. No. 84-745 (1955)....................................................................................6

H.R. Rep. No. 85-1761 (1958)..................................................................................7

Hearings Before the Committee on Ways and Means On H.R. 3 Trade and International Economic Policy Other Proposals Reform Act, 100th Cong. (Feb. 5, 10, 18, 20, 1987)..................................................................................................7

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. (Mar. 6, 1975)............................................4

S. Rep. No. 94-922 (1976)........................................................................................3

S. Rep. No. 95-466 (1977).........................................................................................2

U.S. General Accounting Office, *International Trade: Revitalizing the U.S. Machine Tool Industry* (July 1990).........................................................................7

**INTRODUCTION**

In the International Economic Emergency Powers Act of 1977 (IEEPA), Congress confirmed the President's power to, among other things, "regulate importation" of foreign goods to deal with a national emergency.  In Section 232 of the Trade Expansion Act of 1962, Congress likewise confirmed the President's authority to take action to "adjust imports" of goods, the importation of which threaten to impair national security.  The President, acting under IEEPA , has regulated imports by imposing tariffs on Canadian goods through a series of Executive Orders, to deal with unusual and extraordinary threats to the United States's national security, foreign policy, and economy.  The President, under Section 232, has also imposed tariffs on imports of certain articles and their derivatives to reduce or eliminate the threat to U.S. national security posed by such imports.

Plaintiffs disagree with these policy choices.  They challenge the President's authority to impose tariffs under IEEPA and Section 232, on both constitutional and statutory grounds, and claim an exemption from these tariffs under the Treaty of Amity, Commerce, and Navigation, U.S.–Great Britain, art. III, Nov. 19, 1794, 8 Stat. 116, T.S. No. 105 (the Jay Treaty).  But all of plaintiffs' arguments concern the imposition of tariffs—over which the Court of International Trade has *exclusive* jurisdiction.  28 U.S.C. § 1581(i).  Section 1631 of Title 28 of the U.S. Code

requires transfer when there is "a want of jurisdiction" in the original court and where the action could have been brought in another court. Because the Court of International Trade has exclusive jurisdiction over the subject matter in plaintiffs' complaint, the case should be transferred to the Court of International Trade for any further proceedings, including any threshold challenges.

## STATEMENT OF FACTS

### I.    Legal Background

#### A.    The International Emergency Economic Powers Act

In 1977, Congress enacted IEEPA. *See* S. Rep. No. 95-466, at 1–2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. When adopting IEEPA, Congress modified the existing Trading with the Enemy Act (TWEA) so that it applied only in periods of war, but also extended the President's authority to periods of declared national emergencies. *See Regan v. Wald*, 468 U.S. 222, 227–28 (1984). Although the broad powers granted to the President under IEEPA are "essentially the same as" those under its predecessor TWEA, *id.*; *see Dames & Moore v. Regan*, 453 U.S. 654, 671–72 (1981) (IEEPA was "directly drawn" from the language of TWEA), IEEPA provides authority to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," 50 U.S.C. § 1701(a). Once the

2

President declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate . . . importation . . . with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).  In full, the relevant subsection authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation  of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States[.]

*Id.*  IEEPA also contains narrowly focused exceptions to this broad grant of authority, which, among other things, state that the President may not regulate or prohibit "the importation from any country . . . of any information or informational materials . . .." *Id.* §1702(b)(1)–(4).  But none of the exceptions involves the President's authority to impose tariffs to deal with a declared national emergency.

### B.  The National Emergencies Act

The National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–51), was an effort by Congress to "establish procedural guidelines for the handling of future emergencies with provision for regular Congressional review."  S. Rep. No. 94-922, at 1 (1976).  The

statute includes directives for Presidential declarations of national emergencies with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Congress did not place any conditions on the President's ability to declare a national emergency. Instead, Congress committed this determination to the President as "it would be wrong to try to circumscribe with words what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. 27 (Mar. 6, 1975) (statement of Sen. Mathias); *see also id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

Recognizing that a declaration of an emergency was essentially a political question to be resolved by the political branches, Congress gave itself the exclusive oversight authority over a President's national emergency declaration. For instance, Congress directs that a declaration of a national emergency be "immediately . . . transmitted to the Congress and published in the Federal Register." 50 U.S.C. § 1621(a). Congress also directs the President to comply with congressional reporting requirements pertaining to that declaration. *Id.* § 1641(a)–(c). Congress may terminate a national emergency through a joint resolution that is subject to fast-track procedures, and Congress is directed to meet

"[n]ot later than six months after a national emergency is declared, and [every six months thereafter]," to consider whether the emergency shall be terminated.  *Id.* § 1622(a)–(c).  A declaration of a national emergency also "terminate[s] on the anniversary of the declaration" unless the President provides notice to Congress that the emergency "continue[s]."  *Id.* § 1662(d).

## C. Section 232

Section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862, directs the President to "adjust the imports" of articles and its derivatives that threaten to impair "national security" after receiving a report of an investigation undertaken by the Secretary of Commerce.  To reduce or eliminate the threat to impair national security, Section 232 authorizes the President to use his discretion and "adopt and carry out a plan of action that allows adjustments of specific measures, including by increasing import restrictions, in carrying out the plan over time."  *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1319 (Fed. Cir. 2021); *accord PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1257, 1261 (Fed. Cir. 2023); *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1370–71 (Fed. Cir. 2022).  This authorization includes "imposition on imports of derivatives of the articles that were the subject of the Secretary's threat," even if "the Secretary has [not] investigated and reported on such derivatives."  *PrimeSource*, 59 F.4th at 1262.  The threat the President is addressing need not be

"imminent," and the President's tariffs can be "indefinit[e]," allowing the President to "remov[e] [the tariffs] at a later time once the President determines that [they are] no longer necessary." *USP Holdings*, 36 F.4th at 1369, 1371. And how to address the threat "is a matter committed to the President's discretion, and the President's exercise of his judgment . . . is beyond the scope of [courts'] review." *Id.* at 1371.

This national-security provision has a long pedigree and was first enacted as part of the Trade Agreement Extension Act of 1955. *See Transpacific Steel*, 4 F.4th at 1324–29 (describing the statute's history and historical practice). As originally enacted, upon a finding that an "article is being imported into the United States in such quantities as to threaten to impair the national security," the President was directed to "take such action as he deems necessary to adjust the imports of such article to a level that will not threaten to impair the national security." 19 U.S.C. § 1862(b) (1955).

Congress understood that "the authority granted to the President under this provision is a continuing authority." H.R. Rep. No. 84-745 (1955). Through the Trade Agreements Extension Act of 1958, Congress maintained the scope of this delegation, affirming that it intended to provide "those best able to judge national security needs . . . [with] a way of taking *whatever* action is needed to avoid a

6

threat to the national security through imports." H.R. Rep. No. 85-1761 (1958) (emphasis added).

In 1988, Congress amended Section 232 as part of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988). Among other changes, Congress shortened the time for the Secretary of Commerce's investigation, shortened the time for the President's submission of a written report to Congress, and set time frames for presidential concurrence with the Secretary's report and implementation. The history of this change reflects Congress' intent to address what it perceived to be presidential inaction in the face of national-security threats posed to the domestic machine-tool industry by Japanese and Taiwanese imports. *See* U.S. General Accounting Office, *International Trade: Revitalizing the U.S. Machine Tool Industry*, at 9 (July 1990); Hearings Before the Committee on Ways and Means On H.R. 3 Trade and International Economic Policy Other Proposals Reform Act, 100th Cong., Part 1 at 199 (Feb. 5, 10, 18, 20, 1987) ("Many of our trade problems can be directly traced to the delays, the abuses of discretion, and ill-considered policy decisions by those officially appointed to carry out American policy. One of the worst delays was the machine tools case."); *see also Transpacific Steel*, 4 F.4th at 1329 ("The new provisions have the evident purpose of producing more action, not less—and of counteracting a perceived problem of inaction, including inaction through delay.").

## II.    Executive Orders Under IEEPA

At issue in this case are two declared national emergencies and the President's actions to deal with these emergencies.  In January 2025, the President declared the flow of contraband drugs like fentanyl to the United States through illicit distribution networks, and the resulting public-health crisis, to be a national emergency.  Proclamation 10886 of January 20, 2025, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 29, 2025).  On February 1, 2025, the President found that "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug-trafficking organizations], other drug and human traffickers, criminals at large, and drugs" had contributed to this crisis.  Executive Order 14193 of February 1, 2025, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025).  Using his broad powers under IEEPA, the President took action to deal with the unusual and extraordinary threat to the United States's national security, foreign policy, and economy, ordering that most Canadian imports be assessed a 25% duty (except for energy and energy resources, which were assessed a 10% duty).  *Id.*

Two days later, on February 3, 2025, the President issued an Executive Order recognizing that Canada had taken immediate steps to alleviate the flow of illicit drugs and illegal aliens into the United States, but finding that additional

time was needed to assess those steps' sufficiency.  Executive Order 14197 of February 3, 2025, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 10, 2025).  Accordingly, the President paused most of the tariffs on Canadian goods until March 4, 2025.  *Id.*

Shortly after that pause lapsed, the President issued an Executive Order exempting from these IEEPA tariffs all Canadian goods that qualify for duty-free entry under the United States-Mexico-Canada Agreement.  Executive Order 14231 of March 6, 2025, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (Mar. 11, 2025).  As a result, only goods imported from Canada that are not USMCA-qualifying—generally, goods that do not originate from North America—are subject to the tariffs imposed by Executive Order 14193.  In accordance with these Executive Orders, the U.S. Department of Homeland Security, through U.S. Customs and Border Protection, implemented these tariffs by modifying the Harmonized Tariff Schedule of the United States (HTSUS), which sets forth the duty rates for all imported goods. *Notice of Implementation of Additional Duties on Products of Canada Pursuant to the President's Executive Order 14193, Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,423 (Mar. 6, 2025).

Then, on April 2, 2025, the President declared a separate national emergency, finding "that underlying conditions, including a lack of reciprocity in

our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States."  Executive Order 14257 of April 2, 2025, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025).  That threat, the President found, "has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system."  *Id.*

In particular, these "large and persistent annual U.S. goods trade deficits" have "atrophied" our nation's "domestic production capacity" to the point where, now, the United States' "military readiness" and "national security posture" are "comprise[d]"—an "especially acute" emergency given "the recent rise in armed conflicts abroad."  *Id.* at 15,044–55.  The Executive Order explains, for instance, that "because the United States has supplied so much military equipment to other countries, U.S. stockpiles of military goods are too low to be compatible with U.S. national defense interests."  *Id.* at 15,043.  Additionally, "[i]ncreased reliance on foreign producers for goods also has compromised U.S. economic security by rendering U.S. supply chains vulnerable to geo-political disruption and supply

10

shocks." *Id.* (noting the existence of supply disruptions currently being caused by "Houthi rebels . . . attacking cargo ships in the Middle East"). "The future of American competitiveness depends on reversing" the hemorrhage of manufacturing and manufacturing jobs to create "the industrial base" the nation "needs for national security," as well as safeguarding the vitality of the nation's food and agriculture sectors. *Id.* at 15,044.

Again, using his broad powers under IEEPA, the President took action that he deemed necessary and appropriate to deal with this unusual and extraordinary threat to the United States's national security and economy, and imposed a 10% duty on most imported goods. *Id.* at 15,045. These duties took effect on April 5, 2025, with select countries having additional duties imposed on April 9. *Id.* Since the initial declaration, the President has twice taken additional actions that he deemed necessary and appropriate to address this national emergency. Executive Order 14266 of April 9, 2025, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*; Executive Order 14259 of April 8, 2025, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025).

The 10% duty on most imported goods imposed on April 5, and the additional country-specific duties imposed on April 9, do not currently apply to

Canadian goods. Under section 3(e) of Executive Order 14257, these duties "shall not apply in addition to the *ad valorem* rate of duty specified by the existing orders described in" section 3(d)—that is, the other orders that plaintiffs challenge. And if those other orders "are terminated or suspended, all items of Canada . . . that qualify as originating under USMCA shall not be subject to an additional *ad valorem* rate of duty, while articles no qualifying as originating under USMCA shall be subject to an *ad valorem* rate of duty of 12 percent," except for certain goods. *Id.*

### III.    Proclamations Under Section 232

In January 2018, the Secretary of Commerce transmitted to the President reports on the Secretary's investigation into the effect of imports of steel and aluminum on the United States' national security. The Secretary found that steel and aluminum articles were being imported into the United States in such quantities and under such circumstances as to threaten to impair national security. The President concurred with the Secretary's findings and took action to adjust imports of steel and aluminum by imposing 25% tariffs on steel articles and 10% tariffs on aluminum articles. But Canada was outside the scope of these tariffs. Proclamation 9705 of March 8, 2018, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018); Proclamation 9704 of March 8, 2018, *Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 11,619 (Mar.

15, 2018).  The President modified these Proclamations over time based on

information supplied by the Secretary of Commerce, including by subjecting

derivative steel and aluminum articles to tariffs as well.  Proclamation 9980 of

January 24, 2020, *Adjusting Imports of Derivative Aluminum Articles and

Derivative Steel Articles into the United States*, 85 Fed. Reg. 5,281 (Jan. 29, 2020).

The U.S. Court of Appeals for the Federal Circuit upheld these

Proclamations as valid exercises of the President's delegated authority to adjust

imports under Section 232.  *See, e.g.*, *Transpacific Steel LLC v. United States*, 4

F.4th 1306 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 1414 (2022); *PrimeSource

Bldg. Prods., Inc. v. United States*, 59 F.4th 1255 (Fed. Cir.), *cert. denied*, 144 S.

Ct. 345 (2023) (upheld against constitutional and statutory-authorization

challenges).

On February 10, 2025, the President issued two new Proclamations that

extended Section 232 tariffs to Canadian steel and aluminum articles.  The

Secretary of Commerce informed the President that although the Section 232

tariffs were successful in reducing imports and encouraging domestic steel

manufacturing, imports of steel and aluminum articles from certain countries like

Canada had increased over the past few years and now threatened to impair

national security.  Accordingly, the President exercised his discretion and imposed

25% tariffs on Canadian steel, aluminum, and derivative articles.  Proclamation

13

10896 of February 10, 2025, *Adjusting Imports of Steel Into the United States*, 90

Fed. Reg. 10,896 (Feb. 18, 2025); Proclamation 10895 of February 10, 2025,

*Adjusting Imports of Aluminum Into the United States*, 90 Fed. Reg. 9,807 (Feb.

18, 2025).  The U.S. Department of Commerce, through its Bureau of Industry and

Security, implemented these tariffs by modifying the HTSUS.  *Implementation of*

*Duties on Steel Pursuant to Proclamation 10896 Adjusting Imports of Steel Into*

*the United States*, 90 Fed. Reg. 11,249 (Mar. 5, 2025); *Implementation of Duties*

*on Aluminum Pursuant to Proclamation 10895 Adjusting Imports of Aluminum*

*Into the United States*, 90 Fed. Reg. 11,251 (Mar. 5, 2025).

### IV.   Plaintiffs' Suit

On April 4, 2025, plaintiffs, State Senator Susan Webber and Mr. Jonathan

St. Goddard, filed a complaint and a motion for a preliminary injunction in this

Court.  ECF No. 1; ECF No. 4 (Mot.).  The complaint was amended on April 11,

2025, to add Ms. Rhonda Mountain Chief and Mr. David Mountain Chief as

plaintiffs.  ECF No. 15 (Am. Compl.).  The caption of the amended complaint also

lists "Does 1 – 100" as plaintiffs, but the body of the amended complaint makes no

mention of these pseudonymous individuals or why they are unable to sue in their

own name.

Senator Webber "is an enrolled member of the Blackfeet Nation" and

"represents business that regularly do business across the border of Canada, import

goods for the tribal community, and for personal use[.]" Am. Compl. ¶ 11.  She

claims to have "standing to bring [her] claims on behalf of" others who are

allegedly "harmed by the tariffs."  *Id.*  Mr. St. Goddard, "an enrolled member of

the Blackfeet Tribe," says that, on March 25, 2025, he paid a 25% tariff on a tractor

part that he bought in Canada.  *Id.* ¶ 12; ECF No. 1-2.  And Mr. and Ms. Mountain

Chief, also "enrolled member[s] of the Blackfeet Tribe," allege that the challenged

tariffs will hurt their tourism business and "personal . . . relationships."  Am.

Compl. ¶¶ 13–14.  Plaintiffs allege that the Executive Orders and Proclamations

imposing tariffs on Canadian goods "exceed the President's constitutional and

statutory authority," "violate the separation of powers," are "an unconstitutional

attempt by the Executive to regulate commerce," and violate plaintiffs'

"constitutional and treaty rights."  *Id.* ¶ 4.

As a remedy, plaintiffs request that the Court "[d]eclare" the challenged

Executive Orders and Proclamations "as unconstitutional as violative of: the

Separation of Powers; Article I and Article VI and the Fifth Amendment to the

Constitution; and the Jay Treaty"; "[i]mmediately," "[p]reliminarily, then

permanently enjoin implementation of the" challenged Executive Orders and

Proclamations; "[d]eclare that tariffs cannot be imposed on cross-border

transactions at Montana ports of entry"; and "[d]eclare that tariffs cannot be

imposed on tribal members."  *Id.* ¶¶ 170–74.

## STANDARD OF REVIEW

Federal courts have an obligation to ensure in each case that their actions are "limited to those subjects encompassed within a statutory grant of jurisdiction." *Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites*, 456 U.S. 694, 701 (1982). A plaintiff bears the burden to establish the subject matter jurisdiction of the district court. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). And a district court "must resolve any challenge to its jurisdiction before it may proceed" to consider a motion for a preliminary injunction. *Labat-Anderson, Inc. v. United States*, 346 F. Supp. 2d 145, 149 (D.D.C. 2004) (transferring action to the Court of Federal Claims under 28 U.S.C. § 1631 due to lack of subject-matter jurisdiction and denying preliminary-injunction motion as moot); *accord Sires v. State of Wash.*, 314 F.2d 883, 884 (9th Cir. 1963) ("[W]here there is no underlying cause of action over which the district court has primary jurisdiction, it may not entertain an application for an injunction."); *Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 842 (D. Alaska 2012) ("[T]he jurisdictional question . . . must be considered before evaluating [a] motion for a preliminary injunction, as the latter issue is moot if this court is without subject matter jurisdiction."); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2941 (3d ed.)

(Federal Rule of Civil Procedure 65 "assumes that the district court already has acquired jurisdiction and that venue is proper.").

Ninth Circuit "precedent requires courts faced with conflicts between the broad grants of jurisdiction to the district courts and the grant of exclusive jurisdiction to the Court of International Trade to resolve those conflicts by upholding the exclusivity of the Court of International Trade's jurisdiction." *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836 (9th Cir. 2004) (cleaned up).  Accordingly, when the Court of International Trade appears to have subject-matter jurisdiction over an action filed in district court, "the prudent thing to do is to . . . transfer the case to the [Court of International Trade,] so that [it] can determine the question of its own jurisdiction."  *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995).  Such transfer is accomplished through 28 U.S.C. § 1631, which provides that whenever a civil action is filed and a court finds "there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action  . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed . . . ."

# ARGUMENT

## I.  Transfer is Required Because The Court of International Trade Has Exclusive Subject-Matter Jurisdiction Over Plaintiffs' Complaint

This Court lacks jurisdiction to hear this case and should promptly transfer it to the Court of International Trade.

The Court of International Trade possesses "exclusive jurisdiction" over "any civil action commenced against" federal agencies or officers that "arises out of any law of the United States providing for . . . tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue" or under any law providing for "revenue from imports."  28 U.S.C. § 1581(i)(1)(A), (B).  The Court of International Trade also has exclusive jurisdiction over any civil action arising out of any law "providing for administration and enforcement with respect to the matters referred to in" any preceding provision of section 1581(i)(1). *Id.* § 1581(i)(1)(D).  To emphasize that the district courts lack concurrent jurisdiction over these specialized subject matters, Congress separately provided that "[t]he district courts shall not have jurisdiction under this section of any matter within the exclusive jurisdiction of the Court of International Trade . . .." *Id.* § 1337(c).

The Supreme Court has confirmed that these statutes mean exactly what they say.  When one of the "grants of exclusive jurisdiction to the Court of International Trade" applies, all other district courts are "divested of jurisdiction" over the

action.  *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182–83 (1988).   Other courts (including the Ninth Circuit) similarly agree that "section 1581(i) removes specific actions from the general federal-question jurisdiction of the district courts (under 28 U.S.C. § 1331) and places them in the jurisdiction of the Court of International Trade."  *Orleans Int'l, Inc. v. United States*, 334 F.3d 1375, 1378 (Fed. Cir. 2003); *see also Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994); *Pentax Corp.*, 72 F.3d at 711; *Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110, 1112 (D.C. Cir. 1994).  Thus, where Congress has provided that the Court of International Trade is the exclusive forum for challenges to tariffs imposed on imported merchandise, the district courts have no power to act.

The Court of International Trade's exclusive jurisdiction over tariff cases serves an important function:  it consolidates this area of law "in one place . . . with an already developed expertise in international trade and tariff matters," thus ensuring a "degree of uniformity and consistency."  *Conoco*, 18 F.3d at 1586. Consolidating tariff matters in a single jurisdiction protects the constitutional requirement that "[a]ll Duties, Imposts, and Excises shall be uniform throughout the United States."  U.S. Const. art. 1, § 8, cl. 1.  If tariff challenges like those raised by plaintiffs could be brought in any (or every) district court, there would be a risk of inconsistent results and different tariffs imposed in different regions of the

country, in direct conflict with Congress' statutory design.  Indeed, Congress has consistently placed judicial review of tariff matters in a single forum, beginning with the Board of Appraisers in 1890, *see* Customs Administration Act of 1890, ch. 407, 26 Stat. 131; then the Customs Court in 1926, *see* Act of May 28, 1926, ch. 411, 44 Stat. 669; and finally today's Court of International Trade.

Reflecting the exclusive jurisdiction statutes and their underlying purposes of ensuring uniformity, the Court of International Trade's exclusive jurisdiction is broad, encompassing constitutional challenges to tariffs, duties, exactions, and embargoes.  *See*, *e.g.*, *U.S. Shoe Corp. v. United States,* 523 U.S. 360 (1998) (constitutional challenge to Harbor Maintenance Fee); *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1350–51 (Fed. Cir. 2010) (constitutional challenge to Tariff Schedules of the United States); *cf. Arjay Associates, Inc. v. Bush*, 891 F.2d 894 (Fed. Cir. 1989) (constitutional challenge to embargo on imports from certain Japanese companies); *see also Commodities Export Co. v. U.S. Customs Serv.*, 957 F.2d 223, 229–30 (6th Cir. 1992).

Its exclusive jurisdiction also includes challenges to Presidential proclamations imposing duties—including those imposed under Section 232.  *See, e.g., Transpacific Steel*, 4 F.4th 1306 (Presidential proclamation imposing tariffs on steel under Section 232); *Solar Energy Indus. Assn. v. United States*, 111 F.4th 1349, 1351 (Fed. Cir. 2024) (Presidential proclamation imposing tariffs on solar

20

panels pursuant to section 201 of Trade Act of 1974); *Simon Design Inc. v. United States*, 609 F.3d 1335 (Fed. Cir. 2010) (Presidential proclamation modifying tariff schedules); *Motion Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006) (en banc) (Presidential proclamation declining to impose China-specific safeguard tariff); *Corus Group PLC v. Int'l Trade Comm'n*, 352 F.3d 1351 (Fed. Cir. 2003) (Presidential proclamation imposing duties on certain steel products, based on Section 201 of the Trade Act of 1974); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) (Presidential proclamation imposing duties on mushrooms based on Section 201).  Indeed, as the Federal Circuit explained, a challenge to a President's action to impose tariffs under Section 232 is "clearly cover[ed]" by the Court of International Trade's exclusive jurisdiction provisions.  *Transpacific Steel*, 4 F.4th at 1318 n.5 (citing 28 U.S.C. § 1581(i)).

Here, plaintiffs challenge the President's authority to impose tariffs under IEEPA and Section 232 and claim an exemption from paying these duties under the long-extinct Jay Treaty.  Each of these questions, including all threshold questions, falls squarely within the exclusive subject matter jurisdiction of the Court of International Trade because they arise out of laws providing for tariffs or the administration or enforcement of those laws.  28 U.S.C. § 1581(i)(1)(B), (D).  This Court thus lacks jurisdiction over the case and should transfer it to the Court of International Trade.

This is precisely how similar cases have been treated. Under TWEA (IEEPA's predecessor statute), the Ninth Circuit transferred a claim about the imposition of a 10% duty on imports to the Court of Customs and Patent Appeals (a predecessor to the Court of Appeals for the Federal Circuit, which heard all trade appeals from the Customs Court—the predecessor to the Court of International Trade). *See Cornet Stores v. Morton*, 632 F.2d 96, 99–100 (9th Cir. 1980) (affirming district court's decision that claim seeking recovery of duties paid pursuant to order authorized under TWEA fell within exclusive jurisdiction of the Customs Court); *accord Earth Island Institute v. Christopher*, 6 F.3d 648, 651 (9th Cir. 1990) (holding that challenge to embargo provision fell exclusively within Court of International Trade's jurisdiction under § 1581(i)). Along the same lines, the Court of Customs and Patent Appeals also adjudicated another TWEA matter brought in the right forum. *See, e.g.*, *United States v. Yoshida Int'l*, 526 F.2d 560 (C.C.P.A. 1975); *accord Alcan Sales, Div. of Alcan Aluminum Corp. v. United States*, 693 F.2d 1089 (Fed. Cir. 1982).

In fact, the Court of International Trade is currently considering two similar challenges to the President's authority under IEEPA. *Barnes v. United States*, No. 25-0043, ECF No. 3 (Compl.); *VOS Selections Inc. v. Trump*, No. 25-00066 (ECF No. 2 (Compl.). In both cases, plaintiffs, like Simplified, claim that the President was not authorized to impose tariffs under IEEPA. And while the United States

has asked the court to dismiss the complaint in *Barnes* for lack of standing because Mr. Barnes has not established harm, for the reasons stated above, the consideration of whether to dismiss belongs exclusively to the Court of International Trade. *See Barnes*, ECF No. 9.

The same is true of claims for exemptions from paying duties under the Jay Treaty or under the Fifth Amendment. These claims fall within the Court of International Trade's bailiwick—where they routinely have been heard and rejected on the merits. *See, e.g.*, *Akins v. Saxbe*, 380 F. Supp. 1210, 1217 (D. Me. 1974) (holding that a Jay Treaty claim belonged in the Customs Court); *Akins v. United States*, 551 F.2d 1222 (C.C.P.A. 1977) (affirming the Customs Court's holding that the Jay Treaty is "no longer in force"); *United States v. Garrow*, 88 F.2d 318 (C.C.P.A. 1937) (same); *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) (affirming the Court of International Trade's dismissal of a Fifth Amendment claim, explaining that "the Constitution does not provide a right to import merchandise under a particular . . . rate of duty, or even afford a protectable interest to engage in international trade" (quotation marks and citations omitted)). And, as noted, challenges to Section 232 duties recently have been heard in the Court of International Trade and the Federal Circuit without any jurisdictional doubt. *See, e.g.*, *Transpacific Steel*, 4 F.4th at 1318 n.5 (holding that

Court of International Trade's exclusive jurisdiction provision "clearly covers" challenges to Section 232 duties).

Moreover, over the last several years, the Court of International Trade has entertained thousands of challenges to various Presidential actions imposing tariffs. *See, e.g. HMTX Indus. v. United States*, No. 200-00177 (Ct. Int'l Trade); appeal filed, No. 23-1891, ECF No. 5 (Fed. Cir. May 25, 2023) (identifying the 4,100 similar cases stayed pending resolution of the appeal).  Likewise, the Court of International Trade routinely exercises jurisdiction under 28 U.S.C. § 1581(i) to review agency determinations under the APA.  *See, e.g.*, *Sea Shepherd New Zealand v. United States*, No. 20-00112 (Ct. Int'l Trade); *Maui and Hector's Dolphin Defenders NZ Inc. v. Nat'l Marine Fisheries Svc.*, No. 24-00218 (Ct. Int'l Trade).  This complaint should be treated no differently.

Because only the Court of International Trade has jurisdiction to hear this dispute regarding the imposition of tariffs, this Court lacks jurisdiction, so it is in the interests of justice to promptly transfer this action to the Court of International Trade.  28 U.S.C. § 1631.

24

## CONCLUSION

For these reasons, defendants respectfully request that the Court transfer this action in its entirety to the Court of International Trade.

DATED: April 14, 2025

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

SOSUN BAE
Senior Trial Counsel
BLAKE W. COWMAN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch

KURT G. ALME
United States Attorney
MARK S. SMITH
Assistant United States Attorney
2601 2nd Ave N.
Suite 3200
Billings, MT 59101
(406) 657-6101

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Luke Mathers
LUKE MATHERS
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, NY 10278
(212) 264-9236
luke.mathers@usdoj.gov
*Attorneys for Defendants*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the undersigned, relying on the word count feature of the word-processing system used to prepare the foregoing brief, certifies that this brief contains 5,552 words.

/s/ Luke Mathers
LUKE MATHERS
