LUKE MATHERS
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, NY 10278
(212) 264-9236
luke.mathers@usdoj.gov

*Attorney for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| SUSAN WEBBER, JONATHAN ST. GODDARD, RHONDA MOUNTAIN CHIEF, and DAVID MOUNTAIN CHIEF, | CV 25-26-GF-DLC |
| Plaintiffs, | |
| vs. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM in her official capacity; and THE UNITED STATES OF AMERICA, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION** |
| Defendants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................2

I.  The President's Authority Under IEEPA To Regulate Importation During
National Emergencies .......................................................................2

A. Executive Order 14193 .................................................................6

B. Executive Order 14257 .................................................................8

II.  The President's Authority To Take Actions To Adjust Imports Under
Section 232 .........................................................................................9

A. Proclamations 10895 and 10896........................................10

III. Plaintiffs Sue To Enjoin The Executive Orders And Proclamations ...........12

ARGUMENT ....................................................................................14

I.  Plaintiffs Are Unlikely To Succeed On The Merits .....................................16

A. This Court Lacks Jurisdiction Because The Court of International
Trade Has Exclusive Jurisdiction Over Challenges To Tariffs .....................16

B. Senator Webber, Rhonda Mountain Chief, and David Mountain Chief
Lack Article III Standing ................................................................17

C. .IEEPA's Text, Context, And History Confirm That It Authorizes The
President To Impose Tariffs.............................................................19

D. Section 232 Likewise Authorizes The President To Impose Tariffs. 27

E. IEEPA And Section 232 Are Valid Delegations Of Congressional
Authority ....................................................................................28

F. The Major-Questions Doctrine Does Not Apply Here, And Even If It Did, Congress Spoke Clearly When Authorizing The Imposition Of Tariffs Through IEEPA ................................................................................. 30

G. The President's Declarations Of Emergencies Underlying The Challenged Tariffs Are Unreviewable .............................................. 33

H. The Jay Treaty Is No Longer In Effect ............................................ 36

I.      The Tariffs Raise No Fifth Amendment Concerns .................... 37

II. Plaintiffs Will Not Suffer Irreparable Harm In The Absence Of An Injunction Simply Because They Must Pay Tariffs ............................................ 39

III. The Public Interest And Equities Favor Permitting The President To Exercise Foreign-Affairs Powers To Protect The Nation ................................. 41

CONCLUSION ................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A Classic Time v. United States*,
 123 F.3d 1475 (Fed. Cir. 1997) ........................................................................ 38

*Akins v. United States*,
 551 F.2d 1222 (C.C.P.A. 1977) .................................................................... 36-37

*Al-Bihani v. Obama*,
 619 F.3d 1 (D.C. Cir. 2010) ........................................................................ 26-27

*Alcan Sales v. United States*,
 693 F.2d 1089 (Fed. Cir. 1982) ........................................................................ 21

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
 751 F.2d 1239 (Fed. Cir. 1985) ........................................................................ 38

*Am. Inst. for Int'l Steel, Inc. v. United States*,
 806 F. App'x 982 (Fed. Cir. 2020) .............................................................. 28, 30

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
 526 U.S. 40 (1999) .......................................................................................... 38

*Amoco Prod. Co. v. Village of Gambell*,
 480 U.S. 531 (1987) ........................................................................................ 14

*B-W. Imports, Inc. v. United States*,
 75 F.3d 633 (Fed. Cir. 1996) ...................................................................... 26, 32

*Baker v. Carr*,
 369 U.S. 186 (1962) ........................................................................................ 34

*Bd. of Trs. of Univ. of Ill. v. United States*,
 289 U.S. 48 (1933) .......................................................................................... 21

*Beacon Products*,
 63 F. Supp. 1191 (D. Mass. 1986) .................................................................... 35

*Biden v. Missouri*,
 595 U.S. 87 (2022) .......................................................................................... 33

*City and County of San Francisco*,
    896 F.3d 1225 (9th Cir. 2018)............................................................. 43

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ........................................................................ 17

*Ctr. for Biological Diversity v. Trump*,
    453 F. Supp. 3d 11 (D.D.C. 2020) ................................................. 34-35

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ........................................................... 4-5, 23, 25

*Dep't of Educ. v. Brown*,
    600 U.S. 551 (2023) ........................................................................ 18

*Dep't of Navy v. Egan*,
    484 U.S. 518 (1988) ................................................................... 32, 33

*East Bay Sanctuary Covenant v. Barr*,
    934 F.3d 1026 (9th Cir. 2019) ........................................................ 43

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................ 18

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
    426 U.S. 548 (1976) ............................................................... 27-28, 28

*Florsheim Shoe Co., Div. of Interco v. United States*,
    744 F.2d 787 (Fed. Cir. 1984) ..................................................... 26, 36

*Georgia v. Public.Resource.Org, Inc.*,
    590 U.S. 255 (2020) ........................................................................ 24

*Gibbons v. Ogden*,
    22 U.S. 1 (1824) ............................................................................. 21

*Gilda Indus., Inc. v. United States*,
    446 F.3d 1271 (Fed. Cir. 2006) ................................................... 38-39

*Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*,
    739 F.2d 466 (9th Cir. 1984) .......................................................... 39

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ........................................................................ 31

*Groves v. Slaughter*,
  40 U.S. 449 (1841) ........................................................................ 21

*Gundy v. United States*,
  588 U.S. 128 (2019) ................................................................ 28, 30

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ...................................................... 39

*Herrera v. Wyoming*,
  587 U.S. 329 (2019) ...................................................................... 37

*Hoffman Estates v. Flipside, Hoffman Estates*,
  455 U.S. 489 (1982) ...................................................................... 38

*Humane Soc. of U.S. v. Clinton*,
  236 F.3d 1320 (Fed. Cir. 2001) .................................................... 27

*Int'l Custom Prods., Inc. v. United States*,
  791 F.3d 1329 (Fed. Cir. 2015) .................................................... 38

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986) ...................................................................... 34

*Karnuth v. United States ex rel. Albro*,
  279 U.S. 231 (1929) ...................................................................... 36

*Khademi v. South Orange Cmty. Coll. Dist.*,
  194 F. Supp. 2d 1011 (C.D. Cal. 2002) ........................................ 30

*Labat-Anderson, Inc. v. United States*,
  346 F. Supp. 2d 145 (D.D.C. 2004) .............................................. 17

*Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*,
  634 F.2d 1197 (9th Cir. 1980) ................................................. 39, 40

*Loving v. United States*,
  517 U.S. 748 (1996) ................................................................. 29-30

*Martin v. Mott*,
  25 U.S. 19 (1827) .......................................................................... 34

*McNichols v. Windsor Capital Mortgage Corp.*,
  2008 WL 11414608 (D. Mont. Jan. 10, 2008) .............................. 44

*Moroccanoil, Inc. v. Zotos Intl., Inc.*,
230 F. Supp. 3d 1161 (C.D. Cal. 2017) ............................................................ 44

*Munaf v. Geren*,
553 U.S. 674 (2008) ........................................................................................... 17

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................................................. 19

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................... 41

*Norwegian Nitrogen Prods. Co. v. United States*,
288 U.S. 294 (1933) ........................................................................................... 38

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985) ........................................................................... 39

*PrimeSource Bldg. Prods., Inc. v. United States*,
59 F.4th 1255 (Fed. Cir. 2023)................................................................ 10, 11, 38

*Pulsifer v. United States*,
601 U.S. 124 (2024) ........................................................................................... 22

*Regan v. Wald*,
468 U.S. 222 (1984) ........................................................................................ 4, 23

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
490 U.S. 477 (1989) ........................................................................................... 37

*Rowland v. Watch Tower Bible & Tract Soc'y of New York, Inc.*,
2023 WL 2954851 (D. Mont. Apr. 14, 2023) ............................................... 39-40

*Santiago v. Rumsfeld*,
2004 WL 3008724 (D. Or. Dec. 29) .................................................................. 35

*Santucci v. City & Cnty. of Honolulu*,
2022 WL 17176902 (D. Haw. Nov. 23) ............................................................. 30

*Sec. Pac. Nat. Bank v. Gov't & State of Iran*,
513 F. Supp. 864 (C.D. Cal. 1981) ............................................................... 23, 25

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976) ............................................................................................. 19

*Sires v. Washington,*
    314 F.2d 883 (9th Cir. 1963) ............................................................. 17

*State of Nebraska v. Su,*
    121 F.4th 1 (9th Cir. 2024) ............................................................... 31

*Taggart v. Lorenzen,*
    587 U.S. 554 (2019) ........................................................................ 24

*Town of Chester v. Laroe Estates, Inc.,*
    581 U.S. 433 (2017) ........................................................................ 17

*Transpacific Steel LLC v. United States,*
    4 F.4th 1306 (Fed. Cir. 2021) ...................................... 10, 11, 27, 28

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ................................................................. 32, 34

*United States v. Garrow,*
    88 F.2d 318 (C.C.P.A. 1937) ........................................................... 37

*United States v. George S. Bush & Co.,*
    310 U.S. 371 (1940) ........................................................................ 36

*United States v. Lucero,*
    989 F.3d 1088 (9th Cir. 2021) ......................................................... 38

*United States v. Native Wholesale Supply Co.,*
    822 F. Supp. 2d 326 (W.D.N.Y. 2011) ............................................ 37

*United States v. Shih,*
    73 F.4th 1077 (9th Cir. 2023) ................................................... 29, 35

*United States v. Spawr Optical Rsch., Inc.,*
    685 F.2d 1076 (9th Cir. 1982) ................................. 21, 25, 33, 35

*United States v. Yoshida Int'l, Inc.,*
    526 F.2d 560 (C.C.P.A. 1975) .............................. 2, 21, 25, 29

*Util. Air Reg. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................................ 32

*West Virginia v. EPA,*
    597 U.S. 697 (2022) .................................................................. 32, 33

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ........................................................................... 14, 30, 39, 41

*Yakus v. United States*,
   321 U.S. 414 (1944) ............................................................................. 42

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................. 31-32

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ............................................................................. 32-33

**Presidential Proclamations and Executive Orders**

83 Fed. Reg. 11,619 (Mar. 15, 2018) ...................................................... 11

83 Fed. Reg. 11,625 (Mar. 15, 2018) ...................................................... 11

85 Fed. Reg. 5,281 (Jan. 29, 2020) ........................................................ 11

90 Fed. Reg. 8,327 (Jan. 29, 2025) ........................................................ 6

90 Fed. Reg. 9,113 (Feb. 7, 2025) ......................................................... 6, 7

90 Fed. Reg. 9,114 (Feb. 7, 2025) .........................................................6, 7

90 Fed. Reg. 9,183 (Feb. 10, 2025) ........................................................ 7

90 Fed. Reg. 9,807 (Feb. 18, 2025) ........................................................ 12

90 Fed. Reg. 9,817 (Feb. 18, 2025) ........................................................ 12

90 Fed. Reg. 11,249 (Mar. 5, 2025) ........................................................ 12

90 Fed. Reg. 11,251 (Mar. 5, 2025) ........................................................ 12, 13

90 Fed. Reg. 11,423 (Mar. 6, 2025) ........................................................ 7

90 Fed. Reg. 11,785 (Mar. 11, 2025) ...................................................... 7

90 Fed. Reg. 15,041 (Apr. 7, 2025) ........................................................ 8, 9

**Statutes**

19 U.S.C. §1862 ................................................................................ 9, 10, 27

28 U.S.C. § 2643 ............................................................................... 40

50 U.S.C. §1621 ................................................................................ 3, 4

50 U.S.C. §1622 ................................................................................ 4, 36

50 U.S.C. §1641 ................................................................................ 4

50 U.S.C. §1662 ................................................................................ 4

50 U.S.C. §1701 ............................................................... 5

50 U.S.C. §1702 .................................................. 5, 19, 20, 22, 23, 25

50 U.S.C. §1703 ............................................................. 5, 6

## Constitutional Provisions

U.S. Const. art. II, § 2 .......................................................... 42

## Legislative Materials

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941) ................2

H.R. Rep. No. 95-459 (1977)....................................................2, 3, 6, 24

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) ....................3

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. 27 (March 6, 1975) ................................................3

S. Rep. No. 94-922 (1976)...............................................................3

S. Rep. No. 95-466 (1977)...............................................................3

Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917) .....2

## Other

American Heritage Dictionary (1976) ....................................................20

Black's Law Dictionary (5th ed. 1979) ...............................................20

Black's Law Dictionary (12th ed. 2024)..................................................20

Nat'l Bureau of Econ. Research, Douglas A. Irwin, *The Nixon Shock after Forty Years: The Import Surcharge Revisited* (2012).........................................24

Random House College Dictionary (rev. ed. 1975).......................................20

Webster's Third New International Dictionary (1976)...........................................20

# INTRODUCTION

Plaintiffs challenge the President's authority to impose tariffs under the International Emergency Economic Powers Act of 1977 (IEEPA) and Section 232 of the Trade Expansion Act of 1962, on both constitutional and statutory grounds, and claim an exemption from these tariffs under the Treaty of Amity, Commerce, and Navigation, U.S.-Great Britain, art. III, Nov. 19, 1794, 8 Stat. 116, T.S. No. 105 (the Jay Treaty). ECF No. 4 (Mot.) at 11-18. On these theories, plaintiffs ask the Court to enjoin the Executive Orders and Proclamations imposing the tariffs.

Plaintiffs are unlikely to succeed on the merits. To start, this Court lacks subject-matter jurisdiction first, because all civil actions challenging the imposition of tariffs, including this action, fall within the Court of International Trade's exclusive jurisdiction, and second, because most plaintiffs lack Article III standing. Putting these jurisdictional problems aside, plaintiffs fail to establish likely success on the merits. Both IEEPA and Section 232 clearly authorize the President to impose tariffs, as already held by courts interpreting IEEPA's predecessor and Section 232. Through IEEPA and Section 232, Congress lawfully delegated to the President authority to regulate importation through the imposition of tariffs under specified circumstances. To the extent that plaintiffs challenge the emergency declarations underlying the challenged IEEPA tariffs themselves, those

declarations are unreviewable political questions. Plaintiffs' remaining arguments likewise fail. Plaintiffs are thus unlikely to succeed on the merits of any of their claims.

Nor have plaintiffs established that they would be irreparably harmed without an injunction, or that the equities favor them rather than a President conducting foreign-affairs actions to protect our nation's national security and economy. The Court should thus deny plaintiffs' motion and dismiss this action in its entirety for lack of jurisdiction.

## BACKGROUND

### I.    The President's Authority Under IEEPA To Regulate Importation During National Emergencies

The history of IEEPA begins with its predecessor the Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917)—a statute that was first intended for use during wartime, but then expanded to apply during times of peace. *See* First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941). In 1971, TWEA was invoked during peacetime to impose tariffs. Specifically, "President Nixon declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports." H.R. Rep. No. 95-459, at 5 (1977); *see United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575-76 (C.C.P.A. 1975) (affirming the President's imposition of tariffs during peacetime).

After President Nixon invoked TWEA to impose tariffs, Congress passed two new laws to oversee the President's use of emergency powers: the National Emergencies Act and IEEPA. *See* H.R. Rep. No. 95-459, at 6-7 (1977).

First, the National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976), "establish[ed] procedural guidelines for the handling of future emergencies with provision for regular Congressional review." S. Rep. No. 94-922, at 1 (1976); *see* S. Rep. No. 95-466, at 2 (1977) (explaining that, with certain exemptions, the National Emergencies Act "provides safeguards for the role of Congress in declaring and terminating national emergencies…").

The statute includes directives for Presidential declarations of national emergencies with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power…." 50 U.S.C. §1621(a). Congress did not place any conditions on the President's ability to declare a national emergency. Instead, Congress committed this determination to the President, as "it would be wrong to try to circumscribe with words with what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. 27 (March 6, 1975) (statement of Sen. Mathias); *see also id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

3

Recognizing that a declaration of emergencies was a political question to be resolved by the political branches, Congress gave itself exclusive oversight authority over the President's national emergency declaration. For instance, Congress directed that a declaration of a national emergency be "immediately … transmitted to the Congress and published in the Federal Register." 50 U.S.C. §1621(a). Congress also directed the President to comply with congressional reporting requirements pertaining to that declaration. *Id.* §1641(a)-(c). Congress may terminate a national emergency through a joint resolution that is subject to fast-track procedures, and it is directed to meet "[n]ot later than six months after a national emergency is declared, and [every six months thereafter]," to consider whether the emergency shall be terminated. *Id.* §1622(a)-(c). A declaration of a national emergency also "terminate[s] on the anniversary of the declaration" unless the President provides notice to Congress that the emergency "continue[s]." *Id.* §1662(d).

Second, Congress separated the President's authority to act in wartime and peacetime. Congress modified the existing TWEA so that it applied only in periods of declared wars, and adopted IEEPA, which extended the President's authority to periods of declared national emergencies during peacetime. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). The broad powers granted to the President under IEEPA are "essentially the same as" those under its predecessor TWEA. *Id.*; *see*

4

*Dames & Moore v. Regan*, 453 U.S. 654, 671-72 (1981) (observing that the operative language of IEEPA was "directly drawn" from the language of TWEA). IEEPA authorizes the President to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. §1701(a). Once the President declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate...importation...with respect to any property, subject to the jurisdiction of the United States." *Id.* §1702(a)(1)(B). Unlike TWEA, IEEPA contains narrowly focused exceptions to this broad grant of authority, which, among other things, provide that the President may not regulate or prohibit "the importation from any country...of any information or informational materials…." *Id.* §1702(b)(1)-(4). But none of the exceptions involves the President's authority to impose tariffs to deal with a declared national emergency.

Additionally, through IEEPA, Congress gave itself extensive oversight authority in addition to that afforded by the National Emergencies Act. 50 U.S.C. §1703(d). The President, when possible, "shall consult with the Congress before exercising" IEEPA authorities "and shall consult regularly with the Congress so long as such authorities are exercised." *Id.* §1703(a). The President also "shall

immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* §1703(b)-(c).

Even so, Congress explained that IEEPA's "new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." H.R. Rep. No. 95-459, at 10 (1977). For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency." *Id.*

**A. Executive Order 14193**

In January 2025, the President declared the flow of contraband drugs like fentanyl to the United States through illicit distribution networks, and the resulting public-health crisis, to be a national emergency. *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 29, 2025). On February 1, the President found that "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug-trafficking organizations], other drug and human traffickers, criminals at large, and drugs" had contributed to this crisis. Executive Order 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113, 9,114 (Feb. 7, 2025). Using his broad powers under IEEPA, the President took action to deal with the unusual and extraordinary threat to the United States's national security, foreign policy, and

economy, ordering that most Canadian imports be assessed a 25% duty (except for energy and energy resources, which were assessed a 10% duty). *Id.*

Two days later, the President issued an Executive Order recognizing that Canada had taken immediate steps to alleviate the flow of illicit drugs and illegal aliens into the United States, but finding that additional time was needed to assess those steps' sufficiency. Executive Order 14197, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 10, 2025). Accordingly, he paused most of the tariffs on Canadian goods until March 4, 2025. *Id.*

Soon after that pause lapsed, the President issued an Executive Order exempting from these IEEPA tariffs all Canadian goods that qualify for duty-free entry under the United States-Mexico-Canada Agreement (USMCA). Executive Order 14231, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (Mar. 11, 2025). As such, only goods imported from Canada that are not USMCA-qualifying—generally, goods that do not originate from North America according to the specific rules of origin outlined by the USMCA—are subject to the tariffs imposed by Executive Order 14193. In accordance with these Executive Orders, the Department of Homeland Security implemented these tariffs by modifying the Harmonized Tariff Schedule of the United States (HTSUS), which sets forth the duty rates for all imported goods. 90 Fed. Reg. 11,423 (Mar. 6, 2025).

## B. Executive Order 14257

On April 2, 2025, the President declared a separate national emergency, finding "that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States," which "has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system." Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025).

In particular, these "large and persistent annual U.S. goods trade deficits" have "atroph[ied]" our nation's "domestic production capacity" to the point where, now, the United States' "military readiness" and "national security posture" are "compromise[d]"—an "especially acute" emergency given "the recent rise in armed conflicts abroad." *Id.* at 15,044-45. The Executive Order explains, for instance, that "because the United States has supplied so much military equipment to other countries, U.S. stockpiles of military goods are too low to be compatible

8

with U.S. national defense interests." *Id.* at 15,043. Additionally, "[i]ncreased reliance on foreign producers for goods also has compromised U.S. economic security by rendering U.S. supply chains vulnerable to geo-political disruption and supply shocks." *Id.* (noting the existence of supply disruptions currently being caused by "Houthi rebels...attacking cargo ships in the Middle East"). "The future of American competitiveness depends on reversing" the hemorrhaging of manufacturing and manufacturing jobs to create "the industrial base" the nation "needs for national security," as well as safeguarding the vitality of the nation's food and agriculture sectors. *Id.* at 15,044.

Again, using his broad powers under IEEPA, the President took action to deal with this unusual and extraordinary threat to the United States's national security and economy, imposing a 10% duty on most imported goods—including goods from Canada. *Id.* at 15,045. These duties took effect on April 5, 2025. *Id.*

## II.    The President's Authority To Take Actions To Adjust Imports Under Section 232

Section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. §1862, directs the President to "adjust the imports" of articles that threaten to impair "national security." The procedure begins with an investigation conducted by the Secretary of Commerce "to determine the effects on the national security of imports of [an] article." *Id.* §1862(b)(1)(A). Within 270 days, the Secretary must submit to the President a report containing his findings on "the effect of the

importation of such article...upon the national security," as well as "recommendations" for presidential "action or inaction." *Id.* §1862(b)(3). The statute then directs the President, if he concurs, to take action, within a certain amount of time, that, in his judgment, is necessary to address the threat of impairment to national security. *Id.* §1862(c).

Section 232's text, history, and purpose show that Section 232 authorizes the President "to adopt and carry out a plan of action that allows adjustments of specific measures, including by increasing import restrictions, in carrying out the plan over time," including after the timing directives in the statute. *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1319-31 (Fed. Cir. 2021) (discussing text, history, purpose, and practice of Section 232). In the initial plan or subsequent "adjustments under a timely adopted plan," the President "may take action against derivative products regardless of whether the Secretary has investigated and reported on such derivatives." *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1262 (Fed. Cir. 2023) (citing §1862(b) & (c)(1)(A)(ii)), *cert. denied*, 144 S.Ct. 345 (2023), *and* 144 S.Ct. 561 (2024).

### A. Proclamations 10895 and 10896

In January 2018, the Secretary of Commerce transmitted to the President reports on the Secretary's investigation into the effect of imports of steel and aluminum on national security. The Secretary found that steel and aluminum

articles were being imported into the United States in such quantities and under such circumstances as to threaten to impair national security. The President concurred with the Secretary's findings and timely adopted a plan of action to address the threats. He adjusted imports of steel and aluminum by imposing 25% tariffs on steel articles and 10% tariffs on aluminum articles. But Canada was initially exempted from these tariffs. Proclamation 9705, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018); Proclamation 9704, *Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 11,619 (Mar. 15, 2018). The President modified these Proclamations over time based on information supplied by the Secretary, including by subjecting derivative steel and aluminum articles to tariffs. Proclamation 9980, *Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States*, 85 Fed. Reg. 5,281 (Jan. 29, 2020).

The Federal Circuit upheld these Proclamations as valid exercises of the President's authority to adjust imports under Section 232. *See, e.g.*, *Transpacific Steel*, 4 F.4th at 1306; *PrimeSource*, 59 F.4th at 1255.

On February 10, 2025, the President, in line with the plan of action in his prior orders, extended Section 232 tariffs to Canadian steel and aluminum articles based on fresh information. The Secretary of Commerce informed the President that, although the Section 232 tariffs were successful in reducing imports and

encouraging domestic steel manufacturing, imports of steel and aluminum articles
from certain countries like Canada had increased over the past few years and
threatened to impair national security. Accordingly, the President imposed 25%
tariffs on Canadian steel, aluminum, and derivative articles. Proclamation 10896,
*Adjusting Imports of Steel Into the United States*, 90 Fed. Reg. 9,817 (Feb. 18,
2025); Proclamation 10895, *Adjusting Imports of Aluminum Into the United States*,
90 Fed. Reg. 9,807 (Feb. 18, 2025). The Department of Commerce implemented
these tariffs by modifying the HTSUS. 90 Fed. Reg. 11,249 (Mar. 5, 2025); 90
Fed. Reg. 11,251 (Mar. 5, 2025).

### III.    Plaintiffs Sue To Enjoin The Executive Orders And Proclamations

On April 4, 2025, plaintiffs, State Senator Susan Webber and Mr. Jonathan
St. Goddard, filed a complaint and motion for preliminary and permanent
injunctive relief in this Court. ECF No. 1; ECF No. 4. Plaintiffs amended the
complaint to add Ms. Rhonda Mountain Chief and Mr. David Mountain Chief as
plaintiffs. ECF No. 15 (Am. Compl.).

Senator Webber "is an enrolled member of the Blackfeet Nation" and
"represents businesses that regularly do business across the border of Canada,
import goods for the tribal community, and for personal use[.]" among other
constituencies. Am. Compl. ¶ 11. She claims to have "standing to bring [her]
claims on behalf of" others who are allegedly "harmed by the tariffs and who have

no plain, speedy, or adequate remedy at law." *Id.* Jonathan St. Goddard, "an enrolled member of the Blackfeet Tribe," *Id.* ¶ 12, says that, in March 2025, he paid a 25% tariff on a tractor part that he bought in Canada. ECF No. 1-2 (St. Goddard Decl). And Rhonda and David Mountain Chief, also "enrolled member[s] of the Blackfeet Tribe," allege that the challenged tariffs will hurt their tourism business and "personal and business relationships." Am. Compl. ¶¶ 13-14. Plaintiffs allege that the Executive Orders and Proclamations imposing tariffs on Canadian goods "exceed the President's constitutional and statutory authority," "violate the separation of powers," and are "an unconstitutional attempt by the Executive to regulate commerce," and violate plaintiffs' "constitutional and treaty rights." *Id.* ¶ 4.

As a remedy, plaintiffs request that the Court "[d]eclare" the challenged orders "as unconstitutional as violative of: the Separation of Powers; Article I and Article VI and the Fifth Amendment to the Constitution; and the Jay Treaty"; "[i]mmediately," "[p]reliminarily, then permanently enjoin implementation of the" challenged orders; "[d]eclare that tariffs cannot be imposed on cross-border transactions at Montana ports of entry"; and "[d]eclare that tariffs cannot be imposed on tribal members," among other relief. *Id.* ¶¶ 170-74.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). To obtain preliminary injunctive relief, plaintiffs must show that they are "likely to succeed on the merits," they are "likely to suffer irreparable harm in the absence of preliminary relief," "that the balance of equities tips in" their favor, "and that an injunction is in the public interest." *Id.* at 20. These same factors apply for permanent injunctive relief, *id.* at 32, except that plaintiffs must show "actual success" on the merits rather than a likelihood thereof, *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).

## ARGUMENT

Plaintiffs' motion for a preliminary and permanent injunction should be denied because plaintiffs fail to establish a likelihood of success on the merits.

To begin, plaintiffs filed this action in a court that lacks jurisdiction. Congress vested the Court of International Trade with exclusive jurisdiction over civil actions challenging the imposition of tariffs. Plaintiffs' motion fails for this reason alone, and their case must be dismissed or transferred for the same reason.

Even assuming this Court had jurisdiction to hear plaintiffs' motion for injunctive relief, plaintiffs still would be unlikely to succeed on any of their claims.

14

1.      Three plaintiffs—Senator Webber, Rhonda Mountain Chief, and David Mountain Chief—lack Article III standing to bring their claims. Senator Webber claims standing only in her representative role, but she lacks third-party standing to assert others' claims. Rhonda and David Mountain Chief likewise lack Article III standing to sue over the challenged tariffs. The alleged harm to their tourism business and personal relationships is too speculative and attenuated to be traceable to the challenged tariffs or redressable by the Court. Their claims must also be dismissed for lack of jurisdiction.

2.      Should the Court reach the merits, plaintiffs' arguments still would be unlikely to succeed. IEEPA permits the President to "regulate…importation," and Section 232 permits the President to "adjust imports." Those terms encompass the power to impose tariffs on imported goods, as courts have already held in interpreting TWEA, IEEPA's predecessor, as well as Section 232. Congress has long delegated authority to regulate importation and international commerce to the President, and courts have upheld both IEEPA and Section 232 as constitutionally valid delegations. Nor does the major-questions doctrine undermine that conclusion.

Plaintiffs' remaining merits arguments—about the validity of the President's declarations of national emergencies, the Jay Treaty, and the Fifth Amendment— similarly are unlikely to succeed. The President's declaration of a national

emergency is an unreviewable political question. The Jay Treaty has not been in effect for over 200 years, as courts have repeatedly held. And plaintiffs' Fifth Amendment vagueness and due-process arguments fail because they identify no lack of clarity in the tariffs and lack a protected right to import.

The other injunction factors also weigh against relief. Plaintiffs fail to establish that they would be irreparably harmed in the absence of an injunction. They can pay the tariffs and sue for a refund, just as in any other revenue case. Moreover, the equities and public interest favor a President using his foreign-affairs powers to protect our nation's economy and national security.

## I. Plaintiffs Are Unlikely To Succeed On The Merits

### A. This Court Lacks Jurisdiction Because The Court of International Trade Has Exclusive Jurisdiction Over Challenges To Tariffs

Plaintiffs' request for injunctive relief fails at the outset because they have filed this case in the wrong court. As explained in the Government's motion to transfer, the Court of International Trade has exclusive jurisdiction over all of plaintiffs' claims, even those relating to IEEPA. *See* Def.'s Br. in Support of Mot. to Transfer, ECF No. 19. In fact, the Court of International Trade has already ordered the Government to respond by April 21, 2025, to plaintiff's motion for a temporary restraining order in a similar case brought by plaintiffs alleging identical claims of *ultra vires* action by the President and violation of the nondelegation

doctrine. The Court must therefore dismiss this action or transfer it to the Court of International Trade.

For the same reason, injunctive relief is unavailable. A court "may not entertain an application for an injunction" where the court lacks jurisdiction. *Sires v. Washington*, 314 F.2d 883, 884 (9th Cir. 1963); *accord Labat-Anderson, Inc. v. United States*, 346 F.Supp.2d 145, 149, 155 (D.D.C. 2004) (denying injunctive relief due to lack of jurisdiction, and transferring action to the Court of Federal Claims).

## B. Senator Webber, Rhonda Mountain Chief, and David Mountain Chief Lack Article III Standing

Independently, this Court lacks jurisdiction over the claims of Senator Webber, Rhonda Mountain Chief, and David Mountain Chief. *See Munaf v. Geren*, 553 U.S. 674, 690 (2008). Standing is not "dispensed in gross." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quotation omitted). Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quotation omitted). As part of that demonstration, a plaintiff must at least plausibly allege that he "has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (cleaned up).

Here, Senator Webber has failed to allege any Article III injury. She relies solely on her representation of unnamed others who allegedly will import goods from Canada subject to the challenged tariffs. Am. Compl. ¶ 11. But an uninjured state lawmaker lacks third-party standing to sue on her constituents' behalf. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 n.5 (2024) ("The third-party standing doctrine does not allow doctors to shoehorn themselves into Article III standing simply by showing that their patients have suffered injuries or may suffer future injuries.").

Rhonda Mountain Chief and David Mountain Chief also fail to establish Article III standing. Any alleged harm to their business and personal relationships—even assuming that counts as a cognizable injury—must be "fairly traceable" to the challenged tariffs, meaning that "there must be a causal connection between the injury and the conduct complained of." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quotation omitted). Similarly, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (cleaned up).

Here, "it is purely speculative whether" the Mountain Chiefs' alleged injury "fairly can be traced to" the challenged tariffs, or would likely be redressed by enjoining the tariffs. *Id.* at 567 (quotation omitted). Even if these tariffs might "encourage[ ]" or "discourage" particular behavior on the part of Canadian

18

tourists—quite the assumption—it is "just as plausible" that these tourists would forgo visiting the United States for any number of reasons. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42-43 (1976); *see, e.g.*, ECF No. 15-1 (Rhonda Mountain Chief Decl.) ¶ 6 ("Due to the tariffs and immigration crack down and hassle of all the hikers coming into the United States, its [*sic*] affected my bookings and business."). For that same reason, because the Mountain Chiefs' alleged harms can only be redressed by third parties changing their opinions, those harms are not redressable. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (explaining that it is a "bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court,'" particularly where it "require[s] guesswork as to how independent decisionmakers will exercise their judgment") (quotation omitted).

### C. IEEPA's Text, Context, And History Confirm That It Authorizes The President To Impose Tariffs

The President imposed the tariffs under the authority granted to him by IEEPA to "regulate...importation" to deal with a national emergency. 50 U.S.C. §1702(a)(1)(B). The President has properly declared a national emergency, and IEEPA clearly authorizes the President to impose tariffs. IEEPA's text, context, and history compel this conclusion.

IEEPA's plain text authorizes the President to impose tariffs. Section 1702 authorizes the President to:

> investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in … *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. §1702(a)(1)(B) (emphases added).

Imposing tariffs on foreign goods falls within the power to "regulate...importation" of foreign goods. *Id.* Tariffs are one way of controlling how often, and on what terms, foreign goods enter the United States. That is what "regulate" means, both now and when IEEPA was enacted. *See Regulate*, Black's Law Dictionary (12th ed. 2024) ("To control (an activity or process) esp. through the implementation of rules"); *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ("[F]ix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws"); *Regulate*, Random House College Dictionary 1112 (rev. ed. 1975) ("[T]o control or direct by a rule, principle, method, etc."); *Regulate*, American Heritage Dictionary (1976) ("To control or direct according to a rule"); *Regulate*, Webster's Third New International Dictionary (1976) ("[T]o govern or direct according to rule; to bring under the control of law or constituted authority").

Precedent confirms this straightforward reading of the text. Interpreting identical relevant language in TWEA, the Federal Circuit's predecessor upheld a

tariff imposed by President Nixon, explaining that the phrase "regulate importation" permitted the President to "impos[e] an import duty surcharge." *Yoshida*, 526 F.2d at 576; *accord Alcan Sales v. United States*, 693 F.2d 1089, 1093 (Fed. Cir. 1982). And the Ninth Circuit has recognized that "the express delegation in [TWEA] to the President was broad" and that "[t]he unambiguous wording of [TWEA] clearly shows that the President's actions [imposing tariffs] were in accordance with the power Congress delegated." *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1081 n.10 (9th Cir. 1982). Courts have likewise long held that tariffs are a form of regulation of commerce. *See, e.g.*, *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) (recognizing that it is "well established" that import duties may be imposed "in the exercise of the power to regulate commerce"); *Groves v. Slaughter*, 40 U.S. 449, 505 (1841) ("Under the power to regulate foreign commerce, [C]ongress [may] impose duties on importations.") (McLean, J., concurral); *Gibbons v. Ogden*, 22 U.S. 1, 202 (1824) ("[D]uties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of commerce."). IEEPA's permission to "regulate...importation" accordingly vested the President with authority to impose tariffs.

Statutory context cuts in the same direction. The power to "regulate" imports by imposing tariffs is similar to the other powers granted in subsection (a)(1)(B), like the power to "block" the import of goods during an investigation, or the power

to "prevent or prohibit" those imports. 50 U.S.C. §1702(a)(1)(B). Each term grants the President a significant power over foreign commerce. And many partially or fully overlap, suggesting that Congress entrusted the President with wide-ranging powers with respect to imports rather than carefully picking and choosing isolated types of interventions. For example, the provision's list of powers includes two obvious pairs of belt-and-suspenders terms: "direct and compel" and "prevent or prohibit." *Id.* It confers the overlapping powers to "nullify" and "void" various transactions. *Id.* And the power to "prevent or prohibit" imports could be used to "block" imports during an investigation, but the statute goes out of its way to grant both powers. *Id.*

Regardless, attempting to read §1702(a)(1)(B)'s list as enumerating discrete powers instead of covering the waterfront would lead to the same conclusion about "regulation." If each power articulated in the list is distinct, then "regulation" of imports must include actions such as tariffs; otherwise, it would mean little if anything other than the power to "prevent or prohibit" imports—leaving the term largely superfluous. *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 141-43 (2024) (rejecting reading that would leave a provision "superfluous," "without any operative significance").

IEEPA's history further confirms that it authorizes the President to impose tariffs. Congress drew the relevant language directly from a predecessor statute,

TWEA, after courts interpreted the language to include imposing tariffs. During the legislative process for IEEPA, Congress was well aware of the relevant language and the court's decision interpreting the language to authorize the President to impose tariffs, but Congress chose to keep the language.

Start with the key language in IEEPA, "regulate...importation." 50 U.S.C. §1702(a)(1)(B). That language was copied verbatim from TWEA. *See* Dec. 18, 1941, ch. 593, title III, §301, 55 Stat. 839 (authorizing the President to "investigate, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in…" (emphases added)). Courts, including the Supreme Court, have repeatedly recognized the close relationship between IEEPA and TWEA and that IEEPA's scope is essentially the same as TWEA's. *See, e.g.*, *Dames*, 453 U.S. at 671-72 (the pertinent section of IEEPA's language was "directly drawn" from TWEA); *Regan*, 468 U.S. at 227-28 (1984) ("[T]he authorities granted to the President [under] IEEPA are essentially the same as those [under] TWEA."); *Sec. Pac. Nat. Bank v. Gov't & State of Iran*, 513 F.Supp. 864, 875, 877 (C.D. Cal. 1981) (Section 1702 of "IEEPA is, except for stylistic changes, a reenactment of the powers previously conferred on the President by §5(b) of the TWEA").

Congress was well aware of *Yoshida*'s interpretation of TWEA when it chose to use the same language in IEEPA. President Nixon's use of TWEA to impose tariffs provoked outcry, becoming known as the "Nixon shock." *See, e.g.*, Nat'l Bureau of Econ. Research, Douglas A. Irwin, *The Nixon Shock after Forty Years: The Import Surcharge Revisited* (2012). Nor was TWEA's role or its interpretation unfamiliar to Congress. To the contrary, the House Report on IEEPA specifically cited *Yoshida* and explained its holding. H.R. Rep. No. 95-459 at 5. It recounted that "section 5(b) [of TWEA] came into play when...President Nixon declared a national emergency...and under that emergency imposed a surcharge on imports," that the Customs Court invalidated the action after holding that "section 5(b)...did not" permit "imposition of duties," but that "the Appeals Court reversed." *Id.* Aware of that history, Congress chose to use the same language in IEEPA.

Language borrowed from TWEA carries the same meaning in IEEPA. "[W]hen Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" by a court to that language. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020); *see Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it.") (cleaned up). That principle has particular force here: Rather than cabin the President's authority to impose tariffs, Congress in IEEPA included specific,

24

narrowly focused exceptions to the President's broad authority—none of which involve the President's authority to impose tariffs. *See* 50 U.S.C. §1702(b)(1)-(4). Courts, including the Supreme Court, have recognized that IEEPA adopted the scope of TWEA by applying TWEA precedent to interpret IEEPA. *See Dames*, 453 U.S. at 672 ("[W]e think both the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power [*i.e.*, IEEPA]."); *Sec. Pac. Nat. Bank*, 513 F.Supp. at 877 ("[T]he substantial body of judicial interpretation of the TWEA should be applied to interpret the powers of the President under the IEEPA.").

Finally, IEEPA's evident purpose confirms that it includes the power to impose tariffs. The purpose of emergency statutes, like IEEPA, is to give the President broad and flexible powers to effectively address problems surrounding a national emergency. *See Yoshida*, 526 F.2d at 573 ("[T]he primary implication of an emergency power is that it should be effective to deal with a national emergency successfully. The delegation in [TWEA] is broad and extensive; it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress."); *Spawr*, 685 F.2d at 1080 (materially identical). Indeed, "the legislative history of [IEEPA] notes that the authorities available to the President should be sufficiently broad and flexible to enable the President to

25

respond as appropriate and necessary to unforeseen contingencies." *Legal Authorities Available to the President to Respond to A Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel 644, 681 (1982) (quotation omitted). Interpreting IEEPA to include the power to impose tariffs furthers Congress's purpose to give the President the necessary tools and flexibility to effectively handle national emergencies.

The President's independent authority in the foreign-affairs and national-security spaces reinforces that conclusion. IEEPA "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders." *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 793 (Fed. Cir. 1984) (cleaned up); *see e.g.*, *B-W Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) ("[T]he principle that statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed"); *Al-Bihani v. Obama*, 619 F.3d 1, 39 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ("Courts are thus rightly hesitant to construe foreign affairs statutes more narrowly than the text indicates, lest they inadvertently contravene Congress's prudent and reasonable decision to afford the President broad discretion in sensitive and difficult-to-predict national security

issues. Put simply, Congress knows how to limit the Executive's authority in national security and foreign policy; there is no reason or basis for courts to strain to do so absent such congressional direction."). When foreign affairs and national security are involved, "the President plays a dominant role," and "it is generally assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear language." *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001). Plaintiffs cannot point to clear language cabining the President's authority. Quite the opposite—text, history, and context all show that IEEPA authorizes the President to impose tariffs.

### D. Section 232 Likewise Authorizes The President To Impose Tariffs

Plaintiffs' only structured argument against the Section 232 tariffs is that the statute does not authorize the President to impose tariffs at all. Mot. at 13-15. But the authority to "adjust…imports" obviously includes imposing tariffs. 19 U.S.C. §1862(c). Section 232 itself mentions the imposition of "duties" and "other import restrictions" as a means of adjusting imports. *Id.* §1862(a). The Federal Circuit has repeatedly upheld the President's use of Section 232 to impose duties on imports to protect national security. *See, e.g.*, *Transpacific Steel*, 4 F.4th at 1306; *PrimeSource*, 59 F.4th at1255. The Supreme Court has similarly explained that under Section 232, "the President's authority extends to the imposition of monetary exactions" like "license fees and duties." *Fed. Energy Admin. v.*

27

*Algonquin SNG, Inc.*, 426 U.S. 548, 561-64 (1976). Given the Supreme Court's conclusion that Section 232 permits the President to impose duties—and given that Congress expected the President to use Section 232 that way—the President's use of Section 232 to impose duties is neither atextual nor a "major question."

### E. IEEPA And Section 232 Are Valid Delegations Of Congressional Authority

Plaintiffs are unlikely to succeed on their claims that Congress cannot delegate its authority to impose tariffs. *See* Mot. 11-13. "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government" without supplying "an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019). That standard is "not demanding." *Id.* at 146. "Only twice in this country's history (and that in a single year)" has the Supreme Court "found a delegation excessive." *Id.* Neither Section 232 nor IEEPA fails this undemanding standard.

**Section 232.** The Supreme Court has already upheld Section 232 against a nondelegation challenge. *Algonquin* 426 U.S. at 559; *see Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x 982 (Fed. Cir. 2020) (explaining why *Algonquin* compels concluding Section 232 is a valid delegation); *PrimeSource*, 59 F.4th at 1263 (adopting *Am. Inst. for Int'l Steel*). That a President exercises Section 232 to "adjust imports" through tariffs makes no difference. *See, e.g.*, *Transpacific Steel*, 4 F.4th at 1332-33.

28

**IEEPA.** The same is true of IEEPA. The Ninth Circuit "agree[s] with every Circuit to have considered the issue that IEEPA" is a constitutionally valid delegation to the President. *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting cases). The relevant "'meaningful[] constrain[t]'" the Ninth Circuit held passes the intelligible-principle standard applies to the President's exercise of IEEPA to "regulate…importation." *Id.* The intelligible principles that IEEPA provides—like those that TWEA provided—pose no delegation concerns. *See Yoshida*, 526 F.2d at 582 ("Congress, by delegating to the President in [TWEA] the power to regulate imports within the national emergency powers standard, has not succeeded in abdicating its constitutional power to regulate foreign commerce.").

If anything, the Ninth Circuit rejected a nondelegation challenge to the use of IEEPA to "'define criminal conduct,'" an area where courts assume a *higher* nondelegation standard applies. *See Shih*, 73 F.4th at 1092 (relying on *Touby v. United States*, 500 U.S. 160, 166 (1991), which assumed, without deciding, that "greater congressional specificity is required in the criminal context" for nondelegation purposes). Plus, IEEPA involves an area where the President has independent authority, so the intelligible-principle standard is even easier to meet. *See Loving v. United States*, 517 U.S. 748, 772 (1996) (In criminal courts martial context, "[t]he same limitations on delegation do not apply 'where the entity

29

exercising the delegated authority itself possesses independent authority over the subject matter.'"); *Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting) similar); *Am. Inst. for Int'l Steel*, 806 F. App'x at 990. Nor have plaintiffs (Mot. 12) explained why the challenged tariffs' effect on "commerce with the Indian Tribes" would require any different nondelegation analysis. Tariffs are a regulation of foreign commerce, not commerce between the United States and Indian Tribes. Plaintiffs are thus unlikely to succeed on their nondelegation challenges.

**F.  The Major-Questions Doctrine Does Not Apply Here, And Even If It Did, Congress Spoke Clearly When Authorizing The Imposition Of Tariffs Through IEEPA**

Plaintiffs' oblique reference to "major questions," citing a single case in a single paragraph, does not come close to establishing likely success on the merits. Mot. at 14. Plaintiffs have the burden of making a "clear showing" that they are entitled to the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 22. Their failure to develop this argument leaves them far short of such a showing. Indeed, the Court need not "address" these "perfunctory and undeveloped arguments" at all. *Khademi v. South Orange Cmty. Coll. Dist.*, 194 F.Supp.2d 1011, 1027 (C.D. Cal. 2002); *see, e.g., Santucci v. City & Cnty. of Honolulu*, 2022 WL 17176902, at *5 n.4 (D. Hawaii Nov. 23).

Regardless, the major-questions doctrine does not apply here, and it would not help plaintiffs in any event.

"Where the statute at issue is one that confers authority upon an administrative agency, there are certain extraordinary cases that provide a reason to hesitate before concluding that Congress[] meant to confer such authority." *State of Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024) (cleaned up) (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)). In such cases, under the "major questions doctrine," the agency "must point to clear congressional authorization for the proposed regulation." *Id.* (cleaned up).

At the threshold, the Court should not engage in a major-questions analysis at all because the doctrine does not apply to presidential actions, especially in the national-security and foreign-affairs domains. The major-questions doctrine has never been applied to the President's authority to address national-security interests or other circumstances where the President has independent authority. No political-accountability justification applies here, where "the Framers made the President the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020), and the President directs an action in an executive order. And the President's overlapping powers in the national-security and foreign-affairs realm diminish any concerns of unauthorized overreach. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring in the judgment) (the President's "authority is at its maximum" when he

acts pursuant to the "authorization of Congress," and in those circumstances he "may be said" to "personify the federal sovereignty").

Those considerations foreclose application of the major-questions doctrine to national-security and foreign-policy matters. A major-questions approach treats a decision with a "measure of skepticism." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That approach is irreconcilable with longstanding precedent compelling the opposite approach in these contexts. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (acknowledging "the deference traditionally accorded the President" on these matters); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (recounting the "utmost deference to Presidential responsibilities" that courts have "traditionally shown" in these matters); *B-W Imports*, 75 F.3d at 636. There is no "reason to hesitate before concluding that Congress meant to confer" significant authority to regulate foreign commerce on the President. *West Virginia*, 597 U.S. at 721 (internal quotation marks omitted).

Even if the major-questions doctrine were not categorically inapplicable, it would not apply here. The President acted pursuant to a clear, obviously broad authorization in a principal provision of IEEPA. *See id.* at 723-24 (extraordinary grants of regulatory authority are "rarely accomplished" through "modest words" in an "ancillary provision"). And the President acted within his core competencies of foreign policy and national security. *See, e.g.*, *Ziglar v. Abbasi*, 582 U.S. 120,

142 (2017) (national security policy is "the prerogative of Congress and the President"); *Egan*, 484 U.S. at 527 (discussing "constitutional investment of power in the President" over matters of national security); *cf. Biden v. Missouri*, 595 U.S. 87, 95 (2022) (action not "surprising," for major-questions analysis, despite unprecedented scope, because "addressing infection problems in Medicare and Medicaid facilities is what [the Secretary of HHS] does"). Nor is the President's use of IEEPA an exercise of "unheralded power," especially given the President's exercise of his tariff power under materially identical language in IEEPA's predecessor statute. *West Virginia*, 597 U.S. at 724.

Regardless, IEEPA clearly authorizes the President to impose tariffs. Indeed, the Ninth Circuit founds materially identical language in IEEPA's predecessor to be "*unambiguous*" and to "*clearly* show[] that the President's actions [imposing tariffs] were in accordance with the power Congress delegated." *Spawr*, 685 F.2d at 1081 n.10 (emphases added).

### G. The President's Declarations Of Emergencies Underlying The Challenged Tariffs Are Unreviewable

To the extent plaintiffs challenge the underlying emergencies pursuant to the National Emergencies Act, Mot. 9, 14, or the rationality of using tariffs to address those emergencies, *see id.* at 15, such questions are reviewable only by Congress, as set out in the National Emergencies Act and IEEPA itself.

"Cases" and "controversies" that contain "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217 (1962), or "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986), are political questions beyond the courts' authority to resolve, *see Baker*, 369 U.S. at 217. Such deference is particularly critical in cases involving national emergencies, where courts have a long history of declining to review the political branches' responses. *See, e.g.*, *Martin v. Mott*, 25 U.S. 19, 31 (1827) (The President "is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts."); *Hawaii*, 585 U.S. at 708 ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.").

Indeed, courts have consistently held that the President's emergency declarations under the National Emergencies Act, and the adequacy of his policy choices addressing those emergencies under IEEPA, are unreviewable. *See, e.g.*, *Ctr. for Biological Diversity v. Trump*, 453 F.Supp.3d 11, 31 (D.D.C. 2020) ("Although presidential declarations of emergencies...have been at issue in many cases, *no* court has ever reviewed the merits of such a declaration.") (emphasis in

original); *Santiago v. Rumsfeld*, 2004 WL 3008724, at *3 (D. Or. Dec. 29), *aff'd*,

403 F.3d 702 (9th Cir. 2005), *and aff'd*, 407 F.3d 1018 (9th Cir. 2005), *opinion*

*amended and superseded on denial of reh'g*, 425 F.3d 549 (9th Cir. 2005) (holding

that whether situation in Afghanistan constituted an "emergency" is "an essentially

political issue" and that "Courts should refrain from ruling on such issues");

*Beacon Products Corp. v. Reagan*, 633 F.Supp.1191, 1194-95 (D. Mass. 1986)

(concluding that whether Nicaragua posed sufficient threat to trigger the

President's IEEPA power to impose an embargo on the country was a

nonjusticiable political question); *see also Spawr* , 685 F.2d at 1080 (declining "to

address the difficult questions concerning the declaration and duration of a national

emergency under" TWEA); *Shih*, 73 F.4th at 1092 (extending *Spawr*'s

unreviewability holding to IEEPA because "[a]lthough the prior executive orders

were issued under the Trading with the Enemy Act, we see no reason to treat one

issued pursuant to IEEPA any differently").

Reviewing the legitimacy of the underlying emergency or the rationality of

tariffs as a response—both foreign-affairs and national-security matters

constitutionally and statutorily committed to the President—would require "the

court to assess the wisdom of the President's judgment concerning the nature and

extent of that threat, a matter not susceptible to judicially manageable standards."

*Beacon Products*, 63 F.Supp. at 1195. Thus, the President's "motives, his

reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *Florsheim*, 744 F.2d at 796; *see United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains."). Further, Congress designated itself—not the judiciary—as the body to review emergency declarations and the adequacy of the President's response. *See* 50 U.S.C. §1622(c) (creating fast-tracked procedures for review and disapproval of emergency declarations). Therefore, any challenge to the emergency declarations or their connection to the tariffs is a nonjusticiable political question that this Court lacks jurisdiction to consider.

### H. The Jay Treaty Is No Longer In Effect

Plaintiffs cannot succeed on their claims premised on the Jay Treaty, Mot. at 15-17, because that treaty is no longer in effect. As the Supreme Court concluded in *Karnuth v. United States ex rel. Albro*, 279 U.S. 231 (1929), article III of the Jay Treaty "was brought to an end by the War of 1812, leaving the contracting powers discharged from all obligation in respect thereto, and, in the absence of a renewal, free to deal with the matter as their views of national policy, respectively, might from time to time dictate." *Id.* at 241. Accordingly, federal courts with jurisdiction over the imposition of tariffs have routinely held that the exemption from tariffs that plaintiffs here claim no longer exists. *See, e.g.*, *Akins v. United States*, 551

F.2d 1222, 1228 (C.C.P.A. 1977) ("We agree with the Customs Court that the provisions of Article III...are no longer in force."); *United States v. Garrow*, 88 F.2d 318 (C.C.P.A. 1937) (same); *United States v. Native Wholesale Supply Co.*, 822 F.Supp.2d 326, 337 (W.D.N.Y. 2011) ("Courts that have examined the two treaties have concluded that the duty exemption to the Jay Treaty was abrogated by the War of 1812 and the Tariff Act of 1897 and not revived by the Treaty of Ghent.").

Plaintiffs (Mot. at 16) rely on *Herrera v. Wyoming*, 587 U.S. 329 (2019), but that case about implied abrogation of treaty rights through the Wyoming Statehood Act has little to do with the situation here. *Karnuth* held that the War of 1812 abrogated article III of the Jay Treaty. That holding binds this Court unless the Supreme Court itself overturns it. *See, e.g.*, *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

## I.  The Tariffs Raise No Fifth Amendment Concerns

Finally, plaintiffs' Fifth Amendment arguments fail. *See* Mot. at 17-18. As for vagueness, they argue only that the tariffs have "no temporal or other specific limitations." Mot. at 17. But plaintiffs identify no fair-notice problems that could

possibly rise to the level of constitutional vagueness. *See, e.g.*, *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (high standard for vagueness challenges); *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498 (1982) (economic regulations are subject to an even "less strict vagueness test" than criminal enactments). Plaintiffs identify *no* features of the tariffs that could render them vague.

Nor can plaintiffs' due-process challenge succeed, because they have no protected right to import. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). But "the Constitution does not provide a right to import merchandise under a particular classification or rate of duty," *A Classic Time v. United States*, 123 F.3d 1475, 1476 (Fed. Cir. 1997), or even afford "a protectable interest to engage in international trade," *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp.*, 751 F.2d at 1250. "Nor does the Constitution recognize a right to rely on the maintenance of a duty rate." *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015); *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 318 (1933) ("No one has a legal right to the maintenance of an existing rate or duty."); *Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1284 (Fed. Cir. 2006) ("[E]xecutive actions involving foreign trade, such as the imposition of

tariffs, do not constitute the taking of property without due process of law.").

Accordingly, plaintiffs' due-process claims are unlikely to succeed.

## II. Plaintiffs Will Not Suffer Irreparable Harm In The Absence Of An Injunction Simply Because They Must Pay Tariffs

Even if plaintiffs could show a likelihood of success on the merits, they fail

to show that they will suffer irreparable harm without an injunction. A plaintiff

seeking an injunction bears a heavy burden to establish irreparable injury. *Winter*,

555 U.S. at 22. "[S]peculation on future harm" and "unsupported and conclusory

statements" are insufficient. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,

736 F.3d 1239, 1250 (9th Cir. 2013). Simply showing some possibility of

irreparable injury fails to satisfy this factor—the injury must be "likely." *Winter*,

555 U.S. at 22 (citations omitted). Conclusory statements in affidavits from an

interested party have limited probative value. *See Oakland Tribune, Inc. v.

Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

To the extent plaintiffs claim they will be financially harmed from paying

the tariffs, the Ninth Circuit repeatedly has declined to find irreparable harm based

merely on claims of financial losses. *E.g.*, *Goldie's Bookstore, Inc. v. Superior Ct.

of State of Cal.*, 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury...will not

constitute irreparable harm if adequate compensatory relief will be available in the

course of litigation."); *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football

League*, 634 F.2d 1197, 1202 (9th Cir. 1980); *Rowland v. Watch Tower Bible &

*Tract Soc'y of New York, Inc.*, 2023 WL 2954851, at *8 (D. Mont. Apr. 14, 2023) ("[I]t is elementary that, in most circumstances, a payment of money causes no irreparable harm.").

Here, plaintiffs rely solely on affidavits that do not establish the type of irreparable harm justifying an injunction. Plaintiffs include a declaration alleging that Mr. St. Goddard paid a $308.77 tariff on a tractor part that cost $1,252 and contending that "financial stress" from further tariffs will cause irreparable harm to his business. *See* St. Goddard Decl. (ECF No. 1-2) at ¶ 11. This is precisely the type of economic injury discussed in *Los Angeles Memorial Coliseum*, and a single unexpected expense does not come close to showing that plaintiffs are going "out of business" or suffering another form of irreparable injury. 634 F.2d at 1203. Plaintiffs offer no other examples of specific impacts other than the conclusory contention that the Mountain Chiefs "will not be able to stay in business" in the tourism industry "if the tariffs are allowed to go into effect" (even though the tariffs already have gone into effect). Rhonda Mountain Chief Decl. (ECF No. 15-1) at ¶ 10.

Further, plaintiffs fail to explain how monetary damage compensation would not be adequate. For plaintiffs who have actually paid tariffs, were they to ultimately prevail in the Court of International Trade, they could receive back any duties or tariffs they paid on any unliquidated entries. 28 U.S. Code § 2643.

### III.    The Public Interest And Equities Favor Permitting The President To Exercise Foreign-Affairs Powers To Protect The Nation

Even if plaintiffs could establish that they are likely to succeed on the merits and would suffer irreparable harm, that showing would still be "outweighed" by the balance of hardships and the public interest, *Winter*, 555 U.S. at 33, factors that "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009). It is not in the public interest to enjoin the President's response to a national emergency and exercise of foreign-affairs powers; nor does the balance of hardships favor plaintiffs.

### A.  The Public Interest Weighs Against An Injunction

Courts must "pay particular regard for the public consequences" when "employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotations and citations omitted). Indeed, in *Winter*, the Supreme Court vacated the lower court's injunction, concluding that, even if the petitioners had shown irreparable harm, the public interest and balance of equities weighed decisively against injunctive relief. *Id*. at 23-32 (an injunction "does not follow from success on the merits as a matter of course").

Plaintiffs' purported irreparable harm is far outweighed by the public interest in maintaining the challenged executive actions. The President has declared national emergencies in light of threats to the United States' economy, military preparedness, and national security. In these circumstances, the National

Emergencies Act, IEEPA, and Section 232 all authorize the President to take all appropriate and feasible action to address these emergencies. The equities and public interest lie there, not with plaintiffs.

Moreover, where, as here, the President is acting with Congress's authorization, adding its constitutional authority to regulate trade to the President's constitutional authority over foreign affairs, the "public interest" is the policy underlying the specific legislation. *Yakus v. United States*, 321 U.S. 414, 442 (1944). Injunctive relief interfering with action authorized by Congress and taken by the President, after following all the applicable procedures, would contravene the public interest.

### B. The Balance of Hardships Favor the Government

Plaintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA, Section 232, and the Constitution, *see* U.S. Const. art. II, §2. By contrast, plaintiffs have not shown any hardship beyond compensable economic harm. Given the significant foreign-affairs and national-security concerns at stake, the balance of hardships favor the Government.

### C. Any Injunction Should Be Limited Only To Plaintiffs And Would Require The Posting Of A Bond

If this Court were to issue an injunction, the scope of the Court's order must be limited to the parties to this litigation. Moreover, the Court should order

plaintiffs to quantify their harm—for instance, specify what tariffs that they would otherwise have paid without an injunction—and post a bond in that amount. Such an order would make certain that the Court follows the directive that an injunction "must be 'narrowly tailored to remedy the specific harm shown[,]'" while also ensuring that the Government's interests are adequately protected. *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (quoting *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)).

Nationwide injunctions are only available in "exceptional cases." *City and County of San Francisco*, 896 F.3d at 1244. A case is not "exceptional" simply because it involves a rule that applies nationwide. *See East Bay Sanctuary*, 934 F.3d at 1029. Here, plaintiffs do not even try to show that a nationwide injunction of the Canada tariffs is *necessary* to provide them relief. *Id*. Just the opposite: Plaintiffs focus on harms they fear specifically in Montana. *See, e.g.*, Mot. at 8 (asserting that Montana is "the state most vulnerable" to the tariffs); Mot. at 18-19 (predicting effects on "farmers and ranchers and businesses across Montana" given that the "growing, tourism, and construction season is short in Montana"). Issuing nationwide preliminary relief would "unnecessarily 'stymie novel legal challenges and robust debate' arising in different judicial districts." *East Bay Sanctuary Covenant*, 934 F.3d at 1029 (quoting *City and County of San Francisco*, 896 F.3d

at 1244). Thus, any injunctive relief the Court orders should be limited to the named plaintiffs in this case.

As to the posting of a security, Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction...*only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The bond's purpose "is to safeguard a defendant if the Court later determines that a defendant has been wrongfully enjoined." *Moroccanoil, Inc. v. Zotos Intl., Inc.*, 230 F.Supp.3d 1161, 1178-79 (C.D. Cal. 2017). A bond is "mandatory except in limited circumstances[,]" and the Court should only dispense with the bond requirement "if there is no evidence the [requesting] party will suffer damages from the injunction." *McNichols v. Windsor Capital Mortgage Corp.*, 2008 WL 11414608, at *1 (D. Mont. Jan. 10, 2008). As established above, plaintiffs cannot establish a likelihood of success on the merits. Moreover, the Government will be harmed if it is enjoined from collecting duties that have been imposed to protect the United States' national security and military preparedness. Accordingly, the Court should exercise its discretion and require plaintiffs to post a bond that is, at the very least, commensurate to the amount that they would have otherwise paid as a result of the Canada tariffs.

44

# CONCLUSION

For these reasons, the Court should deny plaintiffs' motion for a preliminary and permanent injunction and dismiss this action or transfer it.

DATED: April 18, 2025

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

SOSUN BAE
Senior Trial Counsel
BLAKE W. COWMAN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch

KURT G. ALME
United States Attorney
MARK S. SMITH
Assistant United States Attorney
2601 2nd Ave N.
Suite 3200
Billings, MT 59101
(406) 657-6101

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Luke Mathers
LUKE MATHERS
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, NY 10278
(212) 264-9236
luke.mathers@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

The undersigned, relying on the word count feature of the word-processing system used to prepare the foregoing brief, certifies that this brief contains 10,096 words, and is accompanied by a motion for enlargement of the 6,500 word limit.

/s/ Luke Mathers
LUKE MATHERS