**Jesse A. Laslovich**
LASLOVICH LAW, PLLC
4910 Smallwood Court
Helena, MT 59601
(406) 560-0359
*jalaslovich@gmail.com*

*Attorneys for Plaintiff-Intervenor Montana Farmers Union*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| SUSAN WEBBER, JONATHAN ST. GODDARD, RHONDA MOUNTAIN CHIEF, DAVID MOUNTAIN CHIEF, and DOES 1-100<br><br>Plaintiffs,<br><br>and<br><br>MONTANA FARMERS UNION,<br><br>Plaintiff-Intervenor<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, THE UNITED STATES OF AMERICA, and, in her official capacity, KRISTI NOEM,<br><br>Defendants. | Cause No. 4:25-cv-00026-DLC<br><br><br><br>**PROPOSED COMPLAINT AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF BY MONTANA FARMERS UNION** |

Plaintiff-Intervenor brings this *Complaint* against the U.S. Department of Homeland Security and the United States of America, and, in her official capacity, Kristi Noem, and states as follows:

## I.    SUMMARY OF THE CASE

1.    The Montana Farmers Union (MFU) has been a true grassroots organization for over a century. Since its inception, MFU has been composed of farmers and ranchers from across Montana who feed our state, nation, and the world. MFU's members rely on a predictable and stable trade market and the tariffs imposed by the President not only exceed the President's constitutional and statutory authority, they've "wallop[ed]" the agricultural community in Montana, as no one can "plan or prepare." Schweitzer Dec. para. 6.

2.    This unpredictability means reduced seeding, using less fertilizer, or selling herds that can no longer be fed. *Id.* Fewer crops will be harvested and there will be a massive reduction in the price of beef. *Id.*

3.    MFU's farmers and ranchers rely on international markets, including Canada, to survive. Because of the President's tariffs, their goods will be more expensive to export, which will result in reduced profits and lost customers. Even worse, farms and ranches that have been in families for generations must be sold simply because the President's isolationist and unlawful approach is incongruous with the international market with which these farmers and ranchers have been

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          **2**

dealing and relying upon for decades. MFU's members do not have robust markets in the United States for the crops they grow and those markets cannot be developed overnight. These tariffs are already having devasting impacts on MFU's members and have the potential of putting them out of business if the tariffs are not enjoined.

2.    Plaintiff-Intervenor challenges the legal bases for the President's unilateral tariffs and seek relief as follows:

*First:* Plaintiff-Intervenor challenges the constitutionality of Executive Order 14193 of February 1, 2025, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9,113 (Feb. 7, 2025), as amended by Executive Order 14197 of February 3, 2025, Progress on the Situation at Our Northern Border, 90 Fed. Reg. 9,183 (Feb. 10, 2025) and further amended by Executive Order 14231 of March 6, 2025, Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11,785 (Mar. 11, 2025). The Orders declare a national emergency and invoke the International Emergency Economic Powers Act of 1977 (IEEPA) to impose tariffs that are universal in nature. Plaintiff-Intervenor asks the Court to enjoin Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended;

*Second:* Plaintiff-Intervenor challenges Proclamation 10896 (steel) and Proclamation 10895 (aluminum). Proclamation 10896 of February 10, 2025,

Adjusting Imports of Steel Into the United States, 90 Fed. Reg. 10,896 (Feb. 18,

2025); Proclamation 10895 of February 10, 2025, Adjusting Imports of Aluminum

Into the United States, 90 Fed. Reg. 9,807 (Feb.18, 2025). These two

Proclamations invoke authority under Section 232 of the Trade Expansion Act of

1962, as amended (19 U.S.C. 1862). The steel and aluminum Proclamations

impose 25% tariffs on those products. Plaintiff-Intervenor asks the Court to enjoin

Section 14 of Proclamations 10896 and 10895; and

     *Third:* Plaintiff-Intervenor challenges the constitutionality of Executive

Order 14257 of April 2, 2025, Regulating Imports With a Reciprocal Tariff To

Rectify Trade Practices That Contribute to Large and Persistent Annual United

States Goods Trade Deficits, 90 Fed. Reg. 15,041 (Apr.7, 2025). The Order

declares a national emergency and invokes the International Emergency Economic

Powers Act of 1977 (IEEPA) to impose tariffs that are universal, sweeping, and

random in application. Plaintiff-Intervenor asks the Court to enjoin Sections 2,

3(a), (b), (c), (d), (e) and (f), Section 4 (a), (b), (c), and (d) of the Executive Order

on Reciprocal Tariffs issued April 2, 2025.

     3.    While the Orders and Proclamations impact nations other than

Canada, Plaintiff-Intervenor seeks an Order granting relief for its members specific

trade and commerce across the Montana-Canadian border.

     4.    The Canada Orders exceed the President's constitutional and statutory

authority and violate the separation of powers. The imposition of universal tariffs in the Canada Orders is an unconstitutional attempt by the Executive to regulate commerce and violates Plaintiff-Intervenor's member's constitutional rights.

5.     Plaintiff-Intervenor asks the Court to enjoin the Canada Orders. Alternatively, Plaintiff-Intervenor asks the Court to either: stay tariffs on all commerce and goods at all Montana ports of entry; or stay all tariffs imposed under the Canada Orders for Plaintiff-Intervenor's members.

## II.    JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction because the claims arise under the Constitution and laws of the United States, 28 U.S.C. § 1331 (federal question), 1337 (regulation of commerce), 1346 (U.S. as defendant), and under 28 U.S.C. § 1362. This action is brought by Plaintiff-Intervenor's members who are American farmers and ranchers alleging violations of their rights under the Constitution and laws of the United States and because the individual Defendant is an official of the United States. 28 U.S.C. § 1346(a)(2).

7.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers to grant injunctive and

declaratory relief when the President has no authority to act.[1]

8.      Pursuant to D. Mont. L.R. 1.2, and 3.2(b)(1)(B), venue lies in this District because Plaintiff-Intervenor's members reside here and each Defendant is an agency or officer of the United States sued in her official capacity. 28 U.S.C. § 1391(b), (e)(1).

9.      A real case or controversy exists between the parties as to the legality of universal tariffs imposed on Plaintiff-Intervenor and its members under the Canada Orders, without regard to the Constitutional rights of the Plaintiff-Intervenor's members. This Court has authority to issue the declaratory judgment requested pursuant to 28 U.S.C. § 2201(a).

## III.    PARTIES

11.     Plaintiff-Intervenor adopts the description of the Plaintiffs filed in their *Amended Complaint.*

12.     Montana Farmers Union has served its members, who are Montana farmers and ranchers, for over a century. Its membership is composed of farmers and ranchers scattered across Montana who are engaged in selling a variety of crops and beef to international markets and who have been negatively impacted by the Canada Orders, both from tariffs on imports, as well as the retaliatory tariffs

---

[1] *Indigenous Envtl. Network v. Trump*, 428 F.Supp.3d 296, 307 (D. Mont. 2019), citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

imposed on exports.

13.     Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 20 U.S.C. § 3412.

14.     Defendant the United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government that has been created by Congress. 6 U.S.C. § 111 *et seq.*

15.     Defendant the United States of America is responsible for the exercise of executive action by the named Defendants and all other agencies that are directed by the Order to take action respecting the imposition of universal tariffs. Because the Canada Orders impose universal tariffs, the United States of America is included as a defendant to ensure that the relief ordered by the Court will apply on a government-wide basis, including to federal agencies that are not specifically listed as defendants, and enjoin all tariffs imposed at Montana Ports of Entry.

16.     For all these reasons, Plaintiff-Intervenor seeks an Order: declaring Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended; Section 14 of Proclamations 10896 and 10895; and Sections 2, 3(a), (b), (c), (d), (e) (f), Section 4 (a), (b), (c), and (d) of Executive Order April 2, 2025 violate the of separation of powers and are unconstitutional and staying those Orders

from going into effect until this case is finally determined; or, alternatively, declaring that the Executive branch does not have authority to impose universal tariffs on the Montana-Canada border and that such tariffs are illegal at Montana ports of entry; or, that the Orders do not apply to any of Plaintiff-Intervenor's members.

## IV.    FACTS COMMON TO ALL COUNTS

### A.    Border

17.    Montana shares 14 Canadian border crossings with the Canadian provinces of British Columbia, Alberta, and Saskatchewan along its 545 mile, 877 kilometer northern border, most of which are utilized by Plaintiff-Intervenor's members.

### B.    Tariffs

18.    A tariff is a tax on goods imported from other countries. On June 21, 1788, the U.S. Constitution was ratified; it took effect on March 4, 1789. Because tariffs were a source of revenue, the framers of the United States Constitution inserted into Article 1 – the Article creating the legislative branch and conferring powers to Congress – the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." Art. 1, Sec. 8, Cls. 1. Article I Section 8 Clause 3

of the Constitution gives Congress exclusive power to collect taxes and duties, and to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

19. Four months after the U.S. Constitution took effect, in July of 1789, the U.S. Congress passed and President George Washington signed the first national tariff act to raise revenue and pay the national debt.[2]

20. To encourage the nation's domestic industrial growth after the War of 1812, Congress – not the president – raised tariffs to as much as 50%.[3] These tariffs were generally opposed by the Southern states because their agricultural-based economies relied on exports to other countries.[4]

21. Tariffs continued to be used in the years that followed, but it was the Smoot-Hawley Tariff Act passed by Congress in 1930 that marked the last time a tariff involved congressional action.[5] Passed after the stock market crashed, it was passed to help the economy because, the proponents alleged, keeping out imports would help local economies because consumers would have to buy domestic goods.[6] It "backfired catastrophically" because other countries retaliated with reciprocal tariffs on our exports, which hurt everyone, especially farmers and

---

[2] An Act for laying a Duty on Goods, Wares, and Merchandises imported into the United States, (July 4, 1789) https://tile.loc.gov/storage-services/service/ll/llsl/llsl-c1/llsl-c1.pdf#page=143 (last visited April 15, 2025).
[3] https://www.cato.org/publications/problem-tariff-american-economic-history-1787-1934 (last visited April 15, 2025).
[4] Id.
[5] Id.
[6] Id.

ranchers, who relied on them.[7] Indeed, between 1929 and 1932, U.S. imports from and exports to Europe decreased by two-thirds and it was similar across the rest of the world.[8]

22.    Because of this, Congress passed the Reciprocal Trade Agreements Act in 1934, which initiated a new era of trade policy based on the principle of negotiating lower tariffs with other countries to promote economic growth overall.[9] This approach to trade policy generally continued into the 21st century, with Congress deferring to any president to negotiate bilateral trade agreements to lower tariffs with other countries.[10] Since 1934, the United States, through the president, has negotiated with other countries on tariff amounts and not once has any president, until the current one, unilaterally raised tariffs on imports. This is because the president, neither constitutionally nor statutorily, has the authority to do so.

23.    Today, Plaintiff-Intervenor's members, Montana farmers and ranchers, trade and do business across the border, utilizing cross-border relationships and trade for years. Just like the southern state farmers and ranchers over a century ago, MFU's members are directly harmed by the unpredictability and uncertainty and increased costs imposed by the President's tariffs and

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*

retaliatory tariffs.

### C.    The Executive Orders and Proclamations

24.    On February 1, 2025, three Executive Orders declared a national emergency due to increased immigration and fentanyl flows into the United States. Under the stated emergency, the Executive Orders imposed tariffs on goods from Canada, Mexico, and China.

25.    Plaintiff-Intervenor challenges Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193 as amended (Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border).

26.    On February 10, 2025, Proclamations 10896 and 10895 were issued based on the claim that imported aluminum and steel produced threaten national security. Under the stated threat and invoking Section 232 of the Trade Act of 1962, the Proclamations imposed 25% tariffs on steel and aluminum goods effective March 12, 2025.

27.    Plaintiff-Intervenor challenges Sections 14 of Proclamations 10896 (steel) and 10895 (aluminum), subjecting steel and aluminum imports from Canada to a 25% tariff.

28.    On April 2, 2025 an Executive Order titled Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits was issued, adding to the prior tariffs.

The Order declares a national emergency, and invokes the IEEPA to impose tariffs that are universal, sweeping, and random in application. Plaintiff-Intervenor asks the Court to enjoin Sections 2, 3(a), (b), (c), (d), (e) and (f), Section 4 (a), (b), (c), and (d) of the April 2, 2025 Order.

## I.   *Authority invoked by Executive Orders and Proclamations*

29.    The Canada Orders declare authority to act under: the Constitution; the laws of the United States of America, including the IEEPA (50 U.S.C. 1701 *et seq*); the National Emergencies Act (50 U.S.C. 1601 *et seq*) (NEA); section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483); and section 301 of title 3.

30.    Proclamations 10896 and 10895 declare authority to act under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

### a.   *The Constitution*

31.    The Constitution gives exclusive control over collecting money, as well as commerce with foreign Nations and the Indian Tribes. Article I Section 8 Clause 1 provides:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

Clause 3 provides:

> To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          **12**

32.    Article I Section 10 *prohibits* states from entering into treaties, imposing tariffs, or imposing duties. Read together, these provisions are crystal clear that this power belongs solely to Congress. This is on top of the fact that Article I contains powers conferred to the Congress.

### b.    *The IEEPA*

33.    The IEEPA, enacted in 1977, gives the President certain powers, defined in 50 U.S.C. § 1702, to address any threats which the President has declared a national emergency.

34.    The President may avail himself of the broad authorities granted to him through the IEEPA if he declares a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."[11]

35.    The President's declaration of a national emergency to address an unusual and extraordinary threat is not all-encompassing and without limitation. The IEEPA directs "[a]ny exercise of [ ] authorities to deal with any new threat [to] be based on a new declaration of national emergency."[12] A declaration of a national emergency must be confined "to a specific set of circumstances which

---

[11] 50 U.S.C. § 1701(a).
[12] *Id.* § 1701(b).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU        **13**

constitutes a real emergency, and for no other purpose."[13]

36.     The plain language of the statute does not include the power to "tariff"
or to "tax." The powers enumerated in the statute are extensive and specific.
Omission of tariffs is significant given how clearly Congress referenced tariff
authorities in other trade statutes. The IEEPA has been the basis for over 60
Executive Orders. It has never been used to impose tariffs.

37.     Section 204(a) of the IEEPA, 50 U.S.C. § 1703(a), provides that the
President "in every possible instance, shall consult with the Congress *before*
exercising any of the authorities granted by this chapter, and shall consult regularly
with the Congress so long as such authorities are exercised." (Emphasis added.)

38.     Section 204(b), 50 U.S.C. § 1703(b), requires that "[w]henever the
President exercises any of the authorities granted by this chapter, he shall
immediately transmit to the Congress a report specifying" the circumstances
necessitating the exercise of his authority; the reasons that the circumstances
constitute an unusual and extraordinary threat; the authorities to be exercised and
the actions to be taken; the reasons that such actions are necessary; a list of foreign
countries with respect to which such actions are to be taken; and the reasons for
such decisions.

39.     The Trade Sanctions Reform and Export Enhancement Act of 2000

---

[13] H.R. Rep. 95–459 at 10 (1977).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          **14**

(TSRA), generally prohibits the President from using his IEEPA authority to unilaterally restrict commercial sales of agricultural commodities, food, medicine, and medical devices.[14]

40.    There is no legal basis in the IEEPA to impose universal tariffs. The scale and scope of the tariffs is arbitrary, does not identify how it relates to or abates the declared emergency, and has been erratically deployed. The tariffs have been discussed as bargaining chips, bringing jobs to the U.S., and a way to raise revenue to offset tax cuts. Rarely, if at all, have the tariffs been linked to the stated emergencies.

41.    Executive Order 14193 refers to the January 20, 2025 America First Trade Policy Memorandum and Executive Order 14157 (Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists) for further justification. The Trade Memorandum discusses the importance of tariffs as a trade policy. It mentions Canada in reference only to the USMCA Agreement and in Section 4(g) directing an assessment of fentanyl flows from Canada, Mexico, and China. The Trade Memo does not address the fact that tariffs in 2017 – 2019 resulted in billions of dollars of taxpayer bailout funds for industries that were hurt from the tariffs. The Cartel Designation Order discusses Mexico and the southern border, but does not mention Canada at all.

---

[14] 22 U.S.C. § 7202.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          **15**

### c. *The NEA*

42.    The National Emergency Act 50 USC Section 1601 terminates actions taken as a result of the existence of any declaration of national emergency.[15] Nothing in the NEA delegates congressional power to impose tariffs and conduct commerce with foreign Nations and Indian Tribes to the Executive branch. Nothing in NEA authorizes the executive branch to impose universal tariffs.

### d. *Section 604 of the Trade Act of 1974 as amended*[16]

43.    The Trade Act of 1974 as amended grants the Executive branch authority to "embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter."[17] This Act assigns the President the responsibility of publishing consequential changes in Tariff Schedules. It does not grant the executive the power to unilaterally make such changes.

44.    Section 2486 of the Trade Act provides that the President "may initiate negotiations for a trade agreement with Canada to establish a free trade area covering the United States and Canada. Nothing in this section shall be construed as prior approval of any legislation which may be necessary to implement such a trade agreement." The Trade Act does not give the executive branch power to

---

[15] 50 U.S.C. § 1601.
[16] 19 USC § 2483.
[17] 19 U.S.C. § 2483.

impose universal tariffs. It specifically retains authority to approve legislation necessary to implement a trade agreement in Congress.[18]

45.    The Trade Act of 1974 granted the president new authority to *negotiate* trade agreements and adjust tariffs, while also creating mechanisms to protect U.S. industries and workers. For example, Section 201 provides a mechanism for the U.S. to protect domestic industries from serious injury caused by import surges, and Section 301 grants authority to the U.S. Trade Representative to take action against foreign countries that violate trade agreements or engage in practices that are deemed unfair and negatively affect U.S. commerce. All of this contemplates a process that has not been followed under the Canada Orders.

### e.    3 U.S.C. Section 301

46.    Finally, the Executive Orders rely on 3 U.S.C. Section 301 as authority to impose universal tariffs. This statute authorizes the President to delegate functions to a head of an agency, provided that the official has been approved by the Senate and that the delegation is in writing, among other limitations.

47.    Nothing in Section 301 authorizes the executive branch to engage in constitutional functions reserved to Congress. The universal tariffs are not

---

[18] 19 U.S.C. §2486.

authorized by this statute. The President does not have the authority to impose

them, and has no authority to delegate imposition of tariffs to any head of agency.

### f.    Section 232 of the Trade Expansion Act of 1962

48.    Section 232 of the Trade Expansion Act of 1962, as amended (19

U.S.C. 1862), sets out a process that begins with an investigation that is initiated

by requests from agency heads or the Secretary of Commerce's own motion.[19]

There are strict timelines that apply to the process, which is subject to consultation

with others, and findings and recommendations are

presented to the President. If the findings are affirmative, then the President may

accept them and implement the recommended action, and then inform Congress.

49.    Proclamations 10896 and 10895 do not address the required Section

232 process. They simply provide conclusory statements that "the Secretary has

informed me" without setting out the process required by Section 232, public

input, and consultation with others. There has been no final report published in the

Federal Register regarding the investigation that Section 232 requires prior to

implementing tariffs. Section 232 does not allow the Executive to pick up prior

tariffs and adjust them without some kind of process. Proclamations 10896 and

10895 have not been subjected to the process and timelines set out in Section 232,

and as a result, violate Plaintiff-Intervenor's member's due process rights, and

---

[19] 19 U.S.C. 162(b)(1)(A).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU        **18**

exert authority under a statute that has not been granted.

### 3.    Justification for Tariffs and "Fact Sheet"

50.    Executive Order 14193 states that the U.S. Customs and Border

protection (CBP) has seized, comparatively, much less fentanyl from Canada than

from Mexico last year. But the Order imposes universal tariffs in the same way on

both countries.

51.    Section 1 of Executive Order 14193 declares that the failure of

Canada "to do more to arrest, seize, detain, or otherwise intercept DTOs [Drug

Trafficking Organizations], other drug and human traffickers, criminals at large,

and drugs" constitutes an unusual and extraordinary threat. Section 1 declares that

the "national emergency requires decisive and immediate action." Section 1 states

that the unusual and extraordinary threat justifies the use of section 1702(a)(1)(B)

of the IEEPA to impose universal tariffs on articles that are products of Canada. Of

the more than 60 times the IEEPA has been invoked, not once prior to the 2025

Executive Orders was the IEEPA ever invoked as the basis to impose tariffs.

52.    Section 2(a) and 2(e) of Executive Order 14193 imposed an additional

25 percent ad valorem rate of duty on all non-energy related goods imported from

Canada for which the Secretary of Homeland Security determines modifications are necessary. This includes a 25% duty on all lumber imports from Canada.[20]

53.    Section 2(b) of Executive Order 14193 imposed an additional 10 percent ad valorem rate of duty on energy related goods imported from Canada, defined in Section 8 of Executive Order 14156 of January 20, 2025 as "crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals, as defined by 30 U.S.C. 1606 (a)(3)."

54.    Section 3(a) of Executive Order 14193 declared that the executive branch could remove the tariffs if in the opinion of the Secretary of Homeland Security, Canada had "taken adequate steps" or upon a determination that "sufficient action had been taken" to alleviate the crisis.

55.    Section 3(b) of Executive Order 14193 declared that the Secretary of Homeland Security shall "recommend additional action" if Canada fails "to take adequate steps to alleviate the illegal migration and illicit drug crises through cooperative enforcement actions."

56.    The "Fact Sheet" accompanying Executive Order 14193 includes Canada only in the first two bullets under "Addressing an Emergency Situation"

---

[20] See https://international.canada.ca/en/global-affairs/services/trade/tariffs-regulations/harmonized-system-codes (last visited April 15, 2025).

that encompasses Canada, Mexico, and China without differentiating among the countries.[21]

57.    The second section of the "Fact Sheet" states that "tariffs are a powerful, proven source of leverage for protecting the national interest." Under the third section, the "Fact Sheet asserts that the "problem of illegal aliens and drugs" is not confined to the southern border – "encounters at the northern border with Canada are rising as well." The Fact Sheet does not identify apprehensions at the northern border.

58.    The fourth and final section of the "Fact Sheet" asserts that the tariffs are in line with a promise made in November of 2024 to charge a 25% tariff on ALL products coming into the U.S. This section discusses "threats of tariffs" and "unreasonable behavior" as a basis to ensure that "U.S. trade policy serves the national interest."

59.    In response to the February 1, 2025 Executive Orders imposing universal tariffs under the IEEPA, Canada announced retaliatory tariffs of 25 percent on over $100 billion worth of U.S. goods.

60.    Two days later, on February 3, 2025, Executive Order 14197 (Progress on our Northern Border) was issued pausing implementation of the

---

[21] https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-imposes-tariffs-on-imports-from-canada-mexico-and-china/ (last visited April 15, 2025).

tariffs in Executive Order 14193 until March 4, 2025. Less than 48 hours after the emergency was declared, Section 2 of Executive Order 14197 declared "I have determined that the Government of Canada has taken immediate steps designated to alleviate the illegal migration and illicit drug crisis through cooperative actions." No indication is given as to whether there was consultation with any Secretary appointees or Congress, or what information supported the determination.

61.     Section 3 of Executive Order 14197 paused the implementation of tariffs until March 4, 2025. Section 3(c) declares that if the crisis worsens, and if Canada fails to take sufficient steps to alleviate the situation, the "President shall take necessary steps to address the situation, including by immediate implementation of the tariffs." No mention is made as to consultation with Secretaries, or congress, in making this determination, or what information will constitute "sufficient steps." Section 3 of Executive Order 14197 purports to give the President alone authority to impose further tariffs without any clear assessment of the bases for doing so.

62.     On February 10 and 11, 2025, Proclamations 10896 and 10895 and an accompanying Fact Sheet were issued addressing the claimed national security threat of imports of aluminum and steel, and imposing tariffs of 25% on all steel and aluminum imports from Canada and other countries to address the claimed

national security threat. Section 232 of the Trade Act of 1962 was the authority relied upon to justify imposing these tariffs.

63.    On March 3, 2025 announcements were issued that tariffs would proceed under IEEPA with modifications. The CBP issued a "Cargo Systems Messaging Service" with guidance for additional duties on imports from Canada.[22]

64.    On March 4, 2025 a 10% tariff on Canadian energy and a 25% tariff on goods from Canada and Mexico took effect.

65.    On March 6, 2025 Executive Order 14193 was amended to allow a de minimis exemption from the tariffs until such time as systems are in place to "collect tariff revenue applicable" to articles eligible for de minimis treatment.[23]

66.    On March 6, 2025 tariffs were postponed on many imports from Mexico and some imports from Canada, with "reciprocal" tariffs to start on April 2.[24]

67.    On March 8, 2025 the CBP collected the following additional tariffs on imports from Mexico and Canada under the Executive Orders:

- Additional 25% tariffs on goods that do not satisfy U.S.-Mexico-Canada Agreement rules of origin. Approximately 50% of the products of Mexico and 38% of Canadian products qualify under USMCA. Potash used in fertilizer qualifies under the USMCA.

---

[22] https://content.govdelivery.com/bulletins/gd/USDHSCBP-3d519e9?wgt_ref=USDHSCBP_WIDGET_2 (last visited April 15, 2025).
[23] Executive Order 14231 of March 6, 2025, Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11,785 (Mar. 11, 2025)
[24] https://www.tarifinder.ca/en/getStarted; https://international.canada.ca/en/global-affairs/services/trade/tariffs-regulations/harmonized-system-codes

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          **23**

- A lower, additional 10% tariff on energy products imported from Canada that fall outside the USMCA preference.
- A lower, additional 10% tariff on potash imported from Canada and Mexico that falls outside the USMCA preference.

68.    On March 13, 2025 there was discussion of tariffs and the "goal of fair trade" in advance of the April 2, 2025 deadline for further tariffs to be imposed.[25]

69.    On March 14, 2025, the U.S. Senate approved the House continuing resolution that prohibits any vote terminating the national emergency used to justify imposition of universal tariffs. In other words, regardless of whether all fentanyl was removed from Canada, Congress cannot vote on terminating the national emergency and removing the tariffs.

70.    On April 2, 2025, an additional Executive Order was issued declaring a national emergency related to trade deficits.[26] (Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits). The Order declares a national emergency based on trade deficits that have been present for decades, and invokes the IEEPA to impose tariffs that are universal, sweeping, and random, applying to every country in the world other than the Russian Federation and North Korea.

---

[25] https://www.commerce.gov/news/press-releases/2025/03/readout-secretary-lutnicks-meeting-minister-leblanc-ontario-premier (last visited April 15, 2025).
[26] Executive Order 14257 of April 2, 2025, Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041 (Apr.7, 2025)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          24

Under the Order the new round of tariffs went into effect April 5, 2025.

### D.   <u>Cross Border Trade</u>

71.    Plaintiff-Intervenor's members rely on stability in the trade market and conduct years of planning to position their businesses for success. Sarah Degn Dec. para. 7. For the Fresh Hopped Farm owned by Ms. Degn and operated in Sidney, Montana, she does not have sufficient reserves to overcome the sudden loss of the soybean, corn, and wheat international markets. *Id.* at paras. 1, 8. And she is worried that if the tariffs are ever enjoined, reduced, or removed, her previous trading partners will no longer seek to do business with Fresh Hopped Farm again. *Id.* at para. 9. To make matters worse, the steel and aluminum tariffs make it exceedingly difficult, if not impossible, to maintain their existing facilities and build new ones. *Id.* at para. 10. Because Fresh Hopped Farm has done business in the international market for decades, Ms. Degn believes these tariffs will create even more pain than they have already experienced, which will last for a long time and be difficult from which to recover, if ever. *Id.* at para. 11.

72.    The same goes for John Wicks, who is a fourth generation Montana farmer who has been farming for approximately 20 years in Liberty County. John Wicks Dec. para. 1. Mr. Wicks has been a member of Plaintiff-Intervenor for about five years. *Id.* at para. 4. Since 2016, he has been an organic farmer. *Id.* at para. 1. For his organic lentil exports, he was in contractual discussions with a

Canadian trading partner who told Mr. Wicks he would not enter into a contract due to the instability in the trade market before tariffs were imposed. *Id.* at para. 7. Specifically, the partner said if American tariffs were going to be implemented, the partner would not take the crops. *Id.* The failure to into enter a contract cost Mr. Wicks's business money. *Id.* at paras. 7-8. This is further compounded by the fact that half of Mr. Wicks's trade market is "gone" because "our Canadian partners either won't buy our crops or are offering significantly lower prices than our partners in the United States. Our partners in the United States know that our Canadian partners are doing this and are capitalizing on it by offering lower prices, so we're getting squeezed." *Id.* at para. 9.

The damages don't stop there for Mr. Wicks's farm, as the price for durum, which is used for pasta, has dropped precipitously in the Canadian market since the trade market became unstable and the tariffs were imposed. *Id.* at para. 10. Because most of the demand for durum is in Canada and not the United States, the higher prices in the United States do not make up for the losses suffered in Canada. *Id.* This is a direct result of the instability in the trade market and the tariffs imposed by the President. *Id.*

73.     Trent Stoltz agrees. Mr. Stoltz, whose family has farmed and ranched in Montana for over 100 years, currently has as a yearly cattle operation and he raises and sells irrigated hay from Pompey's Pillar, Montana. Terry Stoltz Dec.

paras. 1, 3. The tariffs are preventing he and other MFU members from locking in

cattle prices with the Livestock Revenue Protection (LRP) program because the

cattle markets are so volatile right now. *Id*. para. 7. Additionally, fertilizer costs

have risen due to the tariffs on potash, which is primarily a group of potassium-

rich salts used as fertilizer to replenish potassium in the soil. *Id*. at 8. These are

just a few examples that have negatively impacted the Stoltz family farm and the

costs are only expected to increase on not just fertilizer, but other items relied on

by Plaintiff-Intervenor's members, too, if the tariffs are not stopped. *Id*. at para. 9.

74.     And finally, the president of Plaintiff-Intervenor notes that Montana

does significant cross border business with Canadian suppliers. Walter Schweitzer

Dec. para. 9. This is especially so due to the geographic proximity many of

Montana's farms and ranches have with Canadian businesses. *Id*. Indeed, "the

tariffs will impose harsh economic penalties on" Montana's farmers and ranchers.

*Id*. at para. 11.

75.     The tariffs imposed by the Executive Orders increase costs and

expenses for the Plaintiff-Intervenor's members substantially, creating a material

and negative effect on the operations of their farms and ranches, including possibly

having to sell their farms or ranches that have been with the same Montana family

for generations.

76.     The Canada Orders have a direct, immediate, and irreparable negative

impact on Plaintiff-Intervenor's members. Projects on their farms and ranches that are not getting killed off outright are being delayed and slow walked due to the tremendous uncertainty caused by the on-again off-again tariffs. This is wreaking havoc on the Plaintiff-Intervenor's members and creating immediate, irreparable harm.

77.     The direct harm includes increased costs of farming and ranching and doing business and inability to export goods and crops they've exported for years, causing direct harm to the Plaintiff-Intervenor's members, and larger societal harm caused by unpredictable tariffs and funding. All of Plaintiff-Intervenor's members are harmed by the instability and unpredictability.

### E.     Irreparable harm

78.     In 2024, U.S. Customs and Border Protection agents intercepted about 19 kilograms of fentanyl at the entire U.S. northern border, compared to almost 9,600 kilograms at the southern border. The quantities of fentanyl leaving Canada for the United States are a fraction of what is seized at the U.S. southern border. The Executive Orders do not address the differential or attempt to target the harm, they simply impose blanket tariffs on all borders without reference to the factual situation or any attempt to explain how universal tariffs, which are functioning like sanctions, will address the stated emergency. Since the Canada Orders were issued, there is little, if any, discussion of how the tariffs are supposed to address the stated

emergency; rather, they are considered part of a "deal" or a "bargaining chip." Plaintiff-Intervenor's members do not believe they should be a bargaining chip or sacrificial lamb for the government.

79.    Out of all the illegal drugs crossing US borders into the United States, less than one percent (1%) comes through Canada. The executive orders impose blanket, universal tariffs without regard to the differentiated facts on the ground. There is no link between the emergency that is declared and the impact that universal tariffs will have on that.

80.    There is no link between the stated national security threat of imports from steel and aluminum and a 25% tariff on all goods, including fertilizer necessary to continue farming and ranching.

81.    There is no link between universal tariffs and the purported harm identified by the government; nor is there any justification for the whiplash series of on-again off-again tariffs that have resulted in a trade war with Canada. Plaintiff-Intervenor's members have been caught in the net of a trade war that causes direct, immediate, and irreparable harm.

82.    The Canada Orders unilaterally impose universal tariffs without justification; they have harmed Plaintiff-Intervenor's members by creating unpredictability in the market, uncertainty in being able to plan for a short ranching, construction, and tourist season in northern Montana, and inability to

develop a business plan to obtain business especially in much-needed areas such as housing.

83.    The Canada Orders have had, and will continue to have, a chilling effect on whether and how Plaintiff-Intervenor's and members will be able to conduct business using traditional cross border imports. These consequences will continue to mount if the Canada Orders are allowed to stand.

## CLAIMS FOR RELIEF

## COUNT I

## (Against All Defendants)

### *Ultra Vires Presidential Action – Unconstitutional Exercise of Congressional Authority*

84.    Plaintiff-Intervenor repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

85.    The Constitution established the separation of powers to prevent concentrated power in one branch of the government. The separation of powers "protects the liberty of the individual from arbitrary power."[27] Courts must take adequate account of separation of powers principles, including both the significant legislative interests of Congress and the unique position of the President.[28]

---

[27] *Bond v. United States*, 564 U.S. 211, 222 (2011).
[28] *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          30

86.     The Constitution vests the legislative power in Congress. U.S. Const., Art. I. Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law.[29]

87.     The Constitution vests executive power in the President. U.S. Const., Art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed."[30] The President's authority to act must "stem either from an act of Congress or from the Constitution itself."[31]

88.     The Executive Branch has no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes.[32] The declared purpose of separating and dividing the powers of government was to "diffus[e] power the better to secure liberty."[33] "There can be no liberty where the legislative and executive powers are united in the same person..."[34]

89.     There is no enumerated or inherent executive authority from the Constitution to impose tariffs. To the contrary, tariffs lie exclusively with Congress. They are expressly *not* part of the executive branch's core constitutional

---

[29] U.S. Const., Art. I.; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).
[30] U.S. Const. art. II, § 3.
[31] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).
[32] *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).
[33] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); see also *Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986).
[34] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); citing James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          31

power.

90.    The Canada Orders rely on the IEEPA as the source of authority to impose universal tariffs in response to a stated emergency. The Orders are *ultra vires* because there is "no express constitutional or statutory authorization" empowering the President to impose universal tariffs under the limited authority of the IEEPA. The Orders fail to distinguish the differences between borders and the harm that universal tariffs might mitigate. Although Executive Order 14193 specifically states that drug seizures at the northern border are a fraction of what is seized at the Mexican border, it does not place that in the context of the fact that the Canada-U.S. border is almost three times longer than the 3,145-kilometer-long border between Mexico and the United States. The Canada-U.S. border is considerably less fortified than the Mexico-U.S. border. Canada's border to the U.S. has around 75+ border crossing locations compared to Mexico's 22 (Montana alone has 14). There is no effort to tailor the sanctions in Executive Order 14193 to address these significant differences.

91.    The IEEPA was specifically passed to limit the President's authority to invoke sweeping invocation of national emergency powers. The Congress is to be consulted *prior* to the implementation of universal tariffs, which did not happen.

92.    The IEEPA was specifically limited by the Trade Sanctions Reform and Export Enhancement Act of 2000; the Orders do not distinguish or account for

this Act.[35]

93.    The Canada Orders create uncertainty and have unilaterally created and escalated a trade war that imposes irreparable harm on Plaintiff-Intervenor's members.

94.    The Canada Orders are *ultra vires* because they violate the separation of powers by exercising power granted exclusively to Congress and because Congress cannot delegate the power exercised in these Orders.

95.    The *ultra vires* nature of the Canada Orders has already harmed, and continues to harm, Plaintiff-Intervenor's members.

**COUNT II**

**(Against All Defendants)**

***Unconstitutional Deprivation of Procedural Due Process***

96.    Plaintiff-Intervenor repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

97.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."

98.    The Canada Orders interfere with and impair multiple liberty and property interests protected by the Due Process Clause. Plaintiff-Intervenor's

---

[35] 22 USC Ch. 79 Section 7201 *et seq.*

members have an ongoing business and community interest in continued cross border trade without universal tariffs unilaterally imposed in violation of the constitutional framework that limits such action to Congress and provides an opportunity to be heard and for due process. The erratic nature of the on-again off-again tariffs and escalating trade war has harmed Plaintiff-Intervenor's members and denied their businesses the ability to plan, prepare, and engage in commerce, as well impairs their private contracts. The Canada Orders harm Plaintiff-Intervenor's members constitutionally- protected property interests by imposing tariffs without notice and an opportunity to be heard.

99.    Plaintiff-Intervenor's members did not receive notice prior to being subjected to The Canada Orders. Plaintiff-Intervenor's members were not aware, prior to the issuance of the Canada Orders, of the severity of the tariffs.

100.    No compelling government interest justifies Defendants' violation of Plaintiff-Intervenor's members' due process rights. If tariffs are a reasonable approach, Congress is constitutionally the sole branch of government that can impose them, especially in the scope and extent set out in the Canada Orders. Rarely, if at all, has the pretextual "emergency" been discussed publicly.

101.    The Canada Orders are based on false premises, but even assuming they were not, the tariffs are unrelated to the stated emergency. The improper purpose of the order and absence of any legitimate justification demonstrates that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU          34

the Canada Orders are an irrational abuse of power that violates nearly 250 years of constitutional order, and shocks the conscience in its abrupt, unilateral imposition of commercial tariffs on every country across the board (other than Russia and North Korea), such that they could not be justified by any level of process.

102.    As a result of Defendants' actions, Plaintiff-Intervenor's Fifth Amendment right to due process has been violated. Defendants' violation of due process has caused Plaintiff-Intervenor's members to suffer ongoing and irreparable harm.

**COUNT III**

**(Against All Defendants)**

***Unconstitutional Deprivation of Due Process (Void for Vagueness)***

103.    Plaintiff-Intervenor repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

104.    A federal law is unconstitutionally vague and thus violates due process if it "fails

to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless

that it authorizes or encourages seriously discriminatory enforcement."[36]

105.   The Canada Orders are unconstitutionally vague and violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution. They do not provide Plaintiff-Intervenor's members with any basis to understand when the tariffs will be imposed, how they might be lifted, or what the basis for future tariffs may be.

106.   The Canada Orders do not provide any guidance on which goods are subject to which tariffs, and created enormous confusion and unpredictability related to trade relations. The Orders are vague and imposition has been erratic and unpredictable. Escalation in response to external stimuli unrelated to trade have nothing to do with the Plaintiff-Intervenor's members' businesses and only cause harm.

107.   Plaintiff-Intervenor's members' farms and ranches in Montana depend on being able to plan and prepare for a short construction, farming, and tourist, season, potentially high energy costs in fire season, and other needs. The Canada Orders fail to provide adequate notice as to what tariffs may be imposed and why. The Canada Orders are unconstitutionally vague because Plaintiff-Intervenor's members cannot prepare, order, and address the upcoming summer season based

---

[36] *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); see also *Johnson v. United States*, 576 U.S. 591, 595 (2015).

on the language in the Orders. There is no way to knowing how long the tariffs will last, why they remain, and whether they will change. Because the Orders are vague about when tariffs will be imposed, changed, or lifted, they are a violation of Plaintiff-Intervenor's members' constitutional due process rights.

108.   The Canada Orders mean the Plaintiff-Intervenor's members will have to face tariffs imposed on a whim and vaguely defined emergency when it exists, or not. This vague and unpredictable imposition of harm violates Plaintiff-Intervenor's members' constitutional due process rights.

109.   There is no compelling government interest to usurp congressional authority to regulate commerce among foreign nations and the decision to adopt the Canada Orders was based on improper purposes. The Orders are based on false premises, but even assuming that they were not, the tariffs are disproportionate and not intended to address the declared emergency. This improper purpose and absence of any legitimate justification demonstrates that the Orders are an irrational abuse of power that shocks the conscience, such that they could not be justified by any level of process.

110.   As a result of Defendants' actions, Plaintiff-Intervenor's members' Fifth Amendment right to due process has been violated. Defendants' violation of due process has caused Plaintiff-Intervenor's members to suffer ongoing and irreparable harm.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU        37

## REQUEST FOR RELIEF

Plaintiff-Intervenor respectfully requests that the Court:

111.   Declare the Canada Orders as unconstitutional as violative of: the Separation of Powers; Article I, Article VI, and the Fifth Amendment to the U.S. Constitution.

112.   Immediately enjoin implementation of the Canada Orders pending hearing and consideration on a motion for preliminary injunction and permanent injunction.

113.   Preliminarily, then permanently, enjoin implementation of the Canada Orders.

114.   Declare that tariffs cannot be imposed on cross-border transactions at all Montana ports of entry.

115.   Award to Plaintiff-Intervenor the costs of this action and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

116.   Grant such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this _____ day of April, 2025.

LASLOVICH LAW, PLLC


By:_____

**Jesse A. Laslovich**
Attorneys for Plaintiff-Intervenor
Montana Farmers Union


COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF BY MFU         **38**