IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| SUSAN WEBBER; JONATHAN ST. GODDARD; RHONDA MOUNTAIN CHIEF; and DAVID MOUNTAIN CHIEF, | CV 25–26–GF–DLC |
| Plaintiffs, | |
| v. | ORDER |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM in her official capacity; and THE UNITED STATES OF AMERICA, | |
| Defendants. | |

Before the Court is Defendants United States Department of Homeland Security, Kristi Noam in her official capacity, and the United States of America's ("Defendants") Motion to Transfer Jurisdiction to the Court of International Trade. (Doc. 18.) Also pending before this Court are Plaintiffs Susan Webber, Jonathan St. Goddard, Rhonda Mountain Chief, and David Mountain Chief's ("Plaintiffs") Motion for Preliminary and Permanent Injunction (Doc. 3), Defendants' Motion to Stay Proceedings Pending Disposition of Defendants' Motion to Transfer (Doc. 20), and Interested Party Montana Farmers Union's Motion to Intervene (Doc. 31).

1

For the reasons herein, Defendants' Motion to Transfer will be granted and this matter will be transferred to the United States Court of International Trade.

**BACKGROUND**

## I.    Legal Background

### A. The Trading with the Enemies Act, the National Emergencies Act, and the International Emergency Economic Powers Act

In 1917, Congress passed the Trading with the Enemies Act ("TWEA") to "regulate international transactions with enemy powers" following the United States' entry into World War I. Congressional Research Service, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, https://crsreports.congress.gov, R45618 (last accessed April 24, 2025). Congress expanded the reach of the TWEA during the 1930s to permit Presidential declarations of national emergencies in times of peace and to "assume sweeping powers over both domestic and international transactions." *Id.* Presidents employed the TWEA to block international financial transactions, restrict exports, limit foreign direct investment in United States companies, and impose tariffs on imports. *Id.*

In 1976, Congress enacted the National Emergencies Act ("NEA"), codified at 50 U.S.C. §§ 1601–51, which "establish[ed] procedural guidelines for the handling of future emergencies with provision for regular Congressional review."

S. Rep. No. 94-922, at 1 (1976). The NEA includes directives for Presidential declarations of national emergencies with respect to statutes "authorizing the exercise, during the period of national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). The NEA also requires that a declaration of a national emergency be "immediately . . . transmitted to the Congress and published in the Federal Register." 50 U.S.C. § 1621(a).

Thereafter, in 1977, Congress modified the TWEA and enacted the International Emergency Economic Powers Act ("IEEPA") to regulate the President's exercise of emergency economic powers in response to peacetime crises. *Regan v. Wald*, 468 U.S. 222, 227–28 (1984) (citing International Economic Powers Act, Title II, Pub.L. 95–223, 91 Stat. 1626 *et seq*., codified at 50 U.S.C. § 1701 *et seq*.). Congress revised the TWEA so that it only applied during periods of war. *Regan*, 468 U.S. at 227–28. The powers granted to the President under the IEEPA are "essentially the same as" those granted under the TWEA. *Id.*

Though the powers granted under the two Acts are largely the same, the procedures for their exercise differ. *Id.* at 228. For example, the IEEPA requires the President, "in every possible instance," to consult with Congress prior to exercising any authority under the IEEPA, and to report to Congress every six months on the actions taken and any changes to the underlying circumstances. 50

U.S.C. § 1703. Following a declaration of a national emergency, the IEEPA

authorizes the President to, amongst other powers:

> [R]egulate, direct and compel, nullify, void, prevent or
> prohibit, any acquisition, holding, withholding, use,
> transfer, withdrawal, transportation, importation or
> exportation of, or dealing in, or exercising any right,
> power, or privilege with respect to, or transactions
> involving, any property in which any foreign country or
> a national thereof has any interest . . . with respect to
> any property, subject to the jurisdiction of the United
> States[.]

*Id.* § 1702(a)(1)(B). The IEEPA contains several exceptions to this grant of

Presidential authority, including, for example, that the President may not regulate

or prohibit "the importation from any country . . . of any information or

information materials." *Id.* § 1702(b)(1)–(4).

### B. Section 232 of the Trade Expansion Act of 1962

Section 232 of the Trade Expansion Act of 1962, as amended and codified at

19 U.S.C. § 1862, directs the President to "adjust the imports" of articles and their

derivatives that threaten to impair "national security" after receiving a report of an

investigation undertaken by the Secretary of Commerce. Section 232 authorizes the

President to "adopt and carry out a plan of action that allows adjustments of

specific measures, including by increasing import restrictions, in carrying out the

plan over time." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1319 (Fed.

Cir. 2021). Section 232 has been understood to provide Presidential authority "to

undertake a plan of action that includes adjusting tariffs over time," in addition to "authority to undertake a plan of action that includes imposing a tariff indefinitely and removing it at a later time once the President determines that it is no longer necessary." *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1370–71 (Fed. Cir. 2022).

## II.     Factual Background

### A. The President's Executive Orders

On February 1, 2025, the President signed Executive Order 14193, declaring that "the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug-trafficking organizations], other drug and human traffickers, criminals at large, and drugs" had contributed to the drug crisis in the United States. Executive Order 14193 of February 1, 2025, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025). Executive Order 14193 was amended by Section 3 of Executive Order 14197 and further amended by Executive Order 14231 on March 6, 2025 to exempt Canadian goods that qualify for duty-free entry under the United States-Mexico-Canada Agreement. Executive Order 14231 of March 6, 2025, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (March 11, 2025). Executive Order 14193, as amended, declares a national

emergency and invokes authority under the IEEPA to impose, in relevant part, duties on specific goods imported into the United States from Canada.

On April 2, 2025, the President signed Executive Order 14257, declaring a separate national emergency related to trade deficits. Executive Order 14257 of April 2, 2025, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025). Executive Order 14257 was amended and modified on April 8 and April 9, 2025. *See* Executive Order 14266 of April 9, 2025, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*; Executive Order 14259 of April 8, 2025, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025). Executive Order 14257 invokes authority under the IEEPA to impose a 10% duty on most imported goods, to take effect on April 5, 2025. 90 Fed. Reg. 15,045.

**B. The President's Proclamations**

On February 10, 2025, the President issued Proclamations 10896 and 10895 to impose a 25% duty on Canadian steel, aluminum articles, and derivative articles pursuant to Section 232 of the Trade Act of 1962. Proclamation 10896 of February 10, 2025, *Adjusting Imports of Steel into the United States*, 90 Fed. Reg. 10,896

(Feb. 18, 2025); Proclamation 10895 of February 10, 2025, *Adjusting Imports of Aluminum into the United States*, 90 Fed. Reg. 9,807 (Feb. 18, 2025).

### C. Plaintiffs' Case

On April 4, 2025, Plaintiffs Webber and St. Goddard, both of whom are enrolled members of the Blackfeet Tribe, filed a Complaint and a Motion for a Preliminary and Permanent Injunction in the United States District Court for the District of Montana. (Docs. 1, 4.) Plaintiffs filed a First Amended Complaint ("FAC") on April 11, 2025, adding Rhonda and David Mountain Chief as Plaintiffs, both of whom are also enrolled members of the Blackfeet Tribe. (Doc. 15.) Plaintiffs allege that Executive Orders 14193 and 14257, and Proclamations 10896 and 10895 (collectively, the "Canada Orders"), "exceed the President's constitutional and statutory authority," "violate the separation of powers," are "an unconstitutional attempt by the Executive to regulate commerce," and violate Plaintiffs' constitutional rights and the rights afforded to them, as enrolled members of the Blackfeet Tribe, by the Jay Treaty of 1794. (*Id.* ¶ 4.) Though the Orders and Proclamations impact nations other than Canada, Plaintiffs specifically challenge the aspects of the Canada Orders affecting commerce across the Blackfeet Nation on the United States-Canada border. (*Id.* ¶ 3.)

The FAC bring three claims for relief: Count I alleges that the Canada Orders are an "*ultra vires*" Presidential action; Count II alleges that the Canada

Orders constitute an unconstitutional deprivation of procedural due process; and Count III alleges that the Canada Orders are unconstitutionally vague and violate the Due Process Clause of the Fifth Amendment. (*Id.* ¶¶ 137–69.) Plaintiffs seek a temporary restraining order and preliminary and permanent injunction enjoining Sections 2(a), (b), (d), (f), (g), and (h) of Executive Order 14193, as amended, Sections 2, 3(a), (b), (c), (d), (e), and (f), Section 4(a), (b), (c), and (d), of Executive Order 14257, as amended, and Section 14 of Proclamations 10896 and 10895. (Doc. 15 ¶¶ 4, 18.) In the alternative, Plaintiffs seek a declaration that the Executive Branch does not have the authority to impose universal tariffs on the border Tribes and that such tariffs are illegal at cross border ports of entry on historically owned tribal lands, specifically the border crossings at Roosville, Piegan/Carway, and Del Bonita, or, finally, that the Canada Orders do not apply to tribally enrolled members (*Id.* ¶ 18.)

### D. Motion to Transfer

On April 14, 2025, Defendants filed the present Motion to Transfer jurisdiction of this case to the United States Court of International Trade (Doc. 19) and seek to stay this matter pending resolution of the Motion to Transfer (Doc. 20). Plaintiffs oppose the transfer and maintain jurisdiction is proper in this Court. (Doc. 22.) The Motion to Transfer is ripe for ruling.

## LEGAL STANDARD

Federal courts have an obligation to ensure that their actions are "limited to those encompassed within a statutory grant of jurisdiction." *Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites*, 456 U.S. 694, 701 (1982). A plaintiff bears the burden to establish the subject matter jurisdiction of the district court. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Where a civil action is filed and the court finds "there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other court . . . in which the action or appeal could have been brought at the time it was filed." 28 U.S.C. § 1631.Where another court has exclusive jurisdiction over a claim filed in district court, transfer is the appropriate recourse. *See Jan's Helicopter Serv. Inc. v. Fed. Aviation Admin*, 525 F.3d 1299, 1304 (Fed. Cir. 2008).

## DISCUSSION

### I.    Exclusive Jurisdiction of the Court of International Trade

Defendants seek to transfer jurisdiction of this matter to the Court of International Trade, arguing the Trade Court has exclusive jurisdiction over the matters contemplated in the FAC. (Doc. 19 at 26.) In response, Plaintiffs argue this Court has jurisdictional authority to review the Executive Orders and enter a declaratory judgment, the Court of International Trade does not have jurisdiction pursuant to 28 U.S.C. § 1581(i), and public interest requires that this case remain

in the United States District Court for the District of Montana. (Doc. 22 at 3, 7, 12.) Plaintiffs maintain that because this Court has subject matter jurisdiction, it need not reach the issue of transfer. (*Id.* at 6.)

Plaintiffs' argument fails to recognize the exclusivity of the Court of International Trade's jurisdiction over matters falling within its purview. Title 28 U.S.C. § 1581(i)(1)(B) grants the Court of International Trade exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." The Court of International Trade also has exclusive jurisdiction over any civil action arising out of any law "providing for administration and enforcement with respect to the matters referred to in" any preceding provision of Section 1581(i)(1). *Id.* § 1581(i)(1)(D).

By creating a grant of "exclusive" jurisdiction, "Section 1581(i) removes specific actions from the general federal-question jurisdiction of the district courts (under 28 U.S.C. § 1331) and places them in the jurisdiction of the Court of International Trade." *Orleans Int'l, Inc. v. United States*, 334 F.3d 1375, 1378 (Fed. Cir. 2003). And when "faced with conflicts between the broad grants of jurisdiction to the district courts and the grant of exclusive jurisdiction to the Court of International Trade," district courts must "resolve those conflicts by upholding

10

the exclusivity of the Court of International Trade's jurisdiction." *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836 (9th Cir. 2004) (cleaned up). Accordingly, even if this Court were to otherwise have federal question subject matter jurisdiction over this matter, it is nonetheless divested of that jurisdiction if the action "arises out of any law" contemplated by 28 U.S.C. § 1581(i)(1)(B). *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182 (1988).

## II.    Section 232 of the Trade Act of 1962

Defendants maintain that the Court of International Trade's exclusive jurisdiction includes challenges to Presidential proclamations imposing tariffs under Section 232. (Docs. 19 at 28; 25 at 4.) Though Plaintiffs fail to respond to this argument, it appears Defendants are correct. The question of whether the Court of International Trade has jurisdiction over challenges to tariffs enacted pursuant to Section 232 has been addressed favorably by the that Court, *see Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1251 (Ct. Int'l Trade 2020), and the Court of Appeals for the Federal Circuit has confirmed that a challenge to an imposition of tariffs under Section 232 is "clearly cover[ed]" by the Court of International Trade's exclusive jurisdiction, *Transpacific Steel*, 4 F.4th at 1318 n. 5 (citing 28 U.S.C. § 1581(i)).

### III.   The IEEPA

Whether the Court of International Trade has exclusive jurisdiction over challenges to tariffs imposed under the IEEPA appears to be a case of first impression. The parties do not provide, nor is this Court aware of, any prior authority relating directly to the imposition of import surcharges under the IEEPA. In the absence of any known authority, Defendants urge this Court to look to caselaw concerning the IEEPA's predecessor, the TWEA.

Two cases indeed prove instructive. First, in *Cornet Stores v. Morton*, 632 F.2d 96, 97, 99–100 (9th Cir. 1980), the Ninth Circuit unambiguously held that jurisdiction over an import duty enacted pursuant to the TWEA belongs with the Customs Court, the predecessor to the Court of International Trade.[1] Relatedly, in *United States v. Yoshida International, Inc.*, 526 F.2d 560, 584 (C.C.P.A. 1975), the Court of Customs and Patent Appeals, the predecessor to the Court of Appeals for the Federal Circuit, upheld the imposition of an import duty enacted pursuant to Section 5(b) of the TWEA.

In an attempt to distinguish the reach of the TWEA and the tariffs at issue in *Yoshida*, Plaintiffs argue the IEEPA conveyed "upon the President a new set of authorities for use in times of national emergency which are both more limited in

---

[1] By enacting Section 1581(i), Congress "expanded the jurisdiction of the [Court of International Trade] beyond that of the earlier Customs Court." *Earth Island Inst. v. Christopher*, 6 F.3d 648, 651 (9th Cir. 1993).

scope than those of [the TWEA] and subject to procedural limitations." (Doc. 22 at 17.) The IEEPA, however, contains the same operative language as that contained in the TWEA and relied upon by *Yoshida*: "the President may, by means of instructions, licenses, or otherwise . . . investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any . . . importation or exportation of . . . any property." *Compare* 50 U.S.C. § 5(b)(1)(B) *with* 50 U.S.C. § 1702(a)(1)(B).[2] Plaintiffs fail to establish how the limits placed on the IEEPA's grant of authority affect the jurisdiction of the Court of International Trade.

Plaintiffs further argue that because the IEEPA does not explicitly mention tariffs, it cannot provide a jurisdictional basis to transfer this matter to the Court of International Trade. (Doc. 22 at 11–12.) This argument is again foreclosed by *Yoshida*. In that case, after first observing that the TWEA did not specifically "authorize[] or prohibit[] the imposition of a surcharge," the Trade Court continued with its examination of whether the TWEA provided authority for President Nixon's tariffs. *Yoshida*, 526 F.2d at 572–73. Therefore, though neither the TWEA nor the IEEPA specifically mention "tariffs" or "duties," it appears this has no

---

[2] In making this observation, the Court emphasizes that it does not make any findings on the merits of this case and whether the IEEP provides Presidential authority to impose tariffs.

bearing on whether the Court of International Trade has jurisdiction over a challenge to either Acts' authority.

Plaintiffs make several arguments that the Canada orders fall within and are excluded by one of the other grants of jurisdiction contained in Section 1581(i). First, Plaintiffs contend that Section 1581(i)(1)(B) excludes tariffs intended to raise revenue, and "[t]he Administration's own statements give up the ghost." (Doc. 22 at 15.) Specifically, Plaintiffs point to the President's statement that "You're going to see billions of dollars, even trillions of dollars coming into our country very soon in the form of tariffs" and Trade Administration advisor Peter Navarro's comment that tariffs will bring in six billion dollars in trade revenue. (Doc. 22 at 15–16.) Further relying on Treasure Secretary Scott Bessent's statements referring to the trade restrictions as "embargos," Plaintiffs argue that the Court of International Trade is precluded from exercising jurisdiction by Section 1581(i)(3), which provides jurisdiction over laws providing for embargos "for reasons other than the protection of the public health or safety." (Docs. 22 at 7; 36 at 2.)

Notwithstanding statements made by the President and other government officials, Executive Order 14193 was signed, at least in part, to address the "flow of illicit drugs" across the northern border by imposing duties, Executive Order 14257 to "rectify trade practices" and address trade deficits, and Proclamations 10896 and 10895 to impose tariffs on several Canadian products. *See* Executive

Order 14193 of February 1, 2025; Executive order 14257 of April 2, 2025; Proclamation 10896 of February 10, 2025; Proclamation 10895 of February 10, 2025. Plaintiffs' FAC recognizes inasmuch. (*See generally* Doc. 15) (discussing the Canada Orders imposition of tariffs and duties.) Because the Court of International Trade "may be able to hear th[is] case, the prudent thing to do" is to "transfer the case to the [Court of International Trade] so that the [Court of International Trade] can determine the question of its own jurisdiction." *Universal Fruits and Vegetables Corp.*, 370 F.3d at 836–37 (internal quotation and citations omitted).

As a final consideration, while the question of jurisdiction appears to be one of first impression, several similar challenges to the President's authority to enact tariffs under the IEEPA have recently been filed with the Court of International Trade. *See, e.g., Barnes v. United States*, No. 25-003; *V.O.S Selections, Inc. v. Trump*, 25-00066; *State of Oregon et. al. v. Trump*, No. 25-00077. And on April 22, 2025, the Court of International Trade issued an order denying plaintiffs' motion for a preliminary injunction in *V.O.S Selections, Inc.*, a clear exercise of its jurisdiction. *See V.O.S Selections, Inc.*, Doc. 13.

Plaintiffs attempt to distinguish *V.O.S Selections, Inc.* by emphasizing the uniqueness and importance of this case to tribal members in Montana, arguing that that Defendants again fail to explain how this Court lacks jurisdiction. (Doc. 36 at

15

2.) Yet, as discussed extensively above, the question here is not whether this Court has federal question subject matter jurisdiction. The question, rather, is whether the Court of International Trade has *exclusive* subject matter jurisdiction pursuant to Section 1581(i). Because when it does, this Court is divested of its ability to hear and to rule on the matters contained in the FAC. *See K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 183 (1988) (explaining that the district court would have jurisdiction over trademark action; however, the court would be divested of that jurisdiction if action fell within one of several grants of exclusive jurisdiction to the Court of International Trade).

## IV.    Jay Treaty

Lastly, Plaintiffs' claims for relief under the Jay Treaty similarly fall within the jurisdictional purview of the Court of International Trade, which has historically considered similar claims. *See Akins v. Saxbe*, 380 F. Supp. 1210, 1214, 1217 (D. Me. 1974) (holding that a Jay Treaty claim belonged to the jurisdiction of the Customs Court); *United States v. Garrow*, 88 F.2d 318 (C.C.P.A. 1937) (considering appeal of Jay Treaty challenge brought before the Customs Court); *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) (affirming Court of International Trade's dismissal of a Fifth Amendment claim, explaining "the Constitution does not provide a right to import

merchandise under a particular . . . rate of duty, or even afford a protectable

interest to engage in international trade") (quotation marks and citations omitted)).

## V.    Public Interest Considerations

Plaintiffs also argue that the public interest requires this case remain in

Montana and that Plaintiffs not be required to travel to Washington D.C. (Doc. 22

at 12.) Yet the Court of International Trade is a "National Court," meaning it has

nationwide jurisdiction and the authority to sit anywhere in the country. More

critically, the decision of whether to transfer this matter is not a discretionary one;

where, as here, a matter falls within the exclusive jurisdiction of the Court of

International Trade, the district court is divested of its jurisdiction and the matter

*must* be transferred. *K-Mart*, 485 U.S. at 182–83.

### CONCLUSION

The Court concludes that Plaintiffs' challenge to the President's imposition

of tariffs and duties under the IEEPA and Section 232, and the question of whether

Plaintiffs are subject to the import surcharges pursuant to the Jay Treaty, fall

squarely within the exclusive subject matter jurisdiction of the Court of

International Trade. 28 U.S.C. § 1581(i)(1)(B), (D). Therefore, pursuant to Section

1581(i), this Court is divested of its jurisdiction and the case must be transferred.

Consolidating tariff matters with the Court of International Trade ensures a

necessary "degree of uniformity and consistency" throughout the United States.

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994).

Accordingly, for the reasons stated above,

IT IS ORDERED that Defendants' Motion to Transfer to the United States Court of International Trade (Doc. 18) is GRANTED. This case shall be transferred to the United States Court of International Trade pursuant to 28 U.S.C. § 1631.

IT IS FURTHER ORDERED that Defendants' Motion to Stay (Doc. 20) pending resolution of the Motion to Transfer is DENIED AS MOOT.

IT IS FURTHER ORDERED that the hearing set for May 1, 2025, is VACATED.

The Clerk of Court is directed to transfer this case to the Court of International Trade.

DATED this 25th day of April, 2025.

Dana L. Christensen, District Judge
United States District Court